# EXHIBIT F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------x

WANDA WASHINGTON,

      Plaintiff,

            No.: 2:20-cv-05432(JS)(ST)

    v.

GILMAN MANAGEMENT CORP.,
ROBERT RAPHAEL, LEE DEANE,
And JOHN and JANE DOE (said
names being fictitious, the
persons intended being those
who aided and abetted the
unlawful conduct of the
named Defendants),

      Defendants.

-------------------------x

          November 22, 2021
          10:00 a.m.

    Videoconference deposition of LEE DEANE, taken by Plaintiff, pursuant to notice, reported remotely by Hope Menaker, a Shorthand Reporter and Notary Public of the State of New York.

---

REMOTE APPEARANCES:

MADUEGBUNA COOPER LLP
   Attorneys for plaintiff
   30 Wall Street
   8th Floor
   New York, NY 10005
BY:  SAMUEL O. MADUEGBUNA, ESQ.
   sam.m@mcande.com
   WILLIAM COWLES, ESQ.
   wcowles@mcande.com

WILSON ELSER MOSKOWITZ & EDELMAN
   Attorneys for defendants & witness
   150 E. 42nd Street, #23
   New York, NY 10017
BY:  AVIVA STEIN, ESQ.
   Aviva.Stein@wilsonelser.com

PRESENT:
WANDA WASHINGTON

---

STIPULATIONS

    IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that all objections, except as to form, are reserved to the time of trial.

    IT IS FURTHER STIPULATED AND AGREED that the deposition may be signed and sworn to before any officer authorized to administer an oath.

    IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the deposition be waived.

---

    THE COURT REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

    They further acknowledge that in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury.

    The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

    Please indicate your agreement by stating your name and your agreement on the record.

    MR. COWLES:  William Cowles for the Plaintiff, we agree.

    MS. STEIN:  Aviva Stein for the Defendant.  We agree as well.

    THE COURT REPORTER:  Will the witness kindly present his

Deane

government-issued identification by holding it up to the camera for verification.

(Verified.)

LEE DEANE, called as a witness, having been duly sworn, testified as follows:

EXAMINATION

BY MR. COWLES:

Q.   Good morning, Mr. Deane.

A.   Good morning.

Q.   Can you hear me okay?

A.   Yes, I hear you fine.

Q.   Okay.  Could you just please state your full name for the record.

A.   First name, Lee, L-E-E, last name, Deane, D as in David, E-A-N-E.

Q.   And the middle name?

A.   Jonathan, hardly ever used.

Q.   Okay.  Thank you for being here this morning.

My name is William Cowles, and I am an attorney at the law firm of Maduegbuna Cooper LLP.  Our law firm represents the Plaintiff in this action, who is Wanda Washington.

And this lawsuit was brought against Gilman Management Corporation, Robert Raphael and yourself, and is filed in the Eastern District of New York, Federal Court, U.S. District Court.

I'm here to ask you some questions today about this lawsuit, and based on your presence here today, I would take it that you are aware of the lawsuit.

A.   Yes, I am.

Q.   I'm going to go through a couple of quick instructions so that we can be efficient with our time and have a clear record.

Do you understand that the oath you gave requires you to tell the truth?

A.   Yes, I do.

Q.   And do you understand if this case would go forward to trial, we have the right to hold you to your answers today that you give us.

You understand that?

Deane

A.   Yes, I do.

Q.   If you don't understand a question, please let me know and I'll repeat it, I'll clarify it or the court reporter can read it back, okay?

A.   Yes.

Q.   If you need to take a break, let me know and we'll take a break, but we ask that if there's a question pending, unless it has to do with privilege and your attorney can instruct you not to answer the question, answer and then we can take a break, okay?

A.   Yes.

Q.   And as we're doing this, the court reporter the only take down one person's remarks at a time.

I'll ask my questions and give you all the time you need to answer; fair enough?

A.   Fair, yes.

Q.   And if I ask a question, and later on you want to clarify or add something to your answer, let me know and I'll give that you opportunity, okay?

A.   Yes.

Q.   And as you're doing, it's necessary to give audible responses.

The court reporter can't picked up shrugs and nods of the head, so please give an audible answer.

Is there any reason you can't go forward with this deposition today?

A.   Can you say that again.

Q.   Is there any reason that you can't go forward with this deposition today?

A.   None whatsoever.

Q.   It appears you're in a room with your attorney, correct?

A.   Yes.

Q.   Do you have any notes or documents in front of you?

A.   I don't, no.

Q.   Are there any notes or documents that are visible to you?

A.   No.

Q.   Okay.  Because we're doing this

9

Deane

remotely, we're not in the same conference room, I'd just ask that -- we want to get your testimony from your memory, not from different notes and things like that, so please don't review or look at any notes or text messages or things like that, okay?

A.    Perfectly fine.

Q.    Have you testified under oath before?

A.    Yes.

Q.    Under what circumstances?

A.    A deposition having to do with a real estate transaction.

Q.    Is that the only time?

A.    To my recollection, yes.

Q.    Have you ever been a defendant in a lawsuit?

A.    Yes.

Q.    What type of lawsuit?

A.    Real estate transaction.

Q.    Any form of employment matter?

A.    No.

Q.    Did the real estate matter have anything to do with discrimination in the

10

Deane

housing context?

A.    None whatsoever.

Q.    Have you ever brought a lawsuit against anyone?

A.    Yes.

Q.    What type of case was it?

A.    Well, this is going back many years, but my recollection was to retrieve money owed to me through business.

Q.    Did that lawsuit go to the point of depositions?

A.    No.  I believe it was -- actually, the venue, I believe, was small claims, so there's no deposition.

Q.    All right.

Did you do anything to prepare for today's deposition?

A.    No.

Q.    Did you review any documents?

A.    Yes.

Q.    What documents did you review?

A.    I reviewed the documents that my attorney presented to me with respect to the formulation of the, I guess, the

11

Deane

lawsuit and your -- I guess you're calling them "interrogatories" if I'm not mistaken, and our response to them.

Q.    The first thing you reviewed, that was a Complaint that was filed in court?

A.    Yes, and the Answer, yes.

MS. STEIN:  He wants to know what you reviewed today.

A.    Oh, today I just reviewed, basically, I don't even have what would be the proper word or name to describe the document.

MS. STEIN:  Well, Answer to Interrogatories.

A.    Yeah, Answer to Interrogatories.

MS. STEIN:  Yeah.  By counsel, I showed him the Answer to Interrogatories so hopefully he could get his verification form signed for you.

BY MR. COWLES:

Q.    Okay.  When you reviewed the interrogatories, did the responses look

12

Deane

accurate?

A.    Yes.

Q.    On your own, outside of the presence of your attorney, did you review any documents in preparation for today?

A.    No.

Q.    I don't know -- I don't want to know what you discussed, but did you prepare with your attorney for today's deposition?

A.    Just had a brief discussion of what I can --

MS. STEIN:  That's it.  All you know is yes.

THE WITNESS:  Okay.  Yes.

BY MR. COWLES:

Q.    How long did that last?

A.    Five minutes.

Q.    Did you have any other prep sessions with your counsel other than that five minutes?

A.    Yes.

Q.    For how long did you talk to counsel, other than the five minutes?

Deane

A.    Another maybe ten to 15 minutes.

Q.    And when was that?

A.    That was via telephone conversation, I believe last week.

Q.    Outside counsel, did you discuss with anyone this lawsuit, what you were going to say today?

A.    No.

Q.    Now, have you read the complaint in this action?

A.    Yes.

Q.    When did you first receive the Complaint?

A.    If memory serves correctly, I would say I think it was a couple of years ago.

Q.    How did you obtain the Complaint?

A.    It was left on my desk when I was employed at Gilman Management.

Q.    When you first received it, did you read it?

A.    Yes.

Q.    After you read it, did you discuss it with anybody?

Deane

A.    No.

Q.    Did you ever discuss it with Mr. Raphael?

A.    No.

Q.    Am I saying his name correctly?

A.    Yeah.  He uses Raphael and Raphael, it's sort of interchangeable.

Q.    Okay.  I have Raphael in my -- stuck in my brain, so that's what I'm going to use.

A.    I recognize him by that.

Q.    Okay, fair enough.
Other than Mr. Raphael, did you discuss the lawsuit with anyone else other than counsel when you first --

A.    No.

Q.    -- received the Complaint?
Since then, have you discussed it with any friends or family or anyone else?

A.    No.

Q.    Now, this is a -- well, let me ask you, Did you understand that in the Complaint Ms. Washington was claiming that she faced discrimination in the workplace?

Deane

A.    I understood the nature of the complaint, yes.

Q.    And did you understand that she was claiming that she was subjected to a hostile work environment at Gilman Management?

A.    Yes, I understood what her complaint was.

Q.    I should have defined this earlier.  One of the defendants is Gilman Management Corporation, and I'm just going to refer to it as "Gilman," if you understand that; fair enough?

A.    Yes, I understand.

Q.    Okay.

A.    Okay.

Q.    Did you understand that Ms. Washington claimed that she was fired from her employment in retaliation for complaining of discrimination?

A.    I understand.

Q.    When you read the Complaint, did you think that the allegations were serious?

Deane

A.    Were serious?

Q.    Yes.

A.    Do you mean, do you want to please define what you mean by "serious" so I can answer truthfully.

Q.    Did you find that the allegation raised issues that would be concerning to most people?

MS. STEIN:  I'm going to object to the form.  You can answer, just referring to you.

A.    I don't -- honestly, I -- if there was truth to it, I would think it would be concerning, yes.

Q.    You didn't find it to be truthful?

A.    No.

Q.    Did you previously work at Gilman?  Did you work at Gilman previously?

MS. STEIN:  Previous to now, did you work there?

A.    Yes, I did.  I mean, my employment with Gilman Management was started in about 2001.

17

Deane

Q.   What was your job title?

A.   I was a building manager.

Q.   Did you ever hold a different title at Gilman?

A.   I called myself a Vice President, but for no other reason but to give myself a little pat on the back.

Q.   Did Mr. Raphael consider you a Vice President?

A.   I have no way of knowing.

Q.   Were you officially known as a Vice President on Gilman e-mails and letterheads?

A.   Yeah, only if I wrote the e-mail.

Q.   Did Mr. Raphael acknowledge that you were a Vice President?

A.   We never had that conversation.

Q.   So it's a title that you gave yourself?

A.   Pretty much, yes.

Q.   Did he ever object to it?

A.   No.

Q.   When did you stop working for Gilman?

18

Deane

A.   Last day of '20.

Q.   So December 31st, 2020, around then?

A.   Correct, yes.

Q.   When you worked at Gilman, did you have a supervisor?

A.   Well, effectively, yes, that would be Robert Raphael.  He was the owner of the company.  Robert Raphael.

Q.   Are you currently employed?

A.   No.

Q.   Do you have any ownership in any type of buildings that you oversee or anything like that?

A.   Well, I am a member and, in some cases, a managing member of certain buildings that are managed by Gilman Management.

Q.   Are those investments that you were a part of while you worked at Gilman?

A.   Yes.

Q.   And do you have any day-to-day managing duties for those buildings or are they purely investment vehicles?

19

Deane

A.   Are you saying now or when I was employed there?

Q.   I'm saying since -- now, since December 31, 2020, to present?

A.   None whatsoever.

Q.   Since you left Gilman, you don't interact with Mr. Raphael to manage these buildings, correct?

A.   No.

Q.   Why did you stop working at Gilman?

A.   A few situations.  This is a good time to leave, owing to my age.

My wife was battling a disease, I could say breast cancer, which was diagnosed in '20, so this seemed like a good time to retire and to attend to my wife's medical needs.

Q.   Did you have any type of -- well, withdrawn.  Let me ask it this way.

What was the relationship like between you and Mr. Raphael when you left Gilman?

A.   I don't really quite understand

20

Deane

the question, so please be more precise, so I can answer precisely.

Q.   Was there any friction between you and Mr. Raphael when you left?

A.   None that I recall.

Q.   All right.  We're going to talk a little bit more about Gilman, but I want to just get a quick background, some background questions.

Do you know who started Gilman Management?

A.   To my knowledge, it was Robert's grandfather.

Q.   Is that Alvin Gilman?

A.   Yes.

Q.   Did you ever know him?

A.   Yes.

Q.   Did you ever work with him?

A.   No.

Q.   Do you know what year Gilman was founded?

A.   Not precisely, no.

Q.   Who owned Gilman in 2018?

A.   To my knowledge, it was Robert

Deane

Raphael.

Q. How did Mr. Raphael become the owner?

A. My recollection is such that he was partners with his uncle, Jeffrey Gilman, until Jeffrey passed away, I believe, in 2007. So they had some arrangement, which, I guess, culminated in him being the sole owner of the company.

Q. So it's fair to say Mr. Raphael did not found Gilman?

A. No, he did not.

Q. He inherited it through his family; is that accurate?

A. I don't know enough to say whether or not he inherited it. I'm not really aware of the details.

Q. Do you know enough to say that Mr. Raphael did not build the company from the ground up?

A. That's fair to say.

Q. Do you think it's fair to say that Mr. Raphael was born with a silver spoon in his mouth?

---

Deane

MS. STEIN: Objection to this question and to form, but you can answer if you have an answer to that.

A. No, I don't believe he had a silver spoon in his mouth.

BY MR. COWLES:

Q. Do you know how much Gilman was worth when Mr. Raphael took over in 2007?

A. I have no way of knowing.

Q. Were you ever shown documents showing profits and revenue of Gilman?

A. Never.

Q. Who would have access to that kind of information?

A. Again, I'm going to say this is based on a guess, a presumption only to -- presumption. That's all I said. Guess and then presumption.

Q. Did you ever have any ownership percentage of Gilman?

A. Never.

Q. Only of buildings managed by Gilman; is that correct?

A. Correct.

---

Deane

Q. What is the day-to-day business of Gilman?

A. Well, basically, Gilman Management is a company that manages the buildings, and, by that, I mean they collect the rent from the tenants. They take care of the day-to-day payers and the properties. They prepare and file the requisite paperwork as required by whatever municipality the property is located in.

They do the banking and they facilitate the distribution, the quarterly distributions to the investors.

Q. And I understand you were an investor, right?

A. Yes.

Q. Did you have family members that were investors as well?

A. Yes.

Q. And which of your family members are investors?

A. My mother.

Q. Is she still an investor?

A. Yes. Technically, yes, because

---

Deane

we -- we reassigned the ownership interests, yes.

Q. The buildings that Gilman manages, are they separately incorporated?

A. Yes. Each and every building either is owned by a corporation or an LLC.

Q. Who manages each of those corporate entities of the buildings?

A. Well, I guess I'll try to make this as concise as possible. Every building is governed by an operating agreement.

Q. Practically speaking, does Mr. Raphael control all of the building corporate entities?

A. What do you mean by "control" so I can answer your question?

Q. Is he the majority shareholder of all the building entities?

A. No.

Q. Does he supervise the day-to-day business of the building entities?

A. Yes.

Q. Do the building entities employ

25

Deane

superintendents?

A. Yes.

Q. Who do those superintendents report to?

A. Managing agents.

Q. Are the managing agents employed by Gilman?

A. Yes.

Q. Do those managing agents report directly to Mr. Raphael?

A. Yes.

Q. Do you know how many buildings in 2018 were under the management of Gilman?

A. It would be a guess if I told you.

Q. Would it be close to a hundred?

A. I think less than that.

Q. I believe I asked you this, but when you worked at Gilman, did you report to Mr. Raphael?

A. Yes.

Q. Did he ever give you formal evaluations of your performance?

A. No.

26

Deane

Q. At the time when you decided to retire, do you know how many employees worked for Gilman and all the building entities together?

A. That would be a guess.

Q. When you retired, how many employees worked directly within Gilman Management Corporation?

A. That would be a guess.

Q. Is it less than ten, more than ten?

A. Again, if a guess is acceptable in this deposition, it would be more than ten.

Q. When you retired, what was the address of Gilman?

A. 55 Water Mill Lane, Great Neck, New York 11021.

Q. When did Gilman move into that 55 Water Mill Lane address?

A. 2008.

Q. What was the business address before 55 Water Mill?

A. 50 Merrick Road, Rockville

27

Deane

Centre, New York.

Q. Is that where Gilman was located when you began working there?

A. No, I was -- actually, I started with Gilman in 2001, and at that time, it was at the basement of the building that we owned and managed at 350 Merrick Road, but also in Rockville Centre, New York.

Q. Ms. Washington, according to the allegations of the Complaint, was terminated in 2018, so a lot of my questions are going to be about 2018, so I'll preface the next question with that.

Do you know in terms of profit how Gilman was doing in 2018?

A. No.

Q. And in 2018, did Mr. Raphael tell you that business was doing worse?

A. No.

Q. Did he tell you he was struggling financially in 2018?

A. No.

Q. In 2018, did Ms. Washington, the Plaintiff in this case, live in a Gilman

28

Deane

property?

A. Yes, to my recollection she did.

Q. And do you have any knowledge of whether Ms. Washington was asked to move out of her Gilman apartment?

A. I don't have a good recollection of that.

Q. Did you have any discussion with Mr. Raphael about the fact that Wanda needed to leave the apartment?

A. No.

Q. Did Mr. Raphael ever tell you in 2018 that Wanda had to move out of her apartment because he was hurting financially and needed the apartment?

A. I never had any conversations with Robert Raphael about her living arrangements at that building and what was behind it.

Q. If Gilman was struggling financially in 2018, is that something that Mr. Raphael would have brought to your attention as Vice President of the business?

29

Deane

A.    No.

Q.    You don't think he would have included you in that?

A.    No.

Q.    Did you notice your investor returns going down in 2018?

A.    They're independent of one another.

Q.    In terms of your background, sir, what educational degrees do you hold?

A.    I have a master's in business administration and I have a BA in economics.

Q.    Where did you earn your BA?

A.    Queens College.

Q.    And where did you earn your MBA?

A.    Pace University.

Q.    Other than those two degrees, do you have any formal management training?

A.    Formal management training, none that I can really say.  I don't have any licenses, per se, with respect to management.

Q.    Including, you know, a weekend

30

Deane

course or any kind of similar, do you have any training with how to run the workplace and oversee employees?

A.    Formal training in that regard, no.

Q.    Can you tell us just briefly about your work history prior to beginning at Gilman in 2000, 2001.

A.    Prior to Gilman, directly prior, I was working as a commercial real estate broker.

Q.    Who was your employer?

A.    I had several of them in that time.  It was about ten years, one of which would be Besen & Associates.  Another one would be Ashkenazy Acquisition Corporation.

Q.    What did you do before you became a real estate broker?

A.    So now we're going back at least -- if you will, give me a moment.

Q.    Sure.

A.    I was pretty much an entrepreneur.

Q.    Were your businesses in real

31

Deane

estate or something else?

A.    Yes, some of it was in real estate.  Some of it included -- I got my entrée, so to speak, into real estate by being involved in hard-money lending.

Q.    How did it come to be that you started to work at Gilman?

A.    I met Robert.  Actually, I met Robert at the building that I listed as a broker, and we both -- we lived in the same community and both knew the same people by virtue of that and also by virtue of the business.  It's a pretty small business.  So we got to know each other and we became friends.

Q.    And did he invite you to join Gilman?

A.    Yes, he did in the sense that I would come in to help to locate new deals.

Q.    And you knew Mr. Raphael.  Did your parents know his parents or any other type of family connections?

A.    None whatsoever, no.

Q.    When you worked in real estate as

32

Deane

a broker for those about ten years, did you manage employees?

A.    No.

Q.    You didn't supervise employees, check their time and attendance, and give them evaluations?

A.    No.

Q.    Did you supervise any employees at Gilman directly?

A.    By default, yes.

Q.    Was there an official supervisor of the employees that you would manage by default?

A.    Official?  No, basically, my -- my job description as manager would be when you're in the course of managing a building, you're interfacing with contractors and supers to make sure that the maintenance is done properly, or any other issue that would come up, you know, with respect to the municipality, whether it was a violation, the property had been insured or any other issue.

Q.    Within the Gilman office then,

Deane

while you're there, what type of employees worked there? What job titles did they hold?

A.    Within the office itself?

Q.    Yes, within the office itself.

A.    Well, you had your -- your group of people that would be there to -- primarily, the primary function would be to collect rents, put the information into the computer system, the master software, do the banking for those rents that were collected.

There was a person there responsible for the payment of the bills to all the contractors, whether it -- or the tax bills to the municipalities or whatever.

And, additionally, there would be someone there to facilitate all the paperwork that had to do, I guess, with the Internal Revenue Service, other tax agencies, or anything that may have come up.

Then in addition to that, you had the managing agents who were not there all the time, but would be coming in back and forth in the back of the office to, I guess, to retrieve messages from their voicemail and deal with whatever issues were pertinent that day.

Q.    So for the 55 Water Mill employees, it sounds like there's managing agents and then there's administrative employees?

A.    Correct.

Q.    Who supervised the managing agents?

A.    That would be Robert Raphael's job.

Q.    Who supervised the administrative employees that worked at 55 Water Mill?

A.    For most of the time that I was there, that would be Donna D'Addario, who was the de facto office manager.

Donna D'Addario, D-A-D-E-R-A-R-I-O [sic]. Donna, D-O-N-N-A, yes.

Q.    I think there's an apostrophe

Deane

after the D.

A.    There is. I left it out. No offense. No offense to Donna.

Q.    Who did Donna report to?

A.    Robert.

Q.    Did Robert ever directly supervise the administrative employees?

A.    Not to my recollection.

Q.    Did he ever directly give them work assignments or particular work?

A.    Work assignments, yes, I do remember. He may just say, you know, pull out somebody in administration and say I need a rent roll for a building or a particular document.

Q.    Was Robert -- Mr. Raphael, was he in the office every day overseeing the work of the administrative employees?

A.    He was there every day, but, again, he did not directly oversee the administration. He -- there was an office manager for that.

Q.    Now, continuing with some of your duties in 2018, were you involved with personnel decisions at Gilman?

A.    No.

Q.    You said no, but I'm just going to go through a list, just to be thorough here.

Did you have any involvement with hiring employees?

A.    No.

Q.    What people were paid?

A.    No.

Q.    What people's duties were?

A.    No.

Q.    Who was promoted?

A.    No.

Q.    Who was reprimanded?

A.    No.

Q.    Who was laid off?

A.    No.

Q.    Who was terminated?

A.    No.

Q.    Who would have been involved with those duties in 2018, if not you?

A.    Robert.

Q.    From 2018 going back five years,

37

Deane

can you tell me if any employees were fired?

A.    I know employees were fired. I just can't discern dates, but it would have -- yeah, it would have to be in that range of time.

Q.    Okay.  In 2018, was Wanda Washington fired?

A.    I believe that was the year, yes, if memory serves correctly.

Q.    Do you know an employee named Manuel -- Manny Lopez?

A.    Yes.

Q.    And when he retired, did he still work at Gilman?

A.    No.

Q.    Do you know why he no longer works at Gilman?

A.    I know there was something having to do with he did something unethical, but that's to the extent of my knowledge.

Q.    What was his position at Gilman?

A.    He was a managing agent.

Q.    Who was the supervisor?

38

Deane

A.    That would be Robert Raphael.

Q.    And this is a race discrimination lawsuit we have here, so, for that purpose, do you know what Manny's -- Manny Lopez's race was?

A.    No.  I believe he's from Puerto Rico, but I'm not sure.

Q.    Did he appear to be Hispanic?

A.    Yes, he appeared to be Hispanic.

Q.    Was Mr. Lopez fired by Robert Raphael?

A.    To my recollection, yes.

Q.    Do you recall it being in the interrogatories that stated that Wanda Washington was the only employee that was terminated within the last five years?

A.    I don't recall that, honestly, that she was the only one.

Q.    Would that be inaccurate to say then, based on your knowledge of Mr. Lopez?

A.    I believe so.  It would be inaccurate if, in fact, Mr. Lopez was fired in that period of time.

Q.    Do you know if Mr. Lopez received

39

Deane

any warnings from Mr. Raphael prior to his termination?

A.    I believe he did.

Q.    Do you know if he received any written reprimands?

A.    I would not know that.

Q.    Do you know an employee by the name of Jose Henrique?

A.    The name sounds familiar.  I'm not sure.  I would imagine he was one of the supers.  I don't know.

Q.    Do you know of a Jose Henrique that filed a lawsuit for a race claim back in 2012?

A.    No.  I really wasn't involved in that side of business, so I couldn't help you.

Q.    Now, other than Wanda Washington, do you know of any other employment lawsuits that have been brought against Gilman?

A.    I don't.

Q.    Do you know of any government agencies that have investigated Gilman for

40

Deane

discrimination?

A.    I don't.

Q.    Do you know any government agencies that have investigated Gilman for housing discrimination?

A.    I don't.

Q.    Are you aware of any tenant complaints about discrimination?

A.    No.

Q.    Is there a way for tenants to complain on the Gilman website?

A.    Yes.

Q.    Is there a portal where a tenant can go on the website and write something and submit it to Gilman with a complaint?

A.    So far as I know, yes.

Q.    And who do those complaints go to?

A.    I'm really not sure, to be honest with you.  I'm trying.  I don't know who actually saw those complaints.

Q.    Okay.  I assume it's not you?

A.    No, definitely not me.

Q.    Were any of those brought to your

41

Deane

attention that tenants were complaining about racial harassment in their apartment complex?

A.    No.

Q.    Now I want to change gears a little bit and ask about your knowledge of state and federal laws involving or prohibiting discrimination in the workplace.

Okay, are you familiar with those?

A.    Well, I know that it's not legal to make any decisions as far as housing or business predicated on one's ethnicity or race.

Q.    How did you learn that?

A.    Well, first of all, I'm a licensed broker in New York, so that's -- it comes part and a parcel with that licensing.  So that extends to management as well.

Q.    Do you agree that discrimination laws like that that apply to tenants or to workplace are designed to protect employees

42

Deane

or tenants from discrimination?

A.    Absolutely.

Q.    And would you agree that that's a good thing?

A.    I agree.

MS. STEIN:  I object to the question.  You can answer that.

A.    It's a good thing.

BY MR. COWLES:

Q.    And are you familiar with state or federal laws that prohibit retaliating against employees if they bring up a complaint of discrimination in the workplace?

A.    Despite no means an expert, but it's, in my mind, it stands to reason that's a good thing anyhow.  We should all have laws like that.

Q.    Would you agree with me that this type of laws protect employees by allowing them to raise complaints without fear of losing their job and their paycheck?

MS. STEIN:  I'm going to object to the form of the question.  You can

43

Deane

answer.

A.    Can you ask that question, please, again.

BY MR. COWLES:

Q.    Would you agree that protections against retaliation in the workplace keep employees safe by allowing them to complain about unlawful discrimination, but not to be retaliated against and lose their paycheck?

MS. STEIN:  My objection stands.  You can answer.

A.    I mean, it's a good thing that there's protection against that, yes.

BY MR. COWLES:

Q.    Have you personally ever experienced discrimination in the workplace?

A.    No.

Q.    Do you believe that discrimination in the workplaces is harmful?

MS. STEIN:  Objection to form, you can answer.

44

Deane

BY MR. COWLES:

Q.    Under certain circumstances, could it cause an employee to experience emotional pain?

MS. STEIN:  Objection to the form.  You can answer if you know.

A.    I wouldn't know.

BY MR. COWLES:

Q.    Well, just, you know, as a practical matter, if someone is discriminated against based on how they are born, whether their race or gender, and they're discriminated against, would that cause the person to experience emotional pain?

MS. STEIN:  I'm going to object to this question because you're asking a hypothetical.  I don't really see that he could answer.  If you have an opinion on it, you can provide your opinion, but other than that, my objection stands.

A.    Okay.  Well, my opinion is that it would not be a good thing if someone was

45

Deane

vilified or held in a bad way solely because of their color of their skin, their ethnicity, their creed or anything, but I have no personal experience with anything to do with that.

Q.   Okay.  Well, just to put it in context, if people came to New York from Europe and people said because of who you are, you can't be a member of our country club or our law firm because of their race, their gender, their ethnicity, that would be painful to be rejected just based on that.

Would you agree with that?

MS. STEIN:  I'm going to object to the form of the question.  It's asking for a hypothetical, but can you provide your opinion on that.

A.   Okay.  Well, my opinion, my personal opinion would -- I'd be -- I would be in agreement with what you just said, although I cannot apply that to any personal experience.

Q.   Did Gilman have any policies

46

Deane

prohibiting discrimination in the workplace?

A.   In what type of policies?  Are you asking written or verbal?

Q.   Let's start with written?

A.   I'm unaware of anything with respect to that, no.

Q.   What about verbal policies prohibiting discrimination?

A.   I will say this, that I've never experienced or saw anything to that effect, so it never came up in my experience.

Q.   Did you ever hear Mr. Raphael announce that there were verbal rules prohibiting discrimination in the workplace?

A.   I never heard any.

Q.   Were there any written rules prohibiting harassment?

A.   I never saw any.

Q.   Were there any verbal rules of that kind?

A.   Again, I never had any experience that would come up.

47

Deane

Q.   Same question for retaliation: Were there any written rules prohibiting retaliation?

A.   Not in my experience.

Q.   Other than your broker training and licensing, did you have any training about workplace discrimination?

A.   Formal training, no.

Q.   Informal training?

A.   Any formal training, you mean?

Q.   Well, informal, I-N?

A.   Oh, informal, I'm sorry, I didn't hear you.

Q.   Yeah.

A.   No, it's just -- it's nothing to do with training.

Q.   What would have caused Gilman to have written policies about discrimination?

MS. STEIN:  I'm going to object to the form.  There's no foundation for this.  If you know, you can answer.

A.   I have absolutely no idea.

BY MR. COWLES:

Q.   Do you think it would have been

48

Deane

expensive for Gilman to write up policies prohibiting discrimination and send them to the employees?

MS. STEIN:  I'm going to let the objection stand.  You can answer if you know.

A.   I have no idea.

BY MR. COWLES:

Q.   Did anyone ever look into providing training to employees on avoiding workplace discrimination?

A.   Not to my recollection.

Q.   Do you have any idea of how much it would cost Gilman to provide that training?

A.   No.

Q.   At Gilman, did employees ever practice what to do upon the result of a fire alarm?

A.   I don't recall.

Q.   Did you ever have any fire alarms that you go outside, go to the exit, those sorts of those things.

Did you ever have that?

49

Deane

A.    I don't recall.

Q.    Have you experienced that in other businesses, you have a fire drill?

A.    Yes.

Q.    And that doesn't take up a lot of time, would you say, to do a fire drill?

A.    Not to my recollection, it does not.

Q.    And it helps keep people safe, right?

A.    Yes.

Q.    When did Wanda Washington start working at Gilman?

A.    I'm not certain, but I do believe she was there before I got there.

Q.    Do you know who hired her?

A.    No.

Q.    Now, I want to go back to -- I'm calling it your business relationship with Mr. Raphael. And I believe you testified you weren't aware of any friction. I'm wondering, did you get into a physical altercation with him in the years before you left?

50

Deane

A.    Did I ever get into a physical altercation with Robert before I left? Yes.

Q.    Was that in about 2018?

A.    Yeah, it's just a guess, and I don't really remember precisely the time.

Q.    Can you tell us what happened?

A.    We just had a disagreement about something having to do with a transaction.

Q.    Did you come to learn that he had stolen money from your mother's investment?

A.    I wouldn't use the word "stolen." It was more about, at that time, what the proper allocation would have been pursuant to a refinance on a property that was undertaken.

Q.    Based on what you told me, it's fair to say that he found out he was shorting your mother?

MS. STEIN: Objection to form. You can answer.

A.    Yes.

BY MR. COWLES:

Q.    Do you think that was dishonest

51

Deane

of him to do?

A.    Yes.

Q.    Were you upset by it?

A.    Yes.

Q.    And in the office in 2018 when you found this out, did you spit on Mr. Raphael?

A.    No.

Q.    Did he throw you into glass picture frames on the wall that had sports jerseys?

I'll ask the question again.

Did he throw you into any glass picture frames on the wall that had sports jerseys signed by players framed?

A.    Without trying to be comical, no, I don't recall what was on the walls, but he didn't throw me. He -- we tussled a little bit.

Q.    And stuff broke?

A.    I think so, yeah, if I remember.

Q.    All right. Did you call for Wanda to call the police?

A.    I don't remember that, no.

52

Deane

Q.    Were you able to get the full money that your mother was owed?

A.    No.

Q.    Did you ever consider suing Mr. Raphael?

A.    No.

Q.    How much money was at issue?

A.    $15,000.

Q.    At the time, would that have been a lot of money for your mother?

A.    Yes.

Q.    Is that money that she used to live on a day-to-day basis for her daily needs?

MS. STEIN: I'm going to object as to relevance and what his mother used the money for, but you can answer.

A.    Not to my knowledge, no, I don't believe so. No.

BY MR. COWLES:

Q.    Do you think that Mr. Raphael is prejudiced?

MS. STEIN: Objection to the question. You can answer.

53

Deane

A.    Absolutely not.

BY MR. COWLES:

Q.    Did you tell Wanda Washington that you thought he was prejudiced?

A.    Never.

Q.    Did you ever tell Wanda Washington that you have so much crap on Mr. Raphael that you could bury him if you wanted to?

A.    I don't recall that conversation.

Q.    Do you have a collection of documents or any type of journal at home that has dishonest misconduct by Mr. Raphael?

A.    None that I recall.

MR. COWLES:  And I'll make this request in writing, but if you have any such documents that go to his honesty and veracity, we're going make a request for that production, and we'll do that through your attorney.

Q.    Did you ever tell Wanda Washington that Mr. Raphael was a narcissistic, prejudiced asshole?

54

Deane

A.    No.

Q.    And that's a very specific statement, would you agree?

A.    It is a very specific statement. Yes, I agree with that.

MS. STEIN:  No, let him ask you a question.

BY MR. COWLES:

Q.    And you don't recall that or it never happened?

A.    Never happened.

Q.    Did you ever hear Mr. Raphael use slurs, racial slurs?

A.    Never.

Q.    Did you ever attend any employee luncheons with Mr. Raphael and Rene Feliciano?

A.    Yes.  Sure.

Q.    And what does Mr. Feliciano do at Gilman?

A.    Super and managing agent.

Q.    Do you know what his race is, for purposes of this lawsuit?

A.    Hispanic.

55

Deane

Q.    Did you ever hear Mr. Raphael refer to Rene Feliciano as spic?

A.    Never.

Q.    Did Wanda Washington refuse to keep coming to the luncheons because Mr. Raphael's conduct was offensive to her?

A.    No.

Q.    Did Mr. Raphael ever temporarily fire Ms. Washington for refusing to come to the luncheons?

A.    I don't recall.

Q.    Has Mr. Raphael ever told you that he was the victim of discrimination from black kids in a movie theater?

I didn't get the answer, sir.

A.    Your screen just came back.  No.

Q.    That's not a story that you're familiar with him telling he was in a movie theater and black children came --

A.    Never heard that story.

MS. STEIN:  Let him finish talking so that the reporter can get it down.

MR. COWLES:  All right.  Does

56

Deane

anyone need a short break?  Madam Court Reporter?  Can we keep going?

(Talking over each other.)

BY MR. COWLES:

Q.    All right.  I'll keep going for a little while.

Now, based on your educational background, sir, it appears you lived in New York your whole life; is that correct?

A.    Yes.

Q.    And have you lived in Long Island or also in the City?

A.    I lived in -- for the first 30 years, I lived in Queens and then Long Island.

Q.    Are you familiar with the different neighborhoods and boroughs that make up New York City?

A.    Absolutely.

Q.    And are Gilman properties located in any specific neighborhoods?

A.    Specific, what do you mean by specific?

Q.    Let me ask it a better way.

57

Deane

Are Gilman buildings concentrated in any specific borough or neighborhood?

MS. STEIN: Objection. Let's start with borough. Can we start with borough?

MR. COWLES: Sure.

A. No.

BY MR. COWLES:

Q. Are they concentrated in any specific neighborhoods?

A. Not really, no.

Q. So does Gilman have properties in all five -- I think it's five -- New York boroughs?

A. No, I was going to bring that up. No, the only borough we don't own in is Staten Island for logistic reasons.

Q. Other than Staten Island, are the properties spread evenly throughout four boroughs?

A. Evenly, no.

Q. So are they concentrated in a certain borough?

A. Not so much one over the other.

58

Deane

They're probably fairly spread out for most the three out of the other four boroughs.

Q. So would that be Brooklyn, Queens, any other boroughs?

A. Yeah, we have them in Brooklyn, Queens, Manhattan and the Bronx.

Q. Now, are Gilman plan apartments in a certain level income? Are they luxury apartments, low income or something else?

A. Middle of the market, primarily.

Q. Does Gilman have Section 8 tenants with Section 8 vouchers?

A. Yes. Yes.

Q. And that would below low-income, correct?

A. Yes.

Q. What percentage of Gilman property tenants have Section 8 vouchers?

A. I don't know.

Q. Is it a small amount or a large amount or something in between?

MS. STEIN: I'm going to object to the form of the question. You can answer.

59

Deane

A. I really don't know.

BY MR. COWLES:

Q. Do you have any sense, based on your knowledge of the buildings and the work with Gilman ledgers, somewhere between 1 percent and 100 percent tenants on Section 8?

A. If I proffered a guess, it would be a guess, so it wouldn't be an accurate answer.

Q. Well, I'm just interested if you can testify, based on your experience at Gilman, what the range would be?

A. It would be shooting from the hip, so I cannot likely guess on things. I like to offer precise answers, so I will answer that question. I don't know.

Q. Is that information available in the Gilman office?

A. I believe so.

Q. Are a majority of Gilman's tenants minorities?

A. I have no way of knowing that.

Q. You don't have any on-the-ground

60

Deane

experience going into the buildings and seeing people in the hallways or anything like that?

A. I have on-the-ground experience, of course.

Q. And when you went to the buildings, did you see mostly minorities or did you see white tenants or something else?

MS. STEIN: I'm going to object. Are you limiting this to his experience in his buildings because you're asking about the whole tenant make-up in all of the buildings.

MR. COWLES: Yes, it seemed like he didn't -- the witness wasn't sure, so I'm trying to narrow it just to what he saw when he went in the buildings.

MS. STEIN: Okay. Fair enough. You can answer.

A. My recollection wouldn't serve one way or the other, and it's impossible for me, based on my experience, to quantify an answer and be precise.

61

Deane

Q.    Do you think that -- withdrawn.

Is this an accurate statement? Most Gilman tenants are white.

MS. STEIN:  Objection to the form.  You can answer.

A.    I have no way of knowing that.

BY MR. COWLES:

Q.    Do you have any awareness of Gilman's reputation as a landlord?

A.    I don't.

Q.    Has anyone ever told you that Gilman is considered a slumlord?

A.    No.

Q.    Have you ever been made aware that local politicians frequently list Gilman as one of the top slumlords in New York City?

A.    No.

Q.    Based on your experience as a New Yorker, do you understand that mostly minorities are forced to live in slumlord buildings?

MS. STEIN:  Objection to the question as to any former state.  You

62

Deane

can answer.

A.    No.

BY MR. COWLES:

Q.    Do you think that Mr. Raphael's reputation, commonly known as a slumlord, shows that he doesn't care about minorities?

MS. STEIN:  Objection to form and objection to foundation.  You can answer.

A.    Well, let me just answer this way:  I'm unaware that Mr. Raphael was commonly referred to as a slumlord.

BY MR. COWLES:

Q.    Does Gilman have apartments that are in rent-stabilization programs?

A.    Yes.

Q.    Do you understand that if capital improvements are made to a building, that a landlord's allowed to raise the price?

A.    Not any longer, really.  The laws changed significantly in 2019.

Q.    In 2018, was that true that if you made capital improvements, that you can

63

Deane

more dramatically increase the price of a rent-stabilized apartment?

A.    That was the law before 2019, correct.

Q.    And landlords had incentive in some cases to improve the buildings so they could obtain more profitable rent.

Is that fair to say?

MS. STEIN:  I object to form. You can answer if you know from your personal experience.

A.    I believe that that was why the laws were created, to make sure that the housing base is kept up for the best possibilities.

Q.    And is it true that landlords would have to submit invoices from contractors to prove that they did the work in order to obtain the increase in the rent price?

MS. STEIN:  I'm going to object to the form of the question.  You can check, it has nothing to do with this case or Gilman, but can you answer

64

Deane

about your personal experience.

A.    Well, we always did everything by the book, and those invoices you referred to would only be brought into question if someone -- if the tenant was looking to see if we did anything ethically and by the law.

Q.    Did Mr. Raphael have practice creating fake invoices to justify rent increases?

A.    None that I know of ever, no.

Q.    Did tenants complain about that?

A.    Not that I know of.

Q.    That is not allowed, correct, to do that?

A.    No, that's not permitted, no.

Q.    And it would be dishonest?

A.    Correct.

Q.    I want to switch gears and talk about some job benefits.

Does Mr. Raphael provide sport tickets to employees like to the Knicks or the Mets?

A.    Yes.

65

Deane

Q.    Did you receive those tickets?

A.    Once in a while I did, yes.

Q.    Did other employees?

A.    Yes.

Q.    Did the managing agent employees receive them?

A.    I believe so, yes.

Q.    Did his administrative employees ever receive tickets from Mr. Raphael?

A.    I'm not sure if they did.

Q.    Did Donna D'Addario receive tickets?

A.    I don't know.

Q.    Do you know if Wanda Washington ever received tickets?

A.    No.

Q.    Was Wanda Washington required to babysit Mr. Raphael's mother's dog?

A.    I don't know if she was required, no.

Q.    Do you know that she did that for Mr. Raphael?

A.    I believe I remember something, yeah.

66

Deane

Q.    Do you know if she was paid extra for that?

A.    I have no idea what their agreement was.

Q.    Was one of Ms. Washington's duties to drive from the office to the bank and back to the office?

A.    We all did that, so it's not just her.  I think so.

Q.    When you say "we all did that," who are you referring to?

A.    Me.  I did it plenty of times myself, as did others.  It's not required. You know, if we were short-staffed, let's say, for whatever reason, if it's bad weather, illness, what have you, whatever, we all pitched in.

Q.    Did you do that on a weekly basis, a monthly basis, or --

A.    You're asking about me?

Q.    Yes, now I'm asking about you.

A.    Whenever it was required.  We were -- you know, we worked as a team, and we basically, you know, took care of one

67

Deane

another.  So what it is, if it was required and we were short-staffed, then it got done.

Q.    Did any employee have that as a daily or a weekly duty to go to the bank?

A.    Not -- I know it was done.  I just do not recall, per se, precisely who the designee was.

Q.    Do you know if the designee was reimbursed for gas?

A.    I wasn't involved in any of that.

Q.    Was there a particular administrative employee that was responsible for picking up office snacks and birthday cakes and things like that?

A.    No, no designee.  No, no one designated person, no.

Q.    So it's not your understanding that that was part of Wanda Washington's job?

A.    No.

Q.    Did she do it for most of everybody in the office?

A.    I have no way of answering that

68

Deane

question.

Q.    In the period 2016 to 2018, what was the office like on a daily basis?

MS. STEIN:  I object to the form. You could answer.

A.    An office, I guess, like any other I ever worked for, nothing special.

Q.    Now, what was your relationship with Wanda Washington like?

A.    I considered her a good friend.

Q.    How often did you interact with her?

A.    From time to time, whenever we were in the office.

Q.    Did you guys ever chill together, tell stories, things like that?

A.    Sure.  Like any two friends would, yes.

Q.    Do you think you ever made any comments or told -- said any jokes that she took offense that you didn't realize that it affected her?

A.    No.

Q.    Did you ever create on paper a

Deane

stress meter about Wanda?

A.    I seem to recall something like that, but, no, I couldn't really expand on it.

Q.    Do you know why you created that?

A.    If I did, it was just purely out of joking around, just as Wanda was also known to joke around about me.

Q.    What did she joke around about you?

A.    Well, she always said I'm Mr. Grumpy, or she would always say something. You know, and she had a nickname for me. My name's Lee, so she would translate that to Leonardo. That would be like her nickname for me. It was just, you know, like a pet name, for lack of a better term.

Q.    Did you ever see Ms. Washington outside of work?

A.    No, other than Christmas parties, no.

Q.    Do you recall putting the chart, the stress meter chart on her desk and then moving it and saying she's off the charts

Deane

when Ms. Washington was stressed out?

A.    No, I don't have any recollection of exactly what happened with that. I really don't.

Q.    Did you ever tell Wanda Washington that she was an angry black woman?

A.    No, no, definitely not.

Q.    Now, that seemed to bring a chuckle to you. What -- what's your reaction to that question?

A.    Because that was really a reference to movie at the time, I believe, Tyler Perry if I'm not mistaken, a movie out. So I think it's Wanda's attempt at twisting something that she had brought up and blaming me for it.

Q.    So what is that phrase? It was used in the office but she brought it up?

A.    It wasn't used in the office. She brought it up.

Q.    And what did she say?

A.    Again, and this is going back years, so I would have to -- it was just

Deane

that reference to a movie that was popular at the time.

Q.    What was the movie?

A.    I think it's called Angry Black Woman or something like that? Tyler Perry, I mean, you can look it up. I think that's the name of the movie.

Q.    And what would Wanda say when she brought it up?

A.    I don't know. I just -- I vaguely remember reference to the movie, so if I was -- if my memory's so good I can remember conversations five or six years ago or whatever, I would pat myself on the back. But I, frankly, do not remember more than what you -- what we just spoke about.

Q.    Did you ever say to Wanda, "Everyone knows you're just an angry black woman"?

A.    No, absolutely --

Q.    Even in jest?

A.    Not even in jest, no.

Q.    Did she call herself an angry black woman?

Deane

A.    I don't recall that as well.

Q.    Did you call her an angry black woman in September 2018 just before she was terminated?

A.    No.

Q.    Do you think that could create a hostile work environment if it did happen for a black person to be called an angry black woman?

MS. STEIN: I'm going to object to the form. You can answer.

A.    No, that's never happened, but if I had to guess, it might.

Q.    Do you know someone named Frankie Washington?

A.    Frank Washington?

Q.    Frank Washington?

A.    Yes.

Q.    Who is that?

A.    That's her ex -- that's Wanda's ex-husband.

Q.    And did he work for Mr. Raphael?

A.    He worked for Gilman as an independent contractor.

73

Deane

Q. Would he come to the office?

A. Many times, yes.

Q. What is his race?

A. Black. African American, to be more precise.

Q. Were there any jokes about Mr. Frank Washington's race that were said in the office that you're aware of?

A. No.

Q. And did Mr. Washington do personal errands for Mr. Raphael's family?

A. Yes.

Q. What kind of personal errands did he do?

A. Well, Frank was always on the road, you know, from building to building, so from time to time, he -- Rob may ask me to do him a favor and pick something up from any store that was near to the building that he was working because we were all the way out on the island and Frank would be in the city on his way home.

Frank lives on the island, so it's a reason on his way home, he would

74

Deane

drive right past the office and he could help Rob out.

Q. Did Mr. Raphael require Frank Washington to pick him and his family up on New Year's Eve at the JFK Airport?

A. I don't know anything about that.

Q. Did people in the office tease Frank Washington and call him an Uncle Tom?

A. Never heard that ever.

Q. Did you hear Mr. Raphael refer to Frank Washington as an Uncle Tom?

A. Never.

Q. Did Mr. Raphael have employees' bathroom trips monitored?

A. I know nothing of that.

Q. Do you know anything about him -- when the women would go to the bathroom and him having someone record how long they spend in the bathroom and write it down on a ledger?

A. No, I don't.

Q. Did he ever have Linda Blumenthal do that?

A. Did he ever have Linda Blumenthal

75

Deane

do what?

Q. Record how long people were in the bathroom in a notebook?

A. I'm unaware of that.

Q. Was Ms. Washington referred to as an errand girl in Gilman Management?

A. I never heard the term used that way.

Q. I'm asking for your opinion. Do you think it's offensive to call a grown professional black woman an errand girl?

MS. STEIN: Objection to the form. You can answer.

A. My personal -- my own opinion? Yeah, I would think that would be offensive.

BY MR. COWLES:

Q. And that could be perceived as discriminatory, if a black woman was called an errand girl, she could take offense?

MS. STEIN: Objection. You're asking for a legal conclusion that he's not equipped to answer.

76

Deane

MR. COWLES: I'm going to ask that counsel not sort of instruct the witness. If you want to object, that's fine, but I'm asking for his personal opinion.

MS. STEIN: If you're asking for his personal opinion, then you can ask him that way in that question. Your question was phrased differently.

A. My personal opinion, yes, that it's offensive to be referred to as an errand person or girl if you were a grown adult, yes.

BY MR. COWLES:

Q. Was Wanda Washington the only black woman in the office when you worked at Gilman?

A. No.

Q. There were other women that were black?

A. Yes.

Q. Who else was black or African American?

A. For a short period of time, we

**77**

Deane

had a woman by the name of Ramona. I don't recall her last name. She was working as a bookkeeper.

Q. How long did Ramona work at Gilman?

A. I don't remember. It wasn't a long time, but, precisely, I don't remember.

Q. Who was her supervisor?

A. Donna D'Addario.

Q. Why does Ramona no longer work at Gilman?

A. Because she basically -- what's the proper term? She basically faked her credentials and her abilities in a resume.

Q. Who discovered that?

A. Well, it just came out by virtue of her inability to perform functions that were required by the position.

Q. Was she terminated from employment at Gilman?

A. I believe so. I'm not precise, but I believe so.

Q. Who made that decision?

**78**

Deane

A. I'm not sure.

Q. What year was she terminated?

A. I don't remember.

Q. Was it recently or ten years ago or something in between?

A. I don't have -- it's a guess, okay, so I'm going preface this by saying that I would say five years ago.

Q. Did that occur at 55 Water Mill?

A. Yes.

Q. Did you ever hear Mr. Raphael say about Wanda, quote, Why are you talking to her? You have to treat them differently?

A. Never.

Q. Did you ever say that about Wanda?

A. Never.

Q. Do you think that the phrase "treat them differently" in this context could refer to African Americans?

A. I have no way of knowing. I don't know what that means in this context.

Q. Well -- and I'm asking for your opinion here -- if you heard someone say

**79**

Deane

you have to -- why are you talking them like that? You have to treat black people differently, would that be offensive to you?

A. If someone came out and categorically stated, Black people need to be treated differently," yes, that could be, in my opinion, considered as being offensive.

Q. Would you agree that sometimes say "them" and everyone knows who they're referencing when they say that based on the context and the attitude and the tone?

MS. STEIN: Objection to the form. You can answer.

A. If you've already been informed as to what the context is, yes, I imagine that could be construed as such, but I never heard the word "them" in the office in my 20 years of working there.

BY MR. COWLES:

Q. Did someone put a sign on Wanda Washington's desk that said, "Don't feed the animal"?

**80**

Deane

A. Never saw that. No.

Q. Would it surprise you if that happened at Gilman?

A. Very surprised.

Q. And in your opinion, would it be offensive to refer to somebody as an animal?

A. In my personal opinion, absolutely, it would be offensive.

Q. And are you aware that there's an ugly history in the United States of comparing minorities to animals?

A. I'm not a history expert when it comes to a that, but I imagine, I guess, there would be.

Q. Could that create a hostile work environment for somebody to have -- be referred to as an animal if they're the only black woman in the office?

MS. STEIN: Objection to the form. You can answer.

A. Again, based on my personal experience, I would find that so, yes.

MR. COWLES: Okay. We've been

81

Deane

going for an hour and a half.  I think we should just take a quick break for everyone, let the court reporter's hands, and we can all stand up and stretch.  If we could do five minutes or so?

MS. STEIN:  Okay.  Sounds good, Will.

(Whereupon, there was a brief recess in the proceedings.)

BY MR. COWLES:

Q.    Mr. Deane, we're going to continue with your deposition.

A.    Okay.

Q.    And I just remind you that you're still under oath.  All right?

A.    Yes, sir.

Q.    In 2018, did Wanda complain to you about discrimination in the workplace?

A.    No.

Q.    Did Wanda send you e-mails in 2018 where she complained about discrimination?

A.    Not to my recollection, no.

82

Deane

Q.    Do you have a work e-mail account at Gilman when you were employed there?

A.    I did, yes.

Q.    Did you check your e-mails on a daily basis?

A.    Hourly basis.

Q.    So you were -- every hour you were checking your e-mails?

A.    Pretty much, yes.

Q.    All right.

MR. COWLES:  I'm going to share my screen and show you a document.

THE WITNESS:  Okay.

MR. COWLES:  I think we can do this.  We can e-mail it around, but that might take some time, and it'd be quicker if I just show it to you.  Just a second.

BY MR. COWLES:

Q.    Mr. Deane, are you able to see the e-mail that I put on?

A.    Yes.

MS. STEIN:  Just for reference, are we going call this Exhibit A for

83

Deane

today?

MR. COWLES:  Well, since we're the plaintiff, I'm going to mark it Exhibit 1.

MS. STEIN:  Okay.

MR. COWLES:  The plaintiffs use numbers.

MS. STEIN:  Yeah, no problem.

(Whereupon, Plaintiff's Exhibit 1 was marked at this time.)

BY MR. COWLES:

Q.    And this is from the Defendants' production.  It doesn't appear to have a Bates number on it, but I believe it's Defendants', some of their production, basically, and this is what it's from in response to our document requests to have this supplemented.

And it's a two-page document, and this is the second page here.

MS. STEIN:  Are you able to read that?

THE WITNESS:  Can you just scroll back to the original one?

84

Deane

(Court reporter requests clarification.)

BY MR. COWLES:

Q.    Yes.  I'm currently showing the witness an e-mail from Wanda Washington dated August 23, 2018 to Lee Deane and this is Plaintiff's Exhibit 1.

A.    The first thing that stands out to me --

MS. STEIN:  He hasn't asked you a question yet.  He just wants you to review it, and then when you're done, tell him, and he'll scroll down to the next page.

THE WITNESS:  Fair enough.

BY MR. COWLES:

Q.    All right, Mr. Deane, have you seen this document before?

A.    Well, that's what I was about to say.  I don't recall it, but the interesting thing is that the "To" address is not my e-mail address.  It seemingly went to the cloud because my e-mail was Lee@gilmanmanagement.com.

85

Deane

What I'm reading here says leedeane@me.com. If I'm not mistaken, that means it went into the cloud, so I'm not sure I saw this.

Q.   Can you explain a little more what you mean by "cloud"?

A.   Okay. So -- and I'm not an expert -- but my knowledge is such that when you have your name at me.com, it's Apple's way of -- or there's an assigned e-mail where the e-mail goes into the cloud.

The cloud is, I guess, a repository, for lack of a better term, of information and e-mails that had are held by Apple.

Q.   So you don't have any recollection of --

A.   I don't. I'm telling you the truth, I do not.

Q.   Mr. Deane, I want to draw your attention to the e-mail at the bottom, the "From" line is Wanda Washington, and the date is August 23rd, 2018. And it says

86

Deane

it's to leedeane@me.com.

Have you seen that e-mail before?

A.   This one?

Q.   Yes.

A.   Let me read it.

Q.   Go ahead.

A.   I don't recall seeing this.

Q.   And would this leedeane@me.com have gone into the inbox of Gilman Management?

A.   No. That's the point I'm trying to make here, that, no, it should have gone to lee@gilmanmanagement.com.

Q.   Do you know why the "To" line appears auto-populated with your name from this e-mail address?

A.   I really don't, no.

Q.   Does Gilman use Outlook as an e-mail software?

A.   Yeah, I think so.

Q.   And if you begin writing to a name, does Outlook auto-populate different e-mail addresses for people?

A.   Yes, within the office it does.

87

Deane

Yes, that, I do recall, uh-huh.

Q.   Do you know why Wanda Washington would have had this leedeane@me.com address?

A.   No.

Q.   Did you ever look at e-mails from this address?

A.   I don't recall that I did. I mean, again, my recollection serves that every e-mail that I received was an e-mail sent to my e-mail address, lee@gilmanmanagement.com.

Q.   All right, we're done with Exhibit 1, and I'm now showing the witness Plaintiff's Exhibit 2.

(Whereupon, Plaintiff's Exhibit 2 was marked at this time.)

BY MR. COWLES:

Q.   This is from defendants.

Actually, let me go back to Exhibit 1.

A.   Okay.

Q.   All right. I'm sorry. Never mind.

88

Deane

So I'm now showing the witness Plaintiff's Exhibit 2. This is from Defendants' production, and it's Bates marked Lee Deane 001277. It's a one-page document.

So if you could look at the document and tell me when you're done reviewing it?

A.   Okay, I just read it.

Q.   Now, this is an e-mail produced by the Defendants, and it says that it's from Wanda Washington, dated October 2, 2018, to Lee Deane. And your name is capital and lower case.

Do you see that?

A.   Capital and lower case -- yes. I don't have my glasses. Yes, I see it okay.

BY MR. COWLES:

Q.   Did you receive this e-mail from Wanda Washington?

A.   I don't remember it.

Q.   Was October 2, 2018, a few days before she was terminated?

A.   I don't remember precisely when

89

Deane

she was terminated.

Q.    Did you discuss this e-mail with Robert Raphael?

A.    No.

Q.    After reading it, did you do anything?

A.    No.

Q.    If you had received this e-mail in your inbox, would you have read it?

A.    Yes.

Q.    Okay.  Would you have discussed it with Robert Raphael?

A.    No.

Q.    Why not?

A.    Because it was really my concern. However, if she had issues with anyone and if she had issues with Robert, it would be between her and Robert, not between myself and Wanda.

Q.    As Vice President, you didn't feel you had an obligation to bring up a complaint of discrimination to Mr. Raphael's attention?

MS. STEIN:  I'm just going to

90

Deane

object to the form.  You can --

A.    Well, first of all, let's remind ourselves that I'm a self-appointed Vice President, and as to that, I don't know what kind of position that really points to or what my responsibilities were, but, no, I did not involve myself in everything that happened in that office on a day-to-day.  I had my own work to do, my own obligations and my own responsibilities.

Q.    So is it your testimony that since you self-appointed yourself Vice President, you're not sure what your duties were?

A.    No, I didn't say that.  I said, I'm not -- let me be very precise here.  I used the word "Vice President" because I gave myself a title.  We went over that earlier.

My responsibilities in the company were very, very laid out and defined.  I was a managing agent overseeing the day-to-day operations of the properties that were under my purview, and that is it

91

Deane

with respect to the management.

With respect to other things, my other function was to source out new deals to invest in and then discuss them with Rob at the appropriate time.

Q.    Now, if your attorneys in this case produced this e-mail from your Gilman inbox, do you have any doubt that you would have read this e-mail?

A.    It's not about doubt; it's about recollection.  I don't recall seeing it and I don't recall reading it.

Q.    And you're telling us today that even if you had read it, it's not your business and you wouldn't have discussed with Mr. Raphael?

A.    That's correct because my responsibilities did not include the management, day-to-day management of the management company in and of itself.

Q.    If you did read this e-mail, Wanda writes, quote, What do we have? Nobody gave us a dollar.  Is it because our skin color and religion make us

92

Deane

meaningless?  We are living on the poverty level, end quote.

If you read that from Ms. Washington, would you have spoken with her about the concerns that she raised?

A.    No, not necessarily, I would not.

Q.    Why not?

A.    If I'm going to offer my opinion based on what I'm seeing here now, I think it's baseless.  I mean, she had her job. It was very, very readily transparent.  You get hired to do a job, you get paid X, Y and Z.  The fact that other people are making money, more or less, is irrelevant to her.

We were investors and the money we made or lost was predicated on our ability to find good investment vehicles, which had absolutely nothing to do with anyone else other than the investors directly involved in the investment.

Q.    All right.  Earlier, you told us that Wanda was your friend, so as a friend, wouldn't you have wanted to put her mind at

93

Deane

ease and address her complaints about treatment based on skin color and religion?

A.    Yeah.  You know, you make a point there, but it's not like I never did that. Wanda had a propensity to complain quite a bit, you know, about things.  She -- she was not in the best of moods on many occasions.  She picked fights, and you want to know the truth, recollection now serves me as I'm thinking more about it, the only time anything in my recollection was ever brought out in the office having to do with race came out of her very own mouth, and this had to do with she had a very, very bad relation experience with that other lady, Ramona, who we discussed before. They were going at each other's throats like two caged dogs, for lack of a better term.  Yeah, and I'm telling you that that's probably the only time I ever heard of any reference made with respect to race. And that came out of Wanda.

Q.    All right.  We talked about Ramona before, but you didn't include that,

94

Deane

correct?

A.    We spoke about Ramona, yes.

Q.    Yeah, but you didn't raise the fact that so many of the people that talked about Ramona and Wanda --

A.    Can you say that again so I can answer you?

Q.    When you raised Ramona as the other black woman in the office --

A.    Right.

Q.    -- in the first place, you didn't tell me that Wanda and her fought like dogs.

A.    No, I just -- I figured that the opportunity would present itself later on in the deposition.

Q.    Okay.  And then we took a ten-minute break, right?

A.    Right.

Q.    And during that break, did anyone tell you to say that Wanda and the other black woman fought in the office?

A.    No, I just --

MS. STEIN:  Objection.  You can

95

Deane

answer.

A.    -- okay.  I knew that from the get-go.

BY MR. COWLES:

Q.    And did you know that Ramona only worked at Gilman for about two months?

A.    I remember it was a short period of time, but as I said before, I don't recall precisely how long.

Q.    So it was very, very short.

A.    It was short, yes.

Q.    But despite the fact that now you say after our break Wanda that complained a lot, she was in a bad mood, she picked fights and was the only one to bring up race, you had told us before that you considered her a friend, right?

A.    Yeah, I could be friendly with somebody even if they don't do things in an appropriate manner.  I don't think one has anything to do with another.  No one's perfect.

Q.    Right.  Did you ever sit down with her, one on one, to talk about these

96

Deane

issues?

A.    I had a lot of conversations with Wanda, yes.  I never feel good to see someone upset or angry.

Q.    So were those conversations to console her or was it to reprimand her or something else?

A.    No.  You know what?  We had a great relationship, and I think a lot of Wanda's upset had to do with the divorce of her husband, Frank Washington.

MS. STEIN:  Objection.  He's asking you about when you guys talked, did you talk to her to console her?

A.    Yes, it was consolation and -- and advice.

BY MR. COWLES:

Q.    And when did their divorce occur?

A.    I don't remember exactly.  I really don't.

MR. COWLES:  I'm going stop sharing my screen.

BY MR. COWLES:

Q.    Does Gilman have employee

97

Deane

personnel files?

A.    I'm not sure.

Q.    Do you know if Gilman had a personnel file for you?

A.    I don't know.

Q.    At the other places that you've worked before in your career, did they have personnel files?

A.    No.

Q.    When you hire someone, there's paperwork, right?

A.    Yes.

Q.    You have to submit to the government.

And would you say that most employers have to keep a record of someone's employment?

MS. STEIN:  Objection.  You can answer if you know.

A.    I guess it makes sense to, but please remember that as a broker, I was an independent contractor for a long time, so I'm not sure if what you're saying applies to my experience.

98

Deane

BY MR. COWLES:

Q.    Just to be clear:  Gilman -- you have no knowledge about whether personnel or human resource files were kept for each employee?

A.    I have no personal knowledge to that effect, no.

Q.    Do you know if Wanda Washington had a personnel file at Gilman?

A.    No.

Q.    I'm sorry, I didn't hear your response?

A.    No, I don't have any recollection or knowledge, anything, no.

Q.    Does Gilman have any employee handbooks or manuals?

A.    Not that I'm aware of.

Q.    Does it have any written rules that apply to employees?

A.    I'm not sure that it does or doesn't.  I don't know.

Q.    And if Gilman, when you worked there, had rules that were for employees, would you be aware of that fact?

99

Deane

A.    Not necessarily.

Q.    How did employees know how to conduct themselves?  If there's no written -- no rules?

MS. STEIN:  Objection to form.  You can answer.

A.    I couldn't even answer that question, I don't know.

BY MR. COWLES:

Q.    Did Gilman have written rules about vacation time?

A.    Yes, I believe so.

Q.    And were employees required to submit a vacation request form to their supervisor?

A.    Yes, including myself.  I actually fill out a form, send it to the office manager requesting a certain date, a timeframe when I was planning to go on vacation.

Q.    Throughout your employment, you complied with that form?

A.    As far as I remember, yes.

Q.    And did you give it to Donna

100

Deane

D'Addario?

A.    Yes.  Yes, I did.

Q.    What did she do with the form?

A.    I guess just made the proper notations.

Q.    Do you know if she saved them anywhere?

A.    I don't remember.

Q.    Did Gilman, when you worked there, have any system for ensuring that its employees behaved appropriately?

MS. STEIN:  Objection to the question.  You can answer.

A.    I'm unaware of any system.

BY MR. COWLES:

Q.    Did Gilman have a policy of documenting employee reprimands?

A.    I'm unaware of that.

Q.    Did Gilman have a policy of using what's called "progressive discipline"?

A.    What is progressive discipline?

Q.    I'll ask you.  Are you familiar with that term?

A.    No.

101

Deane

Q. If I defined "progressive discipline" as a policy or practice where an employee is warned of misconduct and given notice of misconduct so they could change it, and it may start with a verbal warning, a written warning, and it could lead up to more severe reprimands like suspension or other things like that before termination, so ratcheting up of discipline before termination.

Are you familiar with that concept?

A. I understand what the concept is. I never saw it implemented in the office.

Q. Gilman used what are called "disciplinary action forms."

A. Are you asking me, did they?

Q. Yes.

A. I never saw anything like that.

Q. You've never seen a document at Gilman that was titled "Disciplinary Action Form"?

A. No.

Q. Have you ever seen any type of

102

Deane

form at Gilman that's called a "written reprimand"?

A. No.

Q. Did Gilman document employee misconduct and advise the employee of what occurred?

A. I have no knowledge to that effect.

Q. Did you have any involvement at all in dealing with like issuing reprimands, whether verbal or written, to employees?

MS. STEIN: Object to the form. He's already testified, but you can answer.

A. No.

BY MR. COWLES:

Q. Now, do you think that if an employee does something wrong, they should be told and given a chance to change their behavior?

MS. STEIN: I'm going to object to this question. You can answer.

A. My personal opinion would be yes.

103

Deane

BY MR. COWLES:

Q. And it's just a very basic principle: Employees who work should be paid.

MS. STEIN: Objection. You can answer.

A. Yes.

BY MR. COWLES:

Q. And if an employee does something wrong, they should be told by an employer, so they can correct their behavior and continue to earn a paycheck.

Do you agree with that?

A. Will you ask about it again so I can answer proper?

MR. COWLES: Could you just read that back so we have it back, please.

(The question requested was read back by the reporter.)

A. My personal experience, my personal opinion, yeah, I would agree to that. Yeah, but that's just my own opinion.

BY MR. COWLES:

104

Deane

Q. If you were dealing with a subordinates employed at Gilman, is that what you would have applied in such a situation, where the employee did something incorrect?

A. If I was ever given the opportunity or put in a position like that, yes, I would have given a talk to the subordinate and give them a chance to change.

Q. Were you ever put in that position at Gilman?

A. No.

Q. You never had to speak to a building supervisor to correct how they were doing their work or their behavior?

A. My conversations with correcting behavior really had more to do with outside contractors, which is, really, I interfaced with them the most. Almost exclusively.

Q. If a contractor, even if a contractor had done something incorrectly, would you advise them of that before doing something harsher?

105

Deane

MS. STEIN:  Objection to form. You can answer.

A.    Yeah, we would discuss the situation at hand, of course.

BY MR. COWLES:

Q.    Should an employee be allowed to complain about discrimination in the workplace without experiencing retaliation?

MS. STEIN:  I'm going to object to this question.  Are you asking about Gilman?  Are you asking about his opinion in any workplace?

MR. COWLES:  Well, no, I'm just stating a question.  If counsel wants to object, that's fine.

MS. STEIN:  I'm objecting to your question.  You're asking for a legal conclusion.  You can answer.

A.    Can you ask the question again, please.

BY MR. COWLES:

Q.    Should an employee be allowed to complain about discrimination in their workplace without fear of retaliation?

106

Deane

MS. STEIN:  Same objection stands.

A.    If such a situation existed, then, yes, I do believe that they should be able to complain without fear of retaliation.

Q.    Should employers take complaints of discrimination seriously?

MS. STEIN:  The same objection. Go ahead.

A.    My own personal opinion again, yes, they should be taken seriously if it does, in fact, exist.

BY MR. COWLES:

Q.    Would you agree that the employer's decision can have a big impact on an employee's livelihood?

MS. STEIN:  Will, you cut out. Can you say that again?

BY MR. COWLES:

Q.    Would you agree that an employer's decisions can have a big impact on employees' lives and livelihoods?

MS. STEIN:  I'm objecting to this

107

Deane

question based on the same basis.  You can answer.

A.    Yes, I believe, personally speaking, not based on anything I've ever seen, that, yes, that could be detrimental to an employee.

BY MR. COWLES:

Q.    Basically, what we've talked about -- based on what we've talked about with prior notice to employees about their behavior, do you think employee -- employer personnel decisions should be planned in advance?

A.    You cut out a little bit.  Can you say that again.

Q.    Should an employer personnel decisions be planned out in advance?

MS. STEIN:  Objection to this question.  You can answer, though.

A.    I really don't understand the question.  Sorry.

BY MR. COWLES:

Q.    Well, let's say, that if an employee's livelihood and paycheck are on

108

Deane

the line, do you think it's the best practice for an employer to document and plan out drastic personnel decisions before making them?

MS. STEIN:  I'm going to object to this question as prejudicial and form.  You can answer your own personal opinion.

A.    Purely based on a hypothetical situation, I imagine yes.

BY MR. COWLES:

Q.    Did you have any involvement with Wanda Washington's termination?

A.    No.

Q.    Do you know who made the decision?

A.    That would be hearsay.  I would say Robert, but purely based on hearsay.

Q.    And hearsay, your attorney can instruct you, the Court can deal with that, but for purposes of just kind of gathering information about what you know, who did you hear this --

A.    I really don't remember the first

109

Deane

person who told me.

Q.    Was there a second person or anybody you remember?

A.    No, I just think that honestly it was we received the news collectively. We're a small office. You know, it's not hard to figure out when somebody's not sitting at their desk.

Q.    Did you find out about the termination after it occurred?

A.    Yes, after.

Q.    Do you know who you first heard it from?

A.    I don't remember.

Q.    Did you ever discuss it with Mr. Raphael?

A.    No.

Q.    Did you discuss it with anyone else in the office?

A.    I don't remember.

Q.    Did anyone tell you why she was terminated?

A.    I'm sorry? Say that again?

Q.    Did anyone tell you why

110

Deane

Ms. Washington was terminated?

A.    No.

Q.    Did you hear the question? Can you hear me now?

A.    Now I hear you.

Q.    Do you know why Wanda Washington was terminated?

MS. STEIN:  He answered that. He said no. You can answer again.

A.    No.

BY MR. COWLES:

Q.    Did you ever ask anybody?

A.    No.

Q.    You weren't curious?

A.    I was curious, but I didn't involve myself in that situation.

Q.    At the time she was terminated, you worked for Gilman, right?

A.    Yes.

Q.    You saw she wasn't at her desk?

A.    Yes.

Q.    It was a small office?

A.    Yes.

Q.    People were friends in the

111

Deane

office.

MS. STEIN:  Objection to form. Is that a question?

MR. COWLES:  Yes it's a question.

BY MR. COWLES:

Q.    People were friends in the office. People were cordial.

A.    I wouldn't say friends.

Q.    But you didn't actually --

How long did Wanda work at Gilman before she was terminated?

A.    How long did she work there? Is that your question?

Q.    Yes.

A.    At least I'm thinking 20 years.

Q.    And based on all that, why didn't you ask anyone why she was terminated?

A.    Well, okay, because I form my own conclusions. I saw the handwriting on the wall, if you will. So I didn't think it was necessary for me to go around talking about it or asking questions about it.

Q.    What was the handwriting on the wall?

112

Deane

A.    Wanda's general belligerent attitude, constant complaining, poor work ethic, poor work skills.

Q.    Did you suggest that Ms. Washington be terminated?

A.    No.

Q.    Did you discuss it with anybody?

A.    No.

Q.    Have you ever documented in any of the opinions you just told me about her belligerent attitude, poor work ethic, or work skills?

A.    That was my own conclusion, my own opinion.

Q.    And you kept that opinion to yourself. Is that what you're saying?

A.    Yes.

Q.    You never shared it with Wanda?

A.    No, that's not what I said. I did share it with Wanda.

Q.    Okay. When did you share with her?

A.    Well, we had conversations where I asked her to please relax a little bit,

113

Deane

and there's better ways of handling things than attacking people and constantly complaining about co-workers, what they say and what they did. Myself included.

Q. What was the time period of these conversations?

A. Precisely, I can't tell you, but I would -- in the last few years.

Q. So if she was terminated in October 2018, when was the last time you talked to her about your concerns?

A. I don't remember, precisely.

Q. Was anyone else present?

A. No.

Q. Where did the conversations occur?

A. Typically, in my office.

Q. Who had initiated the last conversation that you had?

A. I don't remember.

Q. Is it possible that she walked in the office and you guys were just talking as friends or was it things came up?

A. That's very possible, yes.

114

Deane

Q. Did you ever ask Mr. Raphael why he terminated Wanda?

A. I don't remember if I ever really did ask. I don't remember.

Q. Since the lawsuit was filed, did he tell you why Wanda was terminated?

A. We haven't spoken about it, no.

Q. I just want to switch gears here and ask you about a couple of employees.

In 2018 -- my questions are all in 2018 -- did you know Nelson Colon? Colon, C-O-L-O-N.

A. Yes.

Q. Did he work at Gilman?

A. Yes.

Q. What was his race?

A. He's from Puerto Rico, so he's Hispanic.

Q. What was his job title?

A. Building manager.

Q. Who supervised him?

A. Robert and Brian Teppel.

Q. What was Brian Teppel's job title?

115

Deane

A. I think he could called himself Vice President also, if I'm not mistaken.

Q. What is -- is it T-E-P-P-E-L?

A. Yes.

Q. What did -- what was Mr. Teppel's race?

A. White.

Q. Did Mr. Teppel have involvement with employee personnel decisions?

A. I really don't know.

Q. Did you ever discuss -- sorry.

Did you ever discuss Wanda Washington's termination with Mr. Teppel?

A. Not to my recollection.

Q. Who is Donna Daniel?

A. Donna Daniel, I believe is a woman who's employed by the Raphael family as a caretaker.

Q. Does she work at the 55 Water Mill Lane office?

A. No.

Q. And have you met her?

A. Yes, many times.

Q. Where did you meet her?

116

Deane

A. She sometimes would come to the office for something or I would see her at Rob's home.

Q. What is her race?

A. She's from Grenada, so I imagine she's African American.

Q. Did she appear to be black to you?

A. Yes. Yes.

Q. And do you know Isaac Daniel?

A. Isaac -- no.

Q. What about Isaac Varghese?

A. Oh, Varghese, yes.

Q. Varghese?

A. Yes, I know who you're talking about now. Yes, I did.

Q. It's spelled V-A-R-G-H-E-S-E.

A. Yes.

Q. Did Isaac work at Gilman?

A. Yes.

Q. What was his job title?

A. He was involved in the bookkeeping side.

Q. Do you know what his race was?

117

Deane

A.    He was from India.

Q.    And, before, we talked about Rene, which is spelled R-E-N-E, Feliciano, and he was a property manager?

A.    And a super.

Q.    Do you know someone named Winston King?

A.    Winston King?  Yes.

Q.    Who is he?

A.    Winston -- we're losing connection.

MS. STEIN:  Can you hear us fairly well?

MR. COWLES:  I can hear you.

MS. STEIN:  Okay, go ahead.

A.    Please repeat the question.

BY MR. COWLES:

Q.    How do you know Winston King?

A.    How do I know him?

Q.    Yes.

A.    Winston was a Building Manager working at Gilman Management.

Q.    And what does his race appear to be to you?

118

Deane

A.    Well, I know he comes from St. Vincent, so I guess he's also Caribbean African, Caribbean American, however the proper phraseology is.

Q.    Does he still work at Gilman?

A.    To my knowledge, he does, yes.

Q.    And who is Marilyn Kumar, K-U-M-A-R?

A.    Marilyn succeeded Donna D'Addario in terms of on-site office manager.

Q.    In 2018, what was Ms. Kumar's job title?

A.    I really don't know what her job title was, but she acted -- well, it appeared that she's acting in the capacity of an office manager.

Q.    What is Ms. Kumar's race in your perspective?

A.    Marilyn is from Guyana, so I don't know, you know.  Hard to say.

Q.    Do you know someone named Susan Pomerantz?

A.    Yes, I do.

Q.    And does she work at Gilman?

119

Deane

A.    No.

Q.    Who is she?

A.    Robert Raphael's mom.

Q.    Was she on the payroll at Gilman?

A.    I have no way of knowing that.

Q.    And is Michelle Raphael Mr. Raphael's wife?

A.    Yes.

Q.    Was she on the payroll?

A.    I have no way of knowing that.

Q.    And do you know Anna Varghese?

A.    Anna Varghese, yes.

Q.    Did she work at Gilman?

A.    Yes, she did.

Q.    In 2018, what was her job title?

A.    Administrative.  I don't know what the title was, but her function was administrative.

Q.    What did her race appear to be?

A.    She was Isaac's daughter also, by default, Indian.

Q.    Does Gilman provide loans to employees?

A.    I have no way of knowing that.

120

Deane

Q.    You've never heard that Gilman gives employee loans?

A.    Well, I never took a loan out, so I can only speak for myself.

Q.    And, again, it's a small office, people talk, people are friends, you never heard anyone talking about it?

A.    Right.  I mean, that's something very personal, so as small as the office is, it would not be discussed openly, no.

Q.    Do you know of an account called a Kedem account, spelled K-E-D-E-M?

A.    No.

Q.    Have you ever heard of any 401(k) or any kind of savings account called a Kedem account?

A.    No.

Q.    Do you think that, in your opinion, an employer would give a interest-free loan to a bad employee?

MS. STEIN:  Objection to everything about the question.  Go ahead.  You can answer.

A.    I have no way of answering that.

121

Deane

I guess it depends on the situation.

BY MR. COWLES:

Q. Well, let's say, you started a business next week, you hired some people, would you give a terrible employee a personal loan interest-free?

A. I wouldn't give a loan, period. That's me. That's my opinion.

Q. All right. For purposes of the question, if you were giving loans, would you give it to the good employees or would you give it to a bad employee?

MS. STEIN: Objection. This is hypothetical and has nothing to do with this case, if he says he doesn't do loans, but you can answer.

A. If I ever had an employee and if I ever thought about giving them a loan, I probably wouldn't give them a loan if they were a bad employee, no.

Q. Should bad employees be rewarded?

MS. STEIN: Objection to the question. Go ahead.

A. Personally speaking, no.

122

Deane

BY MR. COWLES:

Q. Now, have you met Wanda Washington's daughter?

A. Yes.

Q. What's her name?

A. Whitnee.

Q. And was she married a few years ago?

A. Yes.

Q. Did you attend the wedding?

A. No.

Q. Were you invited to the wedding?

A. No.

Q. Did you give a wedding gift to Whitnee Washington?

A. Yes.

Q. And what was the gift?

A. I believe it was $200.

Q. And when is the last time you saw the check or a copy of that check?

A. I don't remember.

Q. Have you looked at the -- a copy of the check recently?

A. No.

123

Deane

Q. Was it a personal check?

A. I think it was.

Q. Did anyone recently ask you for a copy of the check?

A. No.

Q. When you wrote the check, did you give a copy of it to anyone at the Gilman office?

A. When I wrote the check, no.

Q. No. Would there be any reason for anyone at Gilman to have a copy of the check?

A. After the fact?

Q. Yes, after.

A. Yes, absolutely. Yes, absolutely there would be a reason.

Q. All right, but it was your testimony that you said there's no reason that Gilman would have a copy of it?

A. You said at the time I wrote it. I'm being precise. Afterwards, there would be.

Q. And what would that be?

A. Well, once I get sued for racial

124

Deane

discrimination, I mean, defending myself and showing how absolutely ridiculous the assertion is, based on the fact that I was nothing but a friend to Wanda and her family.

Q. So when is the last time that you looked at the check?

A. Again, you asked me and I'm answering in the same way. I don't remember.

Q. Have you looked at it since this lawsuit was filed?

A. Yeah, I'm sure I have.

Q. When you learned about the lawsuit, did you look up the check and give a copy to Gilman Management?

A. I believe that I did.

Q. So is it fair to say that contemporaneously at the time you wrote the check before the lawsuit was filed, you did not give a copy to Gilman?

A. Absolutely correct. There's no reason. There was no cause to. There was no reason.

125

Deane

Q.    And who did you give a copy of the check to after you found out about Wanda's lawsuit?

A.    I'm not sure, but I'm not sure. I'm not going to answer that because I don't know.

Q.    Did someone ask you for it?

A.    No.

Q.    Did you give any other documents to Gilman management after you heard of this lawsuit?

A.    Yes, I had some e-mails that, if I'm not mistaken, that I did find in my system. I keep -- I pretty much keep all my e-mails for years and years. Yeah, I did.

Q.    So when you found out about the lawsuit, you went through your e-mails and you sent some to people in the office?

A.    Well, I personally prepared it for myself, and then I gave that, I believe, to Marilyn if I'm not mistaken.

Q.    Do you know what Marilyn did with the e-mails?

126

Deane

A.    No.

MR. COWLES:  I'm going to share my screen.

THE WITNESS:  Okay.

BY MR. COWLES:

Q.    All right.  Mr. Deane, are you able to see a letter on the screen?

A.    Barely.

Q.    Barely, okay.

A.    Okay.

Q.    Can you see it a little bit better?

A.    Yes, now I see it better.  Thank you.

Q.    The letter says, in part, "Please find a copy of Ms. Washington's human resource file as maintained by Gilman Management Corp."

Do you see that?

A.    Yes.

(Whereupon, Plaintiff's Exhibit 3 was marked at this time.)

BY MR. COWLES:

Q.    Before I show this to you, let me

127

Deane

say this is Plaintiff's Exhibit 3 and I just read it's Defendants' production, and it is the human resources file maintained by Gilman Management.  It's a 386-page document.  It's not Bates stamped.

Before I show this to you, are you aware that Wanda had a human resources file?

A.    No.

Q.    I'm at page 19 of the file on Exhibit 3.

Can you take a look at that document and tell me what it is?

A.    That's the check that I gave to Whitnee for her wedding.

Q.    Do you know whose handwriting that is below the check?

A.    Mine.

Q.    Is this what you handed to Gilman Management after you learned about the lawsuit?

A.    I believe so.

Q.    Were you aware it was put in Wanda Washington's human resource file?

128

Deane

A.    No, because I wasn't aware she had one.

Q.    Now based on your business experience, would you agree that a human resource file is supposed to contemporaneously document an employee's employment, not a place to put litigation documents once an employer has been sued?

Do you agree with that?

MS. STEIN:  Objection to the question.  You can answer.

A.    I'm going TO answer another hypothetical situation with my personal opinion that I guess that would make sense, but I have no idea.

BY MR. COWLES:

Q.    Now I'm at page 21.  Please look at the document, tell me when you're done.

A.    Okay.  I seem to recall this, yes.

Q.    And the e-mail was originally sent from Wanda Washington to you on December 4, 2014.

Do you see that?

129

Deane

A. Yeah, and I'd like to make a comment. If you look at the e-mail address, it does have lee@gilmanmanagement.com, not leedeane@me.com.

Q. Why did you forward this to yourself on December 6, 2019?

A. December 6, that was just before I left, just to have paperwork to substantiate my case.

Q. Now, at the time you sent this e-mail to yourself, did you know that Wanda had threatened to bring legal action?

A. Absolutely. This is just before I left. No, I'm sorry, it's not. It's a year before, I'm sorry. Yeah, and I did know.

Q. Is this one of the e-mails that you looked up yourself and then gave to Marilyn to do something with?

A. Yes.

Q. Clearly, this is not a contemporaneous record of Wanda's employment. It was not put in her file on

130

Deane

December 4, 2014, right? I said it had nothing to do with her employment, correct?

A. Correct.

Q. What did it have to do with?

A. That I employed her on the site just so she can make a few extra dollars.

Q. If it had nothing to do with her Gilman employment, why did you give it to Marilyn Kumar when she was -- about the lawsuit?

A. Because I'm named in an action for racial discrimination, so I'm looking for every shred of evidence that I have received to prove the ridiculous nature of the assertion and allegation.

Q. So is it your view that because Wanda Washington was paid to stuff envelopes, that allegations she has made are false?

A. Not solely based on that alone, but partly so, yes.

Q. Do you agree that this document should not be in her Gilman human resource

131

Deane

file because it's not a part of Gilman employment?

MS. STEIN: I'm going to object to this question. You can answer.

A. I have absolutely no experience or knowledge about how someone's employment file should be constituted, so I can't even begin to answer that question.

Q. Did you ever tell Wanda Washington that Donna D'Addario would never change, but other things will?

A. No, I don't remember that.

Q. I'm now on page 22 of Plaintiff's human resource file. Please look at this document and tell me when you're done.

A. Okay. All right. So this is --

MS. STEIN: Do you want to make it --

THE WITNESS: No, I can read this. This is five years ago.

Okay. I read it.

BY MR. COWLES:

Q. In the e-mail at the top from Lee Deane to Wanda Washington, dated August 29,

132

Deane

2016, can you tell what you meant when you said, "She won't change. But other things will..."?

A. We're going back now for five years, so, again, I'd have to really reach down to my memory and try to figure out what I may have said or did say at that particular time, but it's just another representation, Wanda was always fighting and complaining about everybody up and down the line in the office. It was on a daily basis.

Donna was not an easy person to work for, I'm not going to ever say that she was, but she was very efficient and very, you know, there's always -- there's a stress level that comes with that.

Q. Is this one of the e-mails that you found and printed out and gave to Marilyn Kumar after you knew about this lawsuit?

A. I don't remember this one, to be very honest with you.

Q. Well, at the very top it says Lee

133

Deane

Deane and then there's a little marker. That means that it was printed out in your account, correct?

A.    Yeah, but I also think that it could have been retrieved from the server.

Q.    So is it your testimony, you're not sure how this got into Wanda's HR file?

A.    Absolutely not sure.

Q.    Would you have just randomly printed it out in 2016 and given it to somebody or --

A.    No.  More than likely, no.

Q.    Is it most likely that this is one of the e-mails that you found after you learned about the lawsuit and then gave to Marilyn Kumar?

A.    I have no way of answering that because I would just be shooting in the dark based on the memory that I don't have.

Q.    I'm now showing you Plaintiff's Exhibit 3, page 25.

A.    Okay.

Q.    It's an e-mail from you to Donna D'Addario and Brian Teppel.

134

Deane

A.    Right.

Q.    Just look at that document.  You can read the whole thing, but my question is:  Is this e-mail that you printed out and gave to Marilyn Kumar after you learned about Wanda's legal action?

A.    No.  No, I seem to recall this one.  I mean, this really points to some -- trying to squeeze the organization in the office with respect to paying contractors.

Q.    Do you know how this ended up in Wanda's HR file?

A.    No.

Q.    Did you give it Marilyn Kumar?

A.    Well, I don't remember how it got there, and I certainly wouldn't remember giving it to her, no.

Q.    I'm now showing the witness page 30 of Plaintiff's Exhibit 3.

This is an e-mail dated November 23rd, 2016, between the witness, Lee Deane, and Wanda Washington.

Do you recall this e-mail?

A.    Yeah, this one, I do recall,

135

Deane

actually.

Q.    When is the last time you saw this e-mail?

A.    I couldn't tell you.

Q.    Is this one of the e-mails that you searched for and gave Marilyn Kumar after you learned of Wanda's lawsuit?

A.    I don't remember if I did.  I just do remember it happened.

Q.    Would there be a business reason that you could tell us today about why you would print it out or give it to someone in an exchange like this between you and Wanda Washington?

A.    Business reason.  I can only tell you what the reason was for the initial exchange was basically Wanda was grieving her mom's passing.  I was present for the funeral on behalf of Gilman Management and she was feeling sad, so I was commiserating with her.  That's all.

That's the basis of this exchange, but if you're asking me if I put it together as part of my defense, no, I

136

Deane

don't recall doing that.

Q.    Did Mr. Raphael attend the funeral of Wanda's mother?

A.    I don't believe he did.

Q.    Was he one of the only employees that didn't attend?

A.    I don't know.

Q.    Did most employees attend?

A.    No.

Q.    Did a handful of employees attend?

A.    A handful did, yes.

Q.    Well, I really don't recall.  Can you think of a reason why this would be in an employee's HR file?

MS. STEIN:  Objection.  You can answer.

A.    No, because I'm not an expert on such matters.  So, no, I can't answer.

BY MR. COWLES:

Q.    Is it more likely than not that you found this e-mail to help with your defense and you gave it to Gilman to put in their file?

137

Deane

A.    I don't recall.

Q.    Do you understand that the purpose of an HR file is not to bolster a defense for a lawsuit and to sneak in lots of documents to create the appearance of a commemorating record?

MS. STEIN:  Objection to the question.  You can answer.

A.    Well, it sounds reasonable what you're saying, but I have no formal training in that area, so I couldn't really give you a good answer.

Q.    So, say, for example, if after a lawsuit was filed, someone would give you a reprimand and said Wanda really had a really bad attitude, and it was in the file after the lawsuit and many years after she had passed, that wouldn't be honest, would it?

A.    No, it's self-serving.  I understand where you're going with this.

Q.    Okay.  Now, back to Isaac Varghese.

Does he still work at Gilman?

138

Deane

A.    No.

Q.    Do you know why he doesn't?

A.    No.

Q.    Do you know anything about why he's no longer there?

A.    No.

Q.    If I were to tell you that he was caught lying to Mr. Raphael, would that jar your memory?

A.    No.

Q.    Do you have any idea if he was fired or allowed TO resign because of misconduct?

A.    Nothing to do with conduct.  Isaac's English wasn't perfect, which led to some problems.  And, additionally, the problems included Wanda because this, I do remember clear as day, that sometimes they would -- he and his daughter would speak in their native tongue rudely, and Wanda would really get angry about it and start screaming that it's wrong for people to speak in a language that others don't understand.

139

Deane

Q.    Were Isaac and Anna Wanda's co-workers?

A.    Anna was his daughter, and worked in administration, yes.

Q.    The three of them were co-workers?

A.    Yes.  They worked in the general area, which was configured into cubicles.

Q.    And they worked together?

A.    Yeah, under the same roof and in close quarters, yes.

Q.    Did they have to be able to communicate with each other, meaning Wanda and Anna and Isaac?

A.    Sometimes, yes.

Q.    Would it be hard for Wanda to do her job if someone was speaking in a language she didn't understand?

A.    No, it's really not relevant to Wanda whatsoever.  I mean, it was just another sticking point of hers, which I could never -- I could never understand what it was her business.

Q.    Did you ever reprimand her for

140

Deane

this issue?

A.    No.

Q.    Did you ever put anything in writing about this issue?

A.    No.

Q.    Did Anna Varghese have an issue with picking up money from the bank that was short money?

A.    I seem to recall that, yes.  Something happened, but I don't really have a recollection of all the details.

Q.    In her defense, did she claim that there was a black man in a hoodie in the bank parking lot?

A.    I don't remember that.

Q.    Do you remember Wanda being offended by the suggestion that there was a stereotyped, scary black man with a hoodie in the parking lot?

A.    I don't recall Wanda's reaction to it.  I don't recall the situation, honestly.  I just vaguely remember something having to do with money or short on the account.

141

Deane

Q.    Now, when you got into the tussle or whatever you want to call it with Mr. Raphael, did you -- did you receive any sort of reprimand from him?

A.    Reprimand from Rob?  No, it was just yelling and screaming at each other, and that was it.

Q.    And he didn't fire you for that, did he?

A.    No.

Q.    Now, throughout this deposition today, you commented a number of times that you believe the claims are baseless, right?

A.    Yes.

Q.    That Wanda Washington's claims are baseless?

A.    I believe so.

Q.    Would you agree with me that based on your memory and your participation, there are a lot of things I've asked you about that you don't have any firsthand knowledge.

MS. STEIN:  Objection to the form.  You can answer.

142

Deane

A.    If you're asking me if I have any firsthand knowledge with respect to anything being racially motivated or any sort of discrimination, none whatsoever in the 20 years that I've been there.

BY MR. COWLES:

Q.    But am I correct that you weren't in the room with Wanda Washington and Mr. Raphael when she was fired?

A.    Absolutely not.  Robert had a very, very private practice, if you will, of always shutting his door whenever he had a conversation that was, you know, somewhat -- what's the word I'm looking for?

MS. STEIN:  I can't help you.

A.    I know.  I'm drawing a blank. Confidential in nature, thank you.

Q.    Did Mr. Raphael have a temper?

A.    Yes.

Q.    And did he react poorly if he was confronted by employees?

MS. STEIN:  Objection, form.  You can answer in your opinion.

A.    Robert had a temper.

143

Deane

BY MR. COWLES:

Q.    And I just want to confirm this, although you said it a number of times, you think Wanda's allegations are baseless, where there were -- I asked, there were -- I believe the question was:  There were events in the Complaint that you were not a witness to, like her termination, correct?

A.    Correct.

Q.    And you've said before that you've read the Complaint?

A.    Yes.

Q.    And did you see in the Complaint that Ms. Washington is seeking punitive damages?

A.    Okay.

Q.    Are you familiar with punitive damages?

A.    As a layman, I am, yes.

Q.    And do you understand that if a jury awards punitive damages to Ms. Washington and she can prove her case, that, by law, punitive damages cannot be covered by an insurance carrier?

144

Deane

A.    I wasn't aware of that until you just told me, no.

Q.    Now, I think I take from it your testimony that you don't take responsibility for any of the allegations that Ms. Washington has raised?

A.    No, none whatsoever.  Again, I was very -- I thought we were good friends. I was always a sounding board for her if she ever had a bad day.  It's commonplace in any workplace.  And I recently tried to mentor her in any which way I could and make sure she made some extra money on the side or actually go out-of-pocket.

Q.    If you gave her extra work, was she willing to do it?

A.    Yeah, absolutely.  It was no problem.  Never a problem there.

Q.    And at one point, did Wanda have a second job in the evening in a department store?

A.    Yeah, I think I recall that.

MR. COWLES:  Okay.  We're basically at the end of the

145

Deane

examination. I just want to take a quick break and go over my notes and make sure I have everything wrapped up, and then we'll come back and close this up, okay? So let's take about an eight-minute break.

(Whereupon, there was a brief recess in the proceedings.)

MR. COWLES: Okay, Mr. Deane, I have no further questions for you today.

MS. STEIN: Okay.

THE WITNESS: Thank you so much.

MS. STEIN: Thank you.

(Time noted: 1:20 p.m.)

---

146

Deane

November 22, 2021

ERRATA

PAGE/LINE    CHANGE/REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

---

147

Deane

_____

LEE DEANE

Subscribed and sworn to before me this      day of            202_

_____

---

148

CERTIFICATE

STATE OF NEW YORK )
                  ) ss.
COUNTY OF NEW YORK)

I, Hope Lynn Menaker, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That LEE DEANE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

_____

HOPE LYNN MENAKER

149

November 22, 2021

INDEX

WITNESS              EXAMINATION BY      PAGE

Lee Deane          Mr. Cowles          5


PLAINTIFF'S    PAGE

Exhibit 1     83     E-mail chain, top
                     e-mail dated August 27,
                     2018

Exhibit 2     87     E-mail dated October 2,
                     2018

Exhibit 3     126    Wanda Washington HR
                     file


REQUEST:     53

150

## #

**#23** [1] - 2:16

## $

**$15,000** [1] - 52:9
**$200** [1] - 122:19

## '

**'20** [2] - 18:2, 19:17

## 0

**001277** [1] - 88:5
**05432(JS)(ST** [1] - 1:6

## 1

**1** [7] - 59:7, 83:5, 83:10, 84:8, 87:15, 87:22, 149:9
**100** [1] - 59:7
**10005** [1] - 2:8
**10017** [1] - 2:17
**10:00** [1] - 1:13
**11021** [1] - 26:19
**126** [1] - 149:12
**15** [1] - 13:2
**150** [1] - 2:16
**19** [1] - 127:11
**1:20** [1] - 145:16

## 2

**2** [7] - 87:16, 87:17, 88:3, 88:13, 88:23, 149:11
**20** [3] - 79:21, 111:16, 142:6
**2000** [1] - 30:9
**2001** [3] - 16:25, 27:6, 30:9
**2007** [2] - 21:8, 22:9
**2008** [1] - 26:22
**2012** [1] - 39:15
**2014** [2] - 128:24, 130:2
**2016** [4] - 68:3, 132:2, 133:11, 134:22
**2018** [33] - 20:24, 25:14, 27:12, 27:13, 27:16, 27:18, 27:22, 27:24, 28:14, 28:22, 29:7, 35:25, 36:23, 36:25, 37:8, 50:5, 51:6, 62:24, 68:3, 72:4, 81:19, 81:23, 84:7, 85:25, 88:14, 88:23, 113:11, 114:11, 114:12, 118:12, 119:16, 149:10, 149:11
**2019** [3] - 62:23, 63:4, 129:8

**202** [1] - 147:15
**2020** [2] - 18:3, 19:5
**2021** [3] - 1:13, 146:2, 149:2
**21** [1] - 128:18
**22** [4] - 1:13, 131:14, 146:2, 149:2
**23** [1] - 84:7
**23rd** [2] - 85:25, 134:22
**25** [1] - 133:22
**27** [1] - 149:9
**29** [1] - 131:25
**2:20-cv** [1] - 1:5

## 3

**3** [6] - 126:22, 127:2, 127:12, 133:22, 134:20, 149:12
**30** [3] - 2:6, 56:14, 134:20
**31** [1] - 19:5
**31st** [1] - 18:3
**350** [1] - 27:8
**386-page** [1] - 127:5

## 4

**4** [2] - 128:24, 130:2
**401(k** [1] - 120:15
**42nd** [1] - 2:16

## 5

**5** [1] - 149:6
**50** [1] - 26:25
**53** [1] - 149:15
**55** [7] - 26:18, 26:20, 26:24, 34:8, 34:18, 78:10, 115:20

## 6

**6** [2] - 129:8, 129:9

## 8

**8** [4] - 58:12, 58:13, 58:19, 59:8
**83** [1] - 149:9
**87** [1] - 149:11
**8th** [1] - 2:7

## A

**a.m** [1] - 1:13
**abetted** [1] - 1:9
**abilities** [1] - 77:16

**ability** [1] - 92:19
**able** [6] - 52:2, 82:21, 83:22, 106:6, 126:8, 139:13
**Absolutely** [1] - 42:3
**absolutely** [15] - 47:23, 53:2, 56:20, 71:21, 80:10, 92:20, 123:16, 124:3, 124:23, 129:15, 131:6, 133:9, 142:11, 144:18
**acceptable** [1] - 26:13
**access** [1] - 22:14
**according** [1] - 27:10
**account** [7] - 82:2, 120:12, 120:13, 120:16, 120:17, 133:4, 140:25
**accurate** [4] - 12:2, 21:15, 59:10, 61:3
**acknowledge** [3] - 4:4, 4:8, 17:16
**Acquisition** [1] - 30:17
**acted** [1] - 118:15
**acting** [1] - 118:16
**Action** [1] - 101:22
**action** [7] - 6:2, 13:11, 101:17, 129:14, 130:13, 134:7, 148:16
**add** [1] - 7:24
**addition** [1] - 33:25
**additionally** [2] - 33:19, 138:17
**address** [11] - 26:17, 26:21, 26:23, 84:22, 84:23, 86:17, 87:5, 87:8, 87:12, 93:2, 129:4
**addresses** [1] - 86:24
**administer** [1] - 3:12
**administered** [1] - 4:9
**administration** [4] - 29:13, 35:14, 35:22, 139:5
**administrative** [8] - 34:10, 34:17, 35:8, 35:19, 65:9, 67:14, 119:17, 119:19
**adult** [1] - 76:14
**advance** [2] - 107:14, 107:18
**advice** [1] - 96:17
**advise** [2] - 102:6, 104:24
**affected** [1] - 68:23
**African** [5] - 73:5, 76:23, 78:21, 116:7, 118:4
**afterwards** [1] - 123:22
**age** [1] - 19:14
**agencies** [3] - 33:23, 39:25, 40:5
**agent** [4] - 37:24, 54:22, 65:6, 90:23
**agents** [6] - 25:6, 25:7, 25:10, 34:2, 34:10, 34:14
**ago** [6] - 13:17, 71:15, 78:5, 78:9, 122:9, 131:21
**agree** [19] - 4:21, 4:23,

41:23, 42:4, 42:6, 42:20, 43:6, 45:15, 54:4, 54:6, 79:11, 103:14, 103:22, 106:16, 106:22, 128:5, 128:10, 130:24, 141:19
**AGREED** [3] - 3:4, 3:9, 3:13
**agreement** [5] - 4:17, 4:18, 24:13, 45:22, 66:5
**ahead** [5] - 86:7, 106:11, 117:16, 120:24, 121:24
**aided** [1] - 1:9
**Airport** [1] - 74:6
**alarm** [1] - 48:20
**alarms** [1] - 48:22
**allegation** [2] - 16:7, 130:17
**allegations** [5] - 15:24, 27:11, 130:20, 143:5, 144:6
**allocation** [1] - 50:15
**allowed** [5] - 62:21, 64:15, 105:7, 105:23, 138:13
**allowing** [2] - 42:21, 43:8
**almost** [1] - 104:21
**alone** [1] - 130:22
**altercation** [2] - 49:24, 50:3
**Alvin** [1] - 20:15
**American** [4] - 73:5, 76:24, 116:7, 118:4
**Americans** [1] - 78:21
**amount** [2] - 58:21, 58:22
**AND** [3] - 3:4, 3:9, 3:13
**angry** [7] - 70:7, 71:19, 71:24, 72:3, 72:9, 96:5, 138:22
**Angry** [1] - 71:5
**animal** [3] - 79:25, 80:8, 80:19
**animals** [1] - 80:13
**Anna** [6] - 119:12, 119:13, 139:2, 139:4, 139:15, 140:7
**announce** [1] - 46:15
**answer** [69] - 7:12, 7:13, 7:20, 7:25, 8:8, 16:6, 16:11, 20:3, 22:4, 24:18, 42:8, 43:2, 43:13, 43:25, 44:7, 44:20, 47:22, 48:6, 50:22, 52:18, 52:25, 55:16, 58:25, 59:11, 59:18, 60:21, 60:25, 61:6, 62:2, 62:11, 62:12, 63:11, 63:25, 68:6, 72:12, 75:15, 75:25, 79:16, 80:22, 94:8, 95:2, 97:20, 99:7, 99:8, 100:14, 102:16, 102:24, 103:7, 103:16, 105:3, 105:19, 107:3, 107:20, 108:8, 110:10, 120:24, 121:17, 125:6, 128:12, 128:13, 131:5, 131:9, 136:18, 136:20, 137:9, 137:13, 141:25, 142:24
**Answer** [4] - 11:8, 11:15, 11:17, 11:19

**answered** [1] - 110:9
**answering** [4] - 67:25, 120:25, 124:10, 133:18
**answers** [2] - 6:23, 59:17
**anyhow** [1] - 42:18
**apartment** [6] - 28:6, 28:11, 28:15, 28:16, 41:3, 63:3
**apartments** [3] - 58:8, 58:10, 62:16
**apostrophe** [1] - 34:25
**appear** [5] - 38:9, 83:14, 116:8, 117:24, 119:20
**appearance** [1] - 137:6
**APPEARANCES** [1] - 2:2
**appeared** [2] - 38:10, 118:16
**Apple** [1] - 85:17
**Apple's** [1] - 85:11
**applied** [1] - 104:4
**applies** [1] - 97:24
**apply** [3] - 41:24, 45:23, 98:20
**appointed** [2] - 90:4, 90:13
**appropriate** [2] - 91:6, 95:21
**appropriately** [1] - 100:12
**area** [2] - 137:12, 139:9
**arrangement** [2] - 4:14, 21:9
**arrangements** [1] - 28:19
**Ashkenazy** [1] - 30:17
**assertion** [2] - 124:4, 130:17
**asshole** [1] - 53:25
**assigned** [1] - 85:11
**assignments** [2] - 35:11, 35:12
**Associates** [1] - 30:16
**assume** [1] - 40:23
**attacking** [1] - 113:3
**attempt** [1] - 70:16
**attend** [7] - 19:18, 54:16, 122:11, 136:3, 136:7, 136:9, 136:12
**attendance** [1] - 32:6
**attention** [4] - 28:24, 41:2, 85:23, 89:24
**attitude** [4] - 79:14, 112:3, 112:12, 137:17
**attorney** [8] - 5:24, 7:12, 8:17, 10:24, 12:5, 12:10, 53:22, 108:20
**Attorneys** [2] - 2:5, 2:15
**attorneys** [2] - 4:3, 91:7
**audible** [2] - 8:5, 8:8
**August** [4] - 84:7, 85:25, 131:25, 149:9
**authorized** [1] - 3:11
**auto** [2] - 86:16, 86:23
**auto-populate** [1] - 86:23
**auto-populated** [1] - 86:16

**available** [1] - 59:19
**Aviva** [1] - 4:22
**AVIVA** [1] - 2:18
**Aviva.Stein@wilsonelser.com** [1] - 2:19
**avoiding** [1] - 48:11
**awards** [1] - 143:22
**aware** [13] - 6:12, 21:18, 40:8, 49:22, 61:15, 73:9, 80:11, 98:18, 98:25, 127:8, 127:24, 128:2, 144:2
**awareness** [1] - 61:9

## B

**BA** [2] - 29:13, 29:15
**babysit** [1] - 65:19
**background** [4] - 20:9, 20:10, 29:10, 56:9
**bad** [10] - 45:2, 66:16, 93:16, 95:15, 120:21, 121:13, 121:21, 121:22, 137:17, 144:11
**bank** [4] - 66:7, 67:6, 140:8, 140:15
**banking** [2] - 23:12, 33:12
**barely** [1] - 126:9
**Barely** [1] - 126:10
**base** [1] - 63:15
**based** [26] - 6:11, 22:17, 38:21, 44:12, 45:13, 50:18, 56:8, 59:4, 59:13, 60:24, 61:20, 79:13, 80:23, 92:10, 93:3, 107:2, 107:5, 107:10, 108:10, 108:19, 111:17, 124:4, 128:4, 130:22, 133:20, 141:20
**baseless** [4] - 92:11, 141:14, 141:17, 143:5
**basement** [1] - 27:7
**basic** [1] - 103:3
**basis** [9] - 52:14, 66:20, 68:4, 82:6, 82:7, 107:2, 132:13, 135:23
**Bates** [3] - 83:15, 88:4, 127:6
**bathroom** [4] - 74:15, 74:18, 74:20, 75:4
**battling** [1] - 19:15
**became** [2] - 30:18, 31:15
**become** [1] - 21:3
**began** [1] - 27:4
**begin** [2] - 86:22, 131:9
**beginning** [1] - 30:8
**behalf** [1] - 135:20
**behaved** [1] - 100:12
**behavior** [5] - 102:22, 103:12, 104:17, 104:19, 107:12
**behind** [1] - 28:20

**belligerent** [2] - 112:2, 112:12
**below** [2] - 58:15, 127:18
**benefits** [1] - 64:21
**Besen** [1] - 30:16
**best** [3] - 63:15, 93:8, 108:2
**better** [7] - 56:25, 69:18, 85:15, 93:19, 113:2, 126:13, 126:14
**between** [10] - 3:5, 19:23, 20:4, 58:22, 59:6, 78:6, 89:19, 134:22, 135:14
**big** [2] - 106:17, 106:23
**bills** [2] - 33:15, 33:17
**birthday** [1] - 67:16
**bit** [7] - 20:8, 41:7, 51:20, 93:7, 107:15, 112:25, 126:12
**black** [21] - 55:15, 55:20, 70:7, 71:19, 71:25, 72:3, 72:9, 72:10, 73:5, 75:12, 75:21, 76:17, 76:21, 76:23, 79:3, 80:20, 94:10, 94:23, 116:8, 140:14, 140:19
**Black** [2] - 71:5, 79:7
**blaming** [1] - 70:18
**blank** [1] - 142:17
**blood** [1] - 148:17
**Blumenthal** [2] - 74:23, 74:25
**board** [1] - 144:10
**bolster** [1] - 137:4
**book** [1] - 64:4
**bookkeeper** [1] - 77:4
**bookkeeping** [1] - 116:24
**born** [2] - 21:24, 44:13
**borough** [5] - 57:3, 57:5, 57:6, 57:17, 57:24
**boroughs** [5] - 56:18, 57:15, 57:21, 58:3, 58:5
**bottom** [1] - 85:23
**brain** [1] - 14:10
**break** [10] - 7:8, 7:9, 7:14, 56:2, 81:3, 94:19, 94:21, 95:14, 145:3, 145:7
**breast** [1] - 19:16
**Brian** [3] - 114:23, 114:24, 133:25
**brief** [3] - 12:12, 81:10, 145:8
**briefly** [1] - 30:7
**bring** [6] - 42:13, 57:16, 70:10, 89:22, 95:16, 129:14
**broke** [1] - 51:21
**broker** [7] - 30:12, 30:19, 31:11, 32:2, 41:19, 47:6, 97:22
**Bronx** [1] - 58:7
**Brooklyn** [2] - 58:4, 58:6
**brought** [11] - 6:4, 10:4, 28:23, 39:21, 40:25, 64:5, 70:17, 70:20, 70:22, 71:10,

93:13
**build** [1] - 21:20
**Building** [2] - 114:21, 117:22
**building** [18] - 17:3, 24:6, 24:12, 24:15, 24:20, 24:23, 24:25, 26:4, 27:7, 28:19, 31:10, 32:18, 35:15, 62:20, 73:17, 73:21, 104:16
**buildings** [18] - 18:14, 18:18, 18:24, 19:9, 22:23, 23:6, 24:4, 24:9, 25:13, 57:2, 59:5, 60:2, 60:8, 60:13, 60:15, 60:19, 61:23, 63:7
**bury** [1] - 53:9
**business** [18] - 10:10, 23:2, 24:23, 26:23, 27:19, 28:25, 29:12, 31:14, 39:17, 41:15, 49:20, 91:16, 121:5, 128:4, 135:11, 135:16, 139:24
**businesses** [2] - 30:25, 49:4
**BY** [63] - 2:9, 2:18, 5:10, 11:23, 12:17, 22:7, 42:10, 43:5, 43:16, 44:2, 44:9, 47:24, 48:9, 50:24, 52:21, 53:3, 54:9, 56:5, 57:9, 59:3, 61:8, 62:4, 62:15, 75:19, 76:15, 79:22, 81:12, 82:20, 83:12, 84:4, 84:17, 87:19, 88:19, 95:5, 96:18, 96:24, 98:2, 99:10, 100:16, 102:18, 103:2, 103:9, 103:25, 105:6, 105:22, 106:15, 106:21, 107:8, 107:23, 108:12, 110:12, 111:6, 117:18, 121:3, 122:2, 126:6, 126:24, 128:17, 131:23, 136:21, 142:7, 143:2, 149:5

## C

**C-O-L-O-N** [1] - 114:13
**caged** [1] - 93:19
**cakes** [1] - 67:16
**camera** [1] - 5:3
**cancer** [1] - 19:16
**cannot** [3] - 45:23, 59:16, 143:24
**capacity** [1] - 118:16
**capital** [4] - 62:19, 62:25, 88:15, 88:17
**care** [3] - 23:8, 62:7, 66:25
**career** [1] - 97:8
**caretaker** [1] - 115:19
**Caribbean** [2] - 118:3, 118:4
**carrier** [1] - 143:25
**case** [10] - 6:22, 10:7, 27:25, 63:25, 88:15, 88:17, 91:8, 121:16, 129:11, 143:23

**cases** [2] - 18:17, 63:7
**categorically** [1] - 79:7
**caught** [1] - 138:9
**caused** [1] - 47:18
**Centre** [2] - 27:2, 27:9
**certain** [6] - 18:17, 44:3, 49:15, 57:24, 58:9, 99:19
**certainly** [1] - 134:17
**CERTIFICATE** [1] - 148:2
**certify** [2] - 148:9, 148:15
**chain** [1] - 149:9
**chance** [2] - 102:21, 104:10
**change** [6] - 41:6, 101:6, 102:21, 104:11, 131:12, 132:3
**CHANGE/REASON** [1] - 146:5
**changed** [1] - 62:23
**chart** [2] - 69:23, 69:24
**charts** [1] - 69:25
**check** [17] - 32:6, 63:24, 82:5, 122:21, 122:24, 123:2, 123:5, 123:7, 123:10, 123:13, 124:8, 124:16, 124:21, 125:3, 127:15, 127:18
**checking** [1] - 82:9
**children** [1] - 55:20
**chill** [1] - 68:16
**Christmas** [1] - 69:21
**chuckle** [1] - 70:11
**circumstances** [2] - 9:12, 44:3
**city** [1] - 73:23
**City** [3] - 56:13, 56:19, 61:18
**claim** [2] - 39:14, 140:13
**claimed** [1] - 15:19
**claiming** [2] - 14:24, 15:5
**claims** [3] - 10:15, 141:14, 141:16
**clarification** [1] - 84:3
**clarify** [2] - 7:5, 7:24
**clear** [3] - 6:16, 98:3, 138:19
**clearly** [1] - 129:23
**close** [3] - 25:17, 139:12, 145:5
**cloud** [5] - 84:24, 85:4, 85:7, 85:13, 85:14
**club** [1] - 45:11
**co** [3] - 113:4, 139:3, 139:7
**co-workers** [3] - 113:4, 139:3, 139:7
**collect** [2] - 23:7, 33:10
**collected** [1] - 33:13
**collection** [1] - 53:12
**collectively** [1] - 109:6
**College** [1] - 29:16
**Colon** [2] - 114:12, 114:13
**color** [3] - 45:3, 91:25, 93:3

**comical** [1] - 51:17
**coming** [2] - 34:3, 55:6
**commemorating** [1] - 137:7
**comment** [1] - 129:3
**commented** [1] - 141:13
**comments** [1] - 68:21
**commercial** [1] - 30:11
**commiserating** [1] - 135:21
**commonly** [2] - 62:6, 62:14
**commonplace** [1] - 144:11
**communicate** [1] - 139:14
**community** [1] - 31:12
**company** [6] - 18:10, 21:10, 21:20, 23:5, 90:22, 91:21
**comparing** [1] - 80:13
**complain** [8] - 40:12, 43:8, 64:13, 81:19, 93:6, 105:8, 105:24, 106:6
**complained** [2] - 81:23, 95:14
**complaining** [5] - 15:21, 41:2, 112:3, 113:4, 132:11
**Complaint** [10] - 11:6, 13:14, 13:18, 14:18, 14:24, 15:23, 27:11, 143:8, 143:12, 143:14
**complaint** [6] - 13:10, 15:3, 15:9, 40:16, 42:14, 89:23
**complaints** [6] - 40:9, 40:18, 40:22, 42:22, 93:2, 106:8
**complex** [1] - 41:4
**complied** [1] - 99:23
**computer** [1] - 33:11
**concentrated** [3] - 57:2, 57:10, 57:23
**concept** [2] - 101:13, 101:14
**concern** [1] - 89:16
**concerning** [2] - 16:8, 16:15
**concerns** [2] - 92:6, 113:12
**concise** [1] - 24:11
**conclusion** [3] - 75:24, 105:19, 112:14
**conclusions** [1] - 111:20
**conduct** [4] - 1:10, 55:7, 99:4, 138:15
**conference** [1] - 9:2
**confidential** [1] - 142:18
**configured** [1] - 139:9
**confirm** [1] - 143:3
**confronted** [1] - 142:22
**connection** [1] - 117:12
**connections** [1] - 31:23
**consent** [1] - 4:14
**consider** [2] - 17:9, 52:5
**considered** [4] - 61:13, 68:11, 79:9, 95:18
**consolation** [1] - 96:16

**console** [2] - 96:7, 96:15
**constant** [1] - 112:3
**constantly** [1] - 113:3
**constituted** [1] - 131:8
**construed** [1] - 79:19
**contemporaneous** [1] - 129:24
**contemporaneously** [2] - 124:20, 128:7
**context** [6] - 10:2, 45:8, 78:20, 78:23, 79:14, 79:18
**continue** [2] - 81:14, 103:13
**continuing** [1] - 35:24
**contractor** [4] - 72:25, 97:23, 104:22, 104:23
**contractors** [5] - 32:19, 33:16, 63:19, 104:20, 134:11
**control** [2] - 24:15, 24:17
**conversation** [5] - 13:5, 17:18, 53:11, 113:20, 142:14
**conversations** [8] - 28:17, 71:14, 96:3, 96:6, 104:18, 112:24, 113:7, 113:16
**Cooper** [1] - 5:25
**COOPER** [1] - 2:4
**copy** [10] - 122:21, 122:23, 123:5, 123:8, 123:12, 123:20, 124:17, 124:22, 125:2, 126:17
**cordial** [1] - 111:8
**CORP** [1] - 1:7
**Corp** [1] - 126:19
**corporate** [2] - 24:9, 24:16
**Corporation** [4] - 6:5, 15:12, 26:9, 30:17
**corporation** [1] - 24:7
**correct** [22] - 8:17, 18:5, 19:9, 22:24, 22:25, 34:12, 56:10, 58:16, 63:5, 64:15, 64:19, 91:18, 94:2, 103:12, 104:16, 124:23, 130:4, 130:5, 133:4, 142:8, 143:9, 143:10
**correcting** [1] - 104:18
**correctly** [3] - 13:15, 14:6, 37:11
**cost** [1] - 48:15
**counsel** [9] - 3:5, 4:13, 11:18, 12:21, 12:25, 13:6, 14:16, 76:3, 105:15
**country** [1] - 45:10
**COUNTY** [1] - 148:5
**couple** [3] - 6:14, 13:16, 114:10
**course** [4] - 30:2, 32:17, 60:6, 105:5
**Court** [5] - 6:8, 56:2, 84:2, 108:21
**COURT** [3] - 1:2, 4:2, 4:24
**court** [5] - 7:5, 7:17, 8:6,

11:7, 81:4
**covered** [1] - 143:25
**COWLES** [80] - 2:11, 4:20, 5:10, 11:23, 12:17, 22:7, 42:10, 43:5, 43:16, 44:2, 44:9, 47:24, 48:9, 50:24, 52:21, 53:3, 53:17, 54:9, 55:25, 56:5, 57:7, 57:9, 59:3, 60:16, 61:8, 62:4, 62:15, 75:19, 76:2, 76:15, 79:22, 80:25, 81:12, 82:12, 82:15, 82:20, 83:3, 83:7, 83:12, 84:4, 84:17, 87:19, 88:19, 95:5, 96:18, 96:22, 96:24, 98:2, 99:10, 100:16, 102:18, 103:2, 103:9, 103:17, 103:25, 105:6, 105:14, 105:22, 106:15, 106:21, 107:8, 107:23, 108:12, 110:12, 111:5, 111:6, 117:15, 117:18, 121:3, 122:2, 126:3, 126:6, 126:24, 128:17, 131:23, 136:21, 142:7, 143:2, 144:24, 145:10
**Cowles** [3] - 4:20, 5:23, 149:6
**crap** [1] - 53:8
**create** [4] - 68:25, 72:7, 80:17, 137:6
**created** [2] - 63:14, 69:6
**creating** [1] - 64:10
**credentials** [1] - 77:16
**creed** [1] - 45:4
**cubicles** [1] - 139:9
**culminated** [1] - 21:9
**curious** [2] - 110:15, 110:16
**cut** [2] - 106:19, 107:15

## D

**D'Addario** [8] - 34:20, 34:22, 65:12, 77:11, 100:2, 118:10, 131:11, 133:25
**DADERARIO** [1] - 34:23
**daily** [5] - 52:14, 67:6, 68:4, 82:6, 132:12
**damages** [4] - 143:16, 143:19, 143:22, 143:24
**Daniel** [3] - 115:16, 115:17, 116:11
**dark** [1] - 133:20
**date** [2] - 85:25, 99:19
**dated** [6] - 84:7, 88:13, 131:25, 134:21, 149:9, 149:11
**dates** [1] - 37:5
**daughter** [4] - 119:21, 122:4, 138:20, 139:4
**David** [1] - 5:18
**day-to-day** [8] - 18:23,

23:2, 23:8, 24:22, 52:14, 90:9, 90:24, 91:20
**days** [1] - 88:23
**de** [1] - 34:21
**deal** [2] - 34:6, 108:21
**dealing** [2] - 102:11, 104:2
**deals** [2] - 31:20, 91:4
**Deane** [15] - 5:11, 5:18, 81:13, 82:21, 84:7, 84:18, 85:22, 88:5, 88:14, 126:7, 131:25, 133:2, 134:22, 145:10, 149:6
**DEANE** [5] - 1:7, 1:17, 5:6, 147:9, 148:10
**December** [6] - 18:3, 19:5, 128:24, 129:8, 129:9, 130:2
**decided** [1] - 26:2
**decision** [3] - 77:25, 106:17, 108:17
**decisions** [7] - 36:2, 41:14, 106:23, 107:13, 107:18, 108:4, 115:10
**declare** [1] - 4:10
**default** [3] - 32:11, 32:14, 119:22
**defendant** [1] - 9:17
**Defendant** [1] - 4:23
**defendants** [3] - 2:15, 15:11, 87:20
**Defendants** [3] - 1:10, 1:11, 88:12
**Defendants'** [4] - 83:13, 83:16, 88:4, 127:3
**defending** [1] - 124:2
**defense** [4] - 135:25, 136:24, 137:5, 140:13
**define** [1] - 16:5
**defined** [3] - 15:10, 90:23, 101:2
**definitely** [2] - 40:24, 70:9
**degrees** [2] - 29:11, 29:19
**department** [1] - 144:21
**deposition** [18] - 1:16, 3:10, 3:15, 4:4, 4:5, 4:7, 8:10, 8:13, 9:13, 10:15, 10:18, 12:11, 26:14, 81:14, 94:17, 141:12, 148:11, 148:12
**depositions** [1] - 10:12
**describe** [1] - 11:13
**description** [1] - 32:16
**designated** [1] - 67:18
**designed** [1] - 41:25
**designee** [3] - 67:9, 67:10, 67:17
**desk** [5] - 13:19, 69:24, 79:24, 109:9, 110:21
**despite** [2] - 42:16, 95:13
**details** [2] - 21:18, 140:12
**detrimental** [1] - 107:6
**diagnosed** [1] - 19:17
**different** [4] - 9:5, 17:4,

56:18, 86:23
**differently** [5] - 76:10, 78:14, 78:20, 79:4, 79:8
**directly** [8] - 25:11, 26:8, 30:10, 32:10, 35:7, 35:10, 35:21, 92:22
**disagreement** [1] - 50:9
**discern** [1] - 37:5
**disciplinary** [1] - 101:17
**Disciplinary** [1] - 101:22
**discipline** [4] - 100:21, 100:22, 101:3, 101:10
**discovered** [1] - 77:17
**discriminated** [2] - 44:12, 44:14
**discrimination** [31] - 9:25, 14:25, 15:21, 38:3, 40:2, 40:6, 40:9, 41:9, 41:23, 42:2, 42:14, 43:9, 43:18, 43:22, 46:2, 46:10, 46:16, 47:8, 47:19, 48:3, 48:12, 55:14, 81:20, 81:24, 89:23, 105:8, 105:24, 106:9, 124:2, 130:14, 142:5
**discriminatory** [1] - 75:21
**discuss** [12] - 13:6, 13:25, 14:3, 14:15, 89:3, 91:5, 105:4, 109:16, 109:19, 112:8, 115:12, 115:13
**discussed** [6] - 12:9, 14:19, 89:12, 91:16, 93:17, 120:11
**discussion** [2] - 12:12, 28:9
**disease** [1] - 19:15
**dishonest** [3] - 50:25, 53:14, 64:18
**distribution** [1] - 23:13
**distributions** [1] - 23:14
**District** [2] - 6:7, 6:8
**DISTRICT** [2] - 1:2, 1:2
**divorce** [2] - 96:11, 96:19
**document** [18] - 11:14, 35:16, 82:13, 83:18, 83:20, 84:19, 88:6, 88:8, 101:21, 102:5, 108:3, 127:6, 127:14, 128:7, 128:19, 130:24, 131:16, 134:3
**documented** [1] - 112:10
**documenting** [1] - 100:18
**documents** [12] - 8:20, 8:22, 10:20, 10:22, 10:23, 12:6, 22:11, 53:13, 53:19, 125:10, 128:9, 137:6
**DOE** [1] - 1:8
**dog** [1] - 65:19
**dogs** [2] - 93:19, 94:14
**dollar** [1] - 91:24
**dollars** [1] - 130:8
**done** [9] - 32:20, 67:4, 67:7, 84:13, 87:14, 88:8, 104:23, 128:19, 131:16
**Donna** [14] - 34:20, 34:22,

34:23, 35:4, 35:5, 65:12, 77:11, 99:25, 115:16, 115:17, 118:10, 131:11, 132:14, 133:24
**DONNA** [1] - 34:23
**door** [1] - 142:13
**doubt** [2] - 91:9, 91:11
**down** [8] - 7:17, 29:7, 55:24, 74:20, 84:14, 95:24, 132:7, 132:11
**dramatically** [1] - 63:2
**drastic** [1] - 108:4
**draw** [1] - 85:22
**drawing** [1] - 142:17
**drill** [2] - 49:4, 49:7
**drive** [2] - 66:7, 74:2
**duly** [2] - 5:7, 148:12
**during** [1] - 94:21
**duties** [6] - 18:24, 35:25, 36:12, 36:23, 66:7, 90:14
**duty** [1] - 67:6

# E

**E-A-N-E** [1] - 5:18
**E-mail** [2] - 149:9, 149:11
**e-mail** [35] - 17:15, 82:2, 82:16, 82:22, 84:6, 84:23, 84:24, 85:12, 85:23, 86:3, 86:17, 86:20, 86:24, 87:11, 87:12, 88:11, 88:20, 89:3, 89:9, 91:8, 91:10, 91:22, 128:22, 129:3, 129:13, 131:24, 133:24, 134:5, 134:21, 134:24, 135:4, 136:23, 149:9
**e-mails** [14] - 17:13, 81:22, 82:5, 82:9, 85:16, 87:7, 125:13, 125:16, 125:19, 125:25, 129:19, 132:19, 133:15, 135:6
**earn** [3] - 29:15, 29:17, 103:13
**ease** [1] - 93:2
**EASTERN** [1] - 1:2
**Eastern** [1] - 6:7
**easy** [1] - 132:14
**economics** [1] - 29:14
**EDELMAN** [1] - 2:14
**educational** [2] - 29:11, 56:8
**effect** [3] - 46:12, 98:8, 102:9
**effectively** [1] - 18:8
**efficient** [2] - 6:16, 132:16
**eight** [1] - 145:7
**eight-minute** [1] - 145:7
**either** [1] - 24:7
**ELSER** [1] - 2:14
**emotional** [2] - 44:5, 44:15

**employ** [1] - 24:25
**employed** [8] - 13:20, 18:11, 19:3, 25:7, 82:3, 104:3, 115:18, 130:7
**employee** [28] - 37:12, 38:16, 39:8, 44:4, 54:16, 67:5, 67:14, 96:25, 98:6, 98:16, 100:18, 101:4, 102:5, 102:6, 102:20, 103:10, 104:5, 105:7, 105:23, 107:7, 107:12, 115:10, 120:3, 120:21, 121:6, 121:13, 121:18, 121:21
**employee's** [4] - 106:18, 107:25, 128:7, 136:16
**employees** [43] - 26:3, 26:8, 30:4, 32:3, 32:5, 32:9, 32:13, 33:2, 34:9, 34:11, 34:18, 35:8, 35:19, 36:8, 37:2, 37:4, 41:25, 42:13, 42:21, 43:8, 48:4, 48:11, 48:18, 64:23, 65:4, 65:6, 65:9, 98:20, 98:24, 99:3, 99:14, 100:12, 102:13, 103:4, 107:11, 114:10, 119:24, 121:12, 121:22, 136:6, 136:9, 136:11, 142:22
**employees'** [2] - 74:14, 106:24
**employer** [7] - 30:13, 103:11, 107:12, 107:17, 108:3, 120:20, 128:9
**employer's** [2] - 106:17, 106:23
**employers** [2] - 97:17, 106:8
**employment** [13] - 9:22, 15:20, 16:24, 39:20, 77:22, 97:18, 99:22, 128:8, 129:25, 130:4, 130:10, 131:3, 131:7
**end** [2] - 92:3, 144:25
**ended** [1] - 134:12
**English** [1] - 138:16
**ensuring** [1] - 100:11
**entities** [6] - 24:9, 24:16, 24:20, 24:23, 24:25, 26:5
**entrepreneur** [1] - 30:24
**entrée** [1] - 31:5
**envelopes** [1] - 130:20
**environment** [3] - 15:6, 72:8, 80:18
**equipped** [1] - 75:25
**errand** [4] - 75:7, 75:13, 75:22, 76:13
**errands** [2] - 73:12, 73:14
**ERRATA** [1] - 146:3
**ESQ** [3] - 2:9, 2:11, 2:18
**estate** [9] - 9:14, 9:21, 9:24, 30:11, 30:19, 31:2, 31:4, 31:5, 31:25
**ethic** [2] - 112:4, 112:12

ethically [1] - 64:7
ethnicity [3] - 41:15, 45:4, 45:12
Europe [1] - 45:9
evaluations [2] - 25:24, 32:7
Eve [1] - 74:6
evening [1] - 144:21
evenly [2] - 57:20, 57:22
events [1] - 143:8
evidence [1] - 130:15
ex [2] - 72:21, 72:22
ex-husband [1] - 72:22
exactly [2] - 70:4, 96:20
EXAMINATION [2] - 5:9, 149:5
examination [1] - 145:2
example [1] - 137:14
except [1] - 3:6
exchange [3] - 135:14, 135:18, 135:24
exclusively [1] - 104:21
Exhibit [17] - 82:25, 83:5, 83:10, 84:8, 87:15, 87:16, 87:17, 87:22, 88:3, 126:22, 127:2, 127:12, 133:22, 134:20, 149:9, 149:11, 149:12
exist [1] - 106:14
existed [1] - 106:4
exit [1] - 48:23
expand [1] - 69:4
expensive [1] - 48:2
experience [21] - 44:4, 44:15, 45:5, 45:24, 46:13, 46:24, 47:5, 59:13, 60:2, 60:5, 60:12, 60:24, 61:20, 63:12, 64:2, 80:24, 93:16, 97:25, 103:21, 128:5, 131:6
experienced [3] - 43:18, 46:12, 49:3
experiencing [1] - 105:9
expert [4] - 42:16, 80:14, 85:9, 136:19
explain [1] - 85:6
extends [1] - 41:21
extent [1] - 37:22
extra [4] - 66:2, 130:8, 144:14, 144:16

## F

faced [1] - 14:25
facilitate [2] - 23:13, 33:20
fact [9] - 28:10, 38:23, 92:14, 94:5, 95:13, 98:25, 106:14, 123:14, 124:4
facto [1] - 34:21
fair [12] - 7:20, 7:22, 14:13, 15:14, 21:11, 21:22, 21:23,

50:19, 60:20, 63:9, 84:16, 124:19
fairly [2] - 58:2, 117:14
fake [1] - 64:10
faked [1] - 77:15
false [1] - 130:21
familiar [8] - 39:10, 41:11, 42:11, 55:19, 56:17, 100:23, 101:12, 143:18
family [9] - 14:20, 21:15, 23:18, 23:21, 31:23, 73:12, 74:5, 115:18, 124:6
far [3] - 40:17, 41:14, 99:24
favor [1] - 73:19
fear [3] - 42:22, 105:25, 106:6
Federal [1] - 6:8
federal [2] - 41:8, 42:12
feed [1] - 79:24
Feliciano [4] - 54:18, 54:20, 55:3, 117:4
few [5] - 19:13, 88:23, 113:9, 122:8, 130:8
fictitious [1] - 1:8
fighting [1] - 132:10
fights [2] - 93:9, 95:16
figure [2] - 109:8, 132:7
figured [1] - 94:15
file [20] - 23:9, 97:5, 98:10, 126:18, 127:4, 127:9, 127:11, 127:25, 128:6, 129:25, 131:2, 131:8, 131:15, 133:8, 134:13, 136:16, 136:25, 137:4, 137:17, 149:13
filed [7] - 6:6, 11:6, 39:14, 114:6, 124:13, 124:21, 137:15
files [3] - 97:2, 97:9, 98:5
filing [1] - 3:14
fill [1] - 99:18
financially [3] - 27:22, 28:16, 28:22
fine [4] - 5:14, 9:8, 76:5, 105:16
finish [1] - 55:22
fire [6] - 48:20, 48:22, 49:4, 49:7, 55:10, 141:9
fired [8] - 15:19, 37:3, 37:4, 37:9, 38:11, 38:23, 138:13, 142:10
firm [3] - 5:24, 5:25, 45:11
first [12] - 5:17, 11:5, 13:13, 13:21, 14:16, 41:18, 56:14, 84:9, 90:3, 94:12, 108:25, 109:13
firsthand [2] - 141:23, 142:3
five [12] - 12:19, 12:22, 12:25, 36:25, 38:17, 57:14, 71:14, 78:9, 81:6, 131:21,

132:5
Floor [1] - 2:7
follows [1] - 5:8
forced [1] - 61:22
Form [1] - 101:23
form [35] - 3:7, 9:22, 11:21, 16:11, 22:3, 42:25, 43:24, 44:7, 45:17, 47:21, 50:21, 58:24, 61:6, 62:9, 63:10, 63:23, 68:5, 72:12, 75:15, 79:16, 80:22, 90:2, 99:6, 99:15, 99:18, 99:23, 100:4, 102:2, 102:14, 105:2, 108:8, 111:3, 111:19, 141:25, 142:23
formal [7] - 25:23, 29:20, 29:21, 30:5, 47:9, 47:11, 137:11
former [1] - 61:25
forms [1] - 101:17
formulation [1] - 10:25
forth [2] - 34:4, 148:11
forward [4] - 6:22, 8:10, 8:13, 129:7
fought [2] - 94:13, 94:23
foundation [2] - 47:21, 62:10
founded [1] - 20:22
four [2] - 57:20, 58:3
framed [1] - 51:16
frames [2] - 51:11, 51:15
frank [2] - 72:17, 73:24
Frank [8] - 72:18, 73:8, 73:16, 73:23, 74:4, 74:9, 74:12, 96:12
Frankie [1] - 72:15
frankly [1] - 71:16
free [2] - 120:21, 121:7
frequently [1] - 61:16
friction [2] - 20:4, 49:22
friend [5] - 68:11, 92:24, 95:18, 124:5
friendly [1] - 95:19
friends [9] - 14:20, 31:16, 68:18, 110:25, 111:7, 111:9, 113:24, 120:7, 144:9
front [1] - 8:20
full [2] - 5:16, 52:2
function [3] - 33:9, 91:4, 119:18
functions [1] - 77:19
funeral [2] - 135:20, 136:4
FURTHER [2] - 3:9, 3:13

## G

gas [1] - 67:11
gathering [1] - 108:22
gears [3] - 41:6, 64:20, 114:9

gender [2] - 44:13, 45:12
general [2] - 112:2, 139:8
get-go [1] - 95:4
gift [2] - 122:15, 122:18
GILMAN [1] - 1:7
Gilman [135] - 6:5, 13:20, 15:6, 15:11, 15:13, 16:20, 16:24, 17:5, 17:13, 17:25, 18:6, 18:18, 18:21, 19:7, 19:12, 19:24, 20:8, 20:11, 20:15, 20:21, 20:24, 21:7, 21:12, 22:8, 22:12, 22:21, 22:24, 23:3, 23:4, 24:4, 25:8, 25:14, 25:20, 26:4, 26:8, 26:17, 26:20, 27:3, 27:6, 27:16, 27:25, 28:6, 28:21, 30:9, 30:10, 31:8, 31:18, 32:10, 32:25, 36:2, 37:16, 37:19, 37:23, 39:22, 39:25, 40:5, 40:12, 40:16, 45:25, 47:18, 48:2, 48:15, 48:18, 49:14, 54:21, 56:21, 57:2, 57:13, 58:8, 58:12, 58:18, 59:6, 59:14, 59:20, 61:4, 61:13, 61:17, 62:16, 63:25, 72:24, 75:7, 76:18, 77:6, 77:13, 77:22, 80:4, 82:3, 86:10, 86:19, 91:8, 95:7, 96:25, 97:4, 98:3, 98:10, 98:16, 98:23, 99:11, 100:10, 100:17, 100:20, 101:16, 101:22, 102:2, 102:5, 104:3, 104:13, 105:12, 110:19, 111:11, 114:15, 116:20, 117:23, 118:6, 118:25, 119:5, 119:14, 119:23, 120:2, 123:8, 123:12, 123:20, 124:17, 124:22, 125:11, 126:18, 127:5, 127:20, 130:10, 130:25, 131:2, 135:20, 136:24, 137:25
Gilman's [2] - 59:22, 61:10
girl [4] - 75:7, 75:13, 75:22, 76:13
given [6] - 101:5, 102:21, 104:7, 104:9, 133:11, 148:13
glass [2] - 51:10, 51:14
glasses [1] - 88:18
governed [1] - 24:12
government [4] - 5:2, 39:24, 40:4, 97:15
government-issued [1] - 5:2
grandfather [1] - 20:14
great [1] - 96:10
Great [1] - 26:18
Grenada [1] - 116:6
grieving [1] - 135:18
ground [3] - 21:21, 59:25, 60:5

155

**group** [1] - 33:7
**grown** [2] - 75:12, 76:13
**Grumpy** [1] - 69:13
**guess** [26] - 10:25, 11:2, 21:9, 22:17, 22:18, 24:10, 25:15, 26:6, 26:10, 26:13, 33:21, 34:5, 50:6, 59:9, 59:10, 59:16, 68:7, 72:14, 78:7, 80:15, 85:14, 97:21, 100:5, 118:3, 121:2, 128:15
**Guyana** [1] - 118:20
**guys** [3] - 68:16, 96:14, 113:23

**H**

**half** [1] - 81:2
**hallways** [1] - 60:3
**hand** [1] - 105:5
**handbooks** [1] - 98:17
**handed** [1] - 127:20
**handful** [2] - 136:11, 136:13
**handling** [1] - 113:2
**hands** [1] - 81:5
**handwriting** [3] - 111:20, 111:24, 127:17
**harassment** [2] - 41:3, 46:20
**hard** [4] - 31:6, 109:8, 118:21, 139:17
**hard-money** [1] - 31:6
**hardly** [1] - 5:20
**harmful** [1] - 43:23
**harsher** [1] - 104:25
**head** [1] - 8:7
**hear** [15] - 5:13, 5:14, 46:14, 47:14, 54:13, 55:2, 74:11, 78:12, 98:12, 108:24, 110:4, 110:5, 110:6, 117:13, 117:15
**heard** [12] - 46:18, 55:21, 74:10, 75:8, 78:25, 79:20, 93:21, 109:13, 120:2, 120:8, 120:15, 125:11
**hearsay** [3] - 108:18, 108:19, 108:20
**held** [2] - 45:2, 85:16
**help** [5] - 31:20, 39:17, 74:3, 136:23, 142:16
**helps** [1] - 49:10
**Henrique** [2] - 39:9, 39:13
**HEREBY** [1] - 3:4
**hereby** [1] - 148:9
**hereinbefore** [1] - 148:11
**hereto** [1] - 3:6
**herself** [1] - 71:24
**himself** [1] - 115:2
**hip** [1] - 59:16
**hire** [1] - 97:11

**hired** [3] - 49:17, 92:13, 121:5
**hiring** [1] - 36:8
**Hispanic** [4] - 38:9, 38:10, 54:25, 114:19
**history** [3] - 30:8, 80:12, 80:14
**hold** [4] - 6:23, 17:4, 29:11, 33:4
**holding** [1] - 5:3
**home** [4] - 53:13, 73:23, 73:25, 116:4
**honest** [3] - 40:20, 132:24, 137:19
**honestly** [4] - 16:13, 38:18, 109:5, 140:23
**honesty** [1] - 53:19
**hoodie** [2] - 140:14, 140:19
**HOPE** [1] - 148:22
**Hope** [2] - 1:18, 148:7
**hopefully** [1] - 11:20
**hostile** [3] - 15:6, 72:8, 80:17
**hour** [2] - 81:2, 82:8
**hourly** [1] - 82:7
**housing** [4] - 10:2, 40:6, 41:14, 63:15
**HR** [5] - 133:8, 134:13, 136:16, 137:4, 149:12
**human** [8] - 98:5, 126:17, 127:4, 127:8, 127:25, 128:5, 130:25, 131:15
**hundred** [1] - 25:17
**hurting** [1] - 28:15
**husband** [2] - 72:22, 96:12
**hypothetical** [5] - 44:19, 45:18, 108:10, 121:15, 128:14

**I**

**idea** [6] - 47:23, 48:8, 48:14, 66:4, 128:16, 138:12
**identification** [1] - 5:2
**illness** [1] - 66:17
**imagine** [5] - 39:11, 79:18, 80:15, 108:11, 116:6
**impact** [2] - 106:17, 106:23
**implemented** [1] - 101:15
**impossible** [1] - 60:23
**improve** [1] - 63:7
**improvements** [2] - 62:20, 62:25
**IN** [1] - 47:12
**inability** [1] - 77:19
**inaccurate** [2] - 38:20, 38:23
**inbox** [3] - 86:10, 89:10, 91:9
**incentive** [1] - 63:6

**include** [2] - 91:19, 93:25
**included** [4] - 29:4, 31:4, 113:5, 138:18
**including** [2] - 29:25, 99:17
**income** [3] - 58:9, 58:10, 58:15
**incorporated** [1] - 24:5
**incorrect** [1] - 104:6
**incorrectly** [1] - 104:23
**increase** [2] - 63:2, 63:20
**increases** [1] - 64:11
**independent** [3] - 29:8, 72:25, 97:23
**INDEX** [1] - 149:3
**India** [1] - 117:2
**Indian** [1] - 119:22
**indicate** [1] - 4:17
**informal** [3] - 47:10, 47:12, 47:13
**information** [5] - 22:15, 33:10, 59:19, 85:16, 108:23
**informed** [1] - 79:17
**inherited** [2] - 21:14, 21:17
**initial** [1] - 135:17
**initiated** [1] - 113:19
**instruct** [3] - 7:12, 76:3, 108:21
**instructions** [1] - 6:15
**insurance** [1] - 143:25
**insured** [1] - 32:24
**intended** [1] - 1:9
**interact** [2] - 19:8, 68:12
**interchangeable** [1] - 14:8
**interest** [2] - 120:21, 121:7
**interest-free** [2] - 120:21, 121:7
**interested** [2] - 59:12, 148:18
**interesting** [1] - 84:22
**interests** [1] - 24:3
**interfaced** [1] - 104:20
**interfacing** [1] - 32:18
**Internal** [1] - 33:22
**interrogatories** [3] - 11:3, 11:25, 38:15
**Interrogatories** [3] - 11:16, 11:17, 11:20
**invest** [1] - 91:5
**investigated** [2] - 39:25, 40:5
**investment** [4] - 18:25, 50:12, 92:19, 92:22
**investments** [1] - 18:20
**investor** [3] - 23:16, 23:24, 29:6
**investors** [5] - 23:14, 23:19, 23:22, 92:17, 92:21
**invite** [1] - 31:17
**invited** [1] - 122:13
**invoices** [3] - 63:18, 64:4, 64:10

**involve** [2] - 90:8, 110:17
**involved** [7] - 31:6, 35:25, 36:22, 39:16, 67:12, 92:22, 116:23
**involvement** [4] - 36:7, 102:10, 108:13, 115:9
**involving** [1] - 41:8
**irrelevant** [1] - 92:15
**IS** [3] - 3:4, 3:9, 3:13
**Isaac** [7] - 116:11, 116:12, 116:13, 116:20, 137:23, 139:2, 139:15
**Isaac's** [2] - 119:21, 138:16
**Island** [4] - 56:12, 56:16, 57:18, 57:19
**island** [2] - 73:22, 73:24
**issue** [6] - 32:21, 32:24, 52:8, 140:2, 140:5, 140:7
**issued** [1] - 5:2
**issues** [5] - 16:8, 34:6, 89:17, 89:18, 96:2
**issuing** [1] - 102:11
**IT** [3] - 3:4, 3:9, 3:13
**it'd** [1] - 82:17
**itself** [4] - 33:5, 33:6, 91:21, 94:16

**J**

**JANE** [1] - 1:8
**jar** [1] - 138:9
**Jeffrey** [2] - 21:6, 21:7
**jerseys** [2] - 51:12, 51:16
**jest** [2] - 71:22, 71:23
**JFK** [1] - 74:6
**job** [17] - 17:2, 32:16, 33:3, 34:16, 42:23, 64:21, 67:21, 92:11, 92:13, 114:20, 114:24, 116:22, 118:12, 118:14, 119:16, 139:18, 144:21
**JOHN** [1] - 1:8
**join** [1] - 31:17
**joke** [2] - 69:9, 69:10
**jokes** [2] - 68:21, 73:7
**joking** [1] - 69:8
**Jonathan** [1] - 5:20
**Jose** [2] - 39:9, 39:13
**journal** [1] - 53:13
**jury** [1] - 143:22
**justify** [1] - 64:10

**K**

**Kedem** [2] - 120:13, 120:17
**KEDEM** [1] - 120:13
**keep** [8] - 43:7, 49:10, 55:6, 56:3, 56:6, 97:17, 125:15
**kept** [3] - 63:15, 98:5, 112:16

**kids** [1] - 55:15
**kind** [7] - 22:15, 30:2, 46:23, 73:14, 90:6, 108:22, 120:16
**kindly** [1] - 4:25
**King** [3] - 117:8, 117:9, 117:19
**Knicks** [1] - 64:23
**knowing** [8] - 17:11, 22:10, 59:24, 61:7, 78:22, 119:6, 119:11, 119:25
**knowledge** [17] - 20:13, 20:25, 28:4, 37:22, 38:21, 41:7, 52:19, 59:5, 85:9, 98:4, 98:7, 98:15, 102:8, 118:7, 131:7, 141:23, 142:3
**known** [3] - 17:12, 62:6, 69:9
**knows** [2] - 71:19, 79:12
**Kumar** [7] - 118:8, 130:11, 132:21, 133:17, 134:6, 134:15, 135:7
**KUMAR** [1] - 118:9
**Kumar's** [2] - 118:12, 118:18

**L**

**lack** [3] - 69:18, 85:15, 93:19
**lady** [1] - 93:17
**laid** [2] - 36:18, 90:22
**landlord** [1] - 61:10
**landlord's** [1] - 62:21
**landlords** [2] - 63:6, 63:17
**Lane** [3] - 26:18, 26:21, 115:21
**language** [2] - 138:24, 139:19
**large** [1] - 58:21
**last** [12] - 5:17, 12:18, 13:5, 18:2, 38:17, 77:3, 113:9, 113:11, 113:19, 122:20, 124:7, 135:3
**law** [6] - 5:24, 5:25, 45:11, 63:4, 64:8, 143:24
**laws** [7] - 41:8, 41:24, 42:12, 42:19, 42:21, 62:22, 63:14
**lawsuit** [28] - 6:4, 6:10, 6:12, 9:18, 9:20, 10:4, 10:11, 11:2, 13:7, 14:15, 38:4, 39:14, 54:24, 114:6, 124:13, 124:16, 124:21, 125:4, 125:12, 125:19, 127:22, 130:12, 132:22, 133:16, 135:8, 137:5, 137:15, 137:18
**lawsuits** [1] - 39:21
**layman** [1] - 143:20
**lead** [1] - 101:8
**learn** [2] - 41:17, 50:11

**learned** [5] - 124:15, 127:21, 133:16, 134:6, 135:8
**least** [2] - 30:20, 111:16
**leave** [2] - 19:14, 28:11
**led** [1] - 138:16
**ledger** [1] - 74:21
**ledgers** [1] - 59:6
**LEE** [6] - 1:7, 1:16, 5:6, 5:17, 147:9, 148:10
**Lee** [9] - 5:17, 69:15, 84:7, 88:5, 88:14, 131:24, 132:25, 134:22, 149:6
**Lee@gilmanmanagement .com** [1] - 84:25
**lee@gilmanmanagement .com** [3] - 86:14, 87:13, 129:5
**leedeane @me.com** [5] - 85:3, 86:2, 86:9, 87:4, 129:6
**left** [9] - 13:19, 19:7, 19:23, 20:5, 35:3, 49:25, 50:3, 129:10, 129:16
**legal** [5] - 41:13, 75:24, 105:18, 129:14, 134:7
**lending** [1] - 31:6
**Leonardo** [1] - 69:16
**less** [3] - 25:18, 26:11, 92:15
**letter** [2] - 126:8, 126:16
**letterheads** [1] - 17:14
**level** [3] - 58:9, 92:3, 132:18
**licensed** [1] - 41:19
**licenses** [1] - 29:23
**licensing** [2] - 41:21, 47:7
**lieu** [1] - 4:9
**life** [1] - 56:10
**likely** [4] - 59:16, 133:13, 133:14, 136:22
**limiting** [1] - 60:12
**Linda** [2] - 74:23, 74:25
**line** [4] - 85:24, 86:15, 108:2, 132:12
**list** [2] - 36:5, 61:16
**listed** [1] - 31:10
**litigation** [1] - 128:8
**live** [3] - 27:25, 52:14, 61:22
**lived** [5] - 31:11, 56:9, 56:12, 56:14, 56:15
**livelihood** [2] - 106:18, 107:25
**livelihoods** [1] - 106:24
**lives** [2] - 73:24, 106:24
**living** [2] - 28:18, 92:2
**LLC** [1] - 24:7
**LLP** [2] - 2:4, 5:25
**loan** [6] - 120:4, 120:21, 121:7, 121:8, 121:19, 121:20
**loans** [4] - 119:23, 120:3, 121:11, 121:17
**local** [1] - 61:16

**locate** [1] - 31:20
**located** [3] - 23:11, 27:3, 56:21
**logistic** [1] - 57:18
**look** [12] - 9:6, 11:25, 48:10, 71:7, 87:7, 88:7, 124:16, 127:13, 128:18, 129:3, 131:15, 134:3
**looked** [4] - 122:23, 124:8, 124:12, 129:20
**looking** [3] - 64:6, 130:14, 142:15
**Lopez** [5] - 37:13, 38:11, 38:21, 38:23, 38:25
**Lopez's** [1] - 38:5
**lose** [1] - 43:10
**losing** [2] - 42:23, 117:11
**lost** [1] - 92:18
**low** [2] - 58:10, 58:15
**low-income** [1] - 58:15
**lower** [2] - 88:15, 88:17
**luncheons** [3] - 54:17, 55:6, 55:11
**luxury** [1] - 58:9
**lying** [1] - 138:9
**Lynn** [1] - 148:7
**LYNN** [1] - 148:22

**M**

**madam** [1] - 56:2
**Maduegbuna** [1] - 5:25
**MADUEGBUNA** [2] - 2:4, 2:9
**mail** [37] - 17:15, 82:2, 82:16, 82:22, 84:6, 84:23, 84:24, 85:12, 85:23, 86:3, 86:17, 86:20, 86:24, 87:11, 87:12, 88:11, 88:20, 89:3, 89:9, 91:8, 91:10, 91:22, 128:22, 129:3, 129:13, 131:24, 133:24, 134:5, 134:21, 134:24, 135:4, 136:23, 149:9, 149:9, 149:11
**mails** [14] - 17:13, 81:22, 82:5, 82:9, 85:16, 87:7, 125:13, 125:16, 125:19, 125:25, 129:19, 132:19, 133:15, 135:6
**maintained** [2] - 126:18, 127:4
**maintenance** [1] - 32:20
**majority** [2] - 24:19, 59:22
**make-up** [1] - 60:14
**man** [2] - 140:14, 140:19
**manage** [3] - 19:8, 32:3, 32:13
**managed** [3] - 18:18, 22:23, 27:8
**MANAGEMENT** [1] - 1:7

**Management** [17] - 6:5, 13:20, 15:7, 15:12, 16:24, 18:19, 20:12, 23:5, 26:9, 75:7, 86:11, 117:23, 124:17, 126:19, 127:5, 127:21, 135:20
**management** [10] - 25:14, 29:20, 29:21, 29:24, 41:21, 91:2, 91:20, 91:21, 125:11
**manager** [9] - 17:3, 32:16, 34:21, 35:23, 99:19, 114:21, 117:5, 118:11, 118:17
**Manager** [1] - 117:22
**manages** [3] - 23:5, 24:5, 24:8
**managing** [13] - 18:17, 18:24, 25:6, 25:7, 25:10, 32:17, 34:2, 34:9, 34:13, 37:24, 54:22, 65:6, 90:23
**Manhattan** [1] - 58:7
**manner** [2] - 4:15, 95:21
**Manny** [2] - 37:13, 38:5
**Manny's** [1] - 38:5
**manuals** [1] - 98:17
**Manuel** [1] - 37:13
**Marilyn** [12] - 118:8, 118:10, 118:20, 125:23, 125:24, 129:21, 130:11, 132:21, 133:17, 134:6, 134:15, 135:7
**mark** [1] - 83:4
**marked** [4] - 83:11, 87:18, 88:5, 126:23
**marker** [1] - 133:2
**market** [1] - 58:11
**marriage** [1] - 148:17
**married** [1] - 122:8
**master** [1] - 33:11
**master's** [1] - 29:12
**matter** [5] - 4:11, 9:22, 9:24, 44:11, 148:18
**matters** [1] - 136:20
**MBA** [1] - 29:17
**me.com** [1] - 85:10
**mean** [16] - 16:4, 16:5, 16:23, 23:6, 24:17, 43:14, 47:11, 56:23, 71:7, 85:7, 87:10, 92:11, 120:9, 124:2, 134:9, 139:21
**meaning** [1] - 139:14
**meaningless** [1] - 92:2
**means** [4] - 42:16, 78:23, 85:4, 133:3
**meant** [1] - 132:2
**medical** [1] - 19:19
**meet** [1] - 115:25
**member** [3] - 18:16, 18:17, 45:10
**members** [2] - 23:18, 23:21
**memory** [7] - 9:4, 13:15, 37:11, 132:7, 133:20,

138:10, 141:20
**memory's** [1] - 71:13
**MENAKER** [1] - 148:22
**Menaker** [2] - 1:18, 148:7
**mentor** [1] - 144:13
**Merrick** [2] - 26:25, 27:8
**messages** [2] - 9:7, 34:5
**met** [4] - 31:9, 115:23, 122:3
**meter** [2] - 69:2, 69:24
**Mets** [1] - 64:24
**Michelle** [1] - 119:7
**middle** [2] - 5:19, 58:11
**might** [2] - 72:14, 82:17
**Mill** [7] - 26:18, 26:21, 26:24, 34:8, 34:18, 78:10, 115:21
**mind** [3] - 42:17, 87:25, 92:25
**mine** [1] - 127:19
**minorities** [5] - 59:23, 60:8, 61:22, 62:8, 80:13
**minute** [2] - 94:19, 145:7
**minutes** [5] - 12:19, 12:22, 12:25, 13:2, 81:6
**misconduct** [5] - 53:14, 101:4, 101:5, 102:6, 138:14
**mistaken** [6] - 11:3, 70:15, 85:3, 115:3, 125:14, 125:23
**mom** [1] - 119:4
**mom's** [1] - 135:19
**moment** [1] - 30:21
**money** [14] - 10:10, 31:6, 50:12, 52:3, 52:8, 52:11, 52:13, 52:18, 92:15, 92:17, 140:8, 140:9, 140:24, 144:14
**monitored** [1] - 74:15
**monthly** [1] - 66:20
**months** [1] - 95:7
**mood** [1] - 95:15
**moods** [1] - 93:8
**morning** [3] - 5:11, 5:12, 5:22
**MOSKOWITZ** [1] - 2:14
**most** [9] - 16:9, 34:19, 58:2, 61:4, 67:23, 97:16, 104:21, 133:14, 136:9
**mostly** [2] - 60:8, 61:21
**mother** [6] - 23:23, 50:20, 52:3, 52:11, 52:17, 136:4
**mother's** [2] - 50:12, 65:19
**motivated** [1] - 142:4
**mouth** [3] - 21:25, 22:6, 93:14
**move** [3] - 26:20, 28:5, 28:14
**movie** [8] - 55:15, 55:19, 70:14, 70:15, 71:2, 71:4, 71:8, 71:12
**moving** [1] - 69:25
**MR** [79] - 4:20, 5:10, 11:23,

12:17, 22:7, 42:10, 43:5, 43:16, 44:2, 44:9, 47:24, 48:9, 50:24, 52:21, 53:3, 53:17, 54:9, 55:25, 56:5, 57:7, 57:9, 59:3, 60:16, 61:8, 62:4, 62:15, 75:19, 76:2, 76:15, 79:22, 80:25, 81:12, 82:12, 82:15, 82:20, 83:3, 83:7, 83:12, 84:4, 84:17, 87:19, 88:19, 95:5, 96:18, 96:22, 96:24, 98:2, 99:10, 100:16, 102:18, 103:2, 103:9, 103:17, 103:25, 105:6, 105:14, 105:22, 106:15, 106:21, 107:8, 107:23, 108:12, 110:12, 111:5, 111:6, 117:15, 117:18, 121:3, 122:2, 126:3, 126:6, 126:24, 128:17, 131:23, 136:21, 142:7, 143:2, 144:24, 145:10
**MS** [79] - 4:22, 11:9, 11:15, 11:18, 12:14, 16:10, 16:21, 22:2, 42:7, 42:24, 43:12, 43:24, 44:6, 44:17, 45:16, 47:20, 48:5, 50:21, 52:16, 52:24, 54:7, 55:22, 57:4, 58:23, 60:11, 60:20, 61:5, 61:24, 62:9, 63:10, 63:22, 68:5, 72:11, 75:14, 75:23, 76:7, 79:15, 80:21, 81:8, 82:24, 83:6, 83:9, 83:22, 84:11, 89:25, 94:25, 96:13, 97:19, 99:6, 100:13, 102:14, 102:23, 103:6, 105:2, 105:10, 105:17, 106:2, 106:10, 106:19, 106:25, 107:19, 108:6, 110:9, 111:3, 117:13, 117:16, 120:22, 121:14, 121:23, 128:11, 131:4, 131:18, 136:17, 137:8, 141:24, 142:16, 142:23, 145:13, 145:15
**municipalities** [1] - 33:17
**municipality** [2] - 23:11, 32:22

# N

**name** [19] - 4:18, 5:16, 5:17, 5:18, 5:19, 5:23, 11:13, 14:6, 39:9, 39:10, 69:18, 71:8, 77:2, 77:3, 85:10, 86:16, 86:23, 88:14, 122:6
**name's** [1] - 69:15
**named** [6] - 1:10, 37:12, 72:15, 117:7, 118:22, 130:13
**names** [1] - 1:8
**narcissistic** [1] - 53:25
**narrow** [1] - 60:18
**native** [1] - 138:21

**nature** [3] - 15:2, 130:16, 142:18
**near** [1] - 73:20
**necessarily** [2] - 92:7, 99:2
**necessary** [2] - 8:5, 111:22
**Neck** [1] - 26:18
**need** [5] - 7:8, 7:20, 35:15, 56:2, 79:7
**needed** [2] - 28:11, 28:16
**needs** [2] - 19:19, 52:15
**neighborhood** [1] - 57:3
**neighborhoods** [3] - 56:18, 56:22, 57:11
**Nelson** [1] - 114:12
**never** [38] - 17:18, 22:13, 22:22, 28:17, 46:11, 46:13, 46:18, 46:21, 46:24, 53:6, 54:11, 54:12, 54:15, 55:4, 55:21, 72:13, 74:10, 74:13, 75:8, 78:15, 78:18, 79:20, 80:2, 87:24, 93:5, 96:4, 101:15, 101:20, 101:21, 104:15, 112:19, 120:2, 120:4, 120:7, 131:11, 139:23, 144:19
**NEW** [3] - 1:2, 148:3, 148:5
**new** [2] - 31:20, 91:4
**New** [16] - 1:20, 2:8, 2:17, 6:7, 26:19, 27:2, 27:9, 41:19, 45:8, 56:10, 56:19, 57:14, 61:17, 61:20, 74:6, 148:9
**news** [1] - 109:6
**next** [3] - 27:14, 84:15, 121:5
**nickname** [2] - 69:14, 69:17
**nobody** [1] - 91:24
**none** [10] - 8:15, 10:3, 19:6, 20:6, 29:21, 31:24, 53:16, 64:12, 142:5, 144:8
**Notary** [2] - 1:19, 148:8
**notations** [1] - 100:6
**notebook** [1] - 75:4
**noted** [1] - 145:16
**notes** [5] - 8:19, 8:22, 9:5, 9:6, 145:3
**nothing** [10] - 47:16, 63:24, 68:8, 74:16, 92:20, 121:15, 124:5, 130:3, 130:9, 138:15
**notice** [4] - 1:18, 29:6, 101:5, 107:11
**November** [4] - 1:13, 134:21, 146:2, 149:2
**number** [3] - 83:15, 141:13, 143:4
**numbers** [1] - 83:8
**NY** [2] - 2:8, 2:17

# O

**oath** [5] - 3:12, 4:9, 6:18,

9:9, 81:17
**object** [22] - 16:10, 17:22, 42:7, 42:24, 44:17, 45:16, 47:20, 52:16, 58:23, 60:11, 63:10, 63:22, 68:5, 72:11, 76:4, 90:2, 102:14, 102:23, 105:10, 105:16, 108:6, 131:4
**objecting** [2] - 105:17, 106:25
**Objection** [3] - 128:11, 136:17, 137:8
**objection** [33] - 22:2, 43:12, 43:24, 44:6, 44:23, 48:6, 50:21, 52:24, 57:4, 61:5, 61:24, 62:9, 62:10, 75:14, 75:23, 79:15, 80:21, 94:25, 96:13, 97:19, 99:6, 100:13, 103:6, 105:2, 106:2, 106:10, 107:19, 111:3, 120:22, 121:14, 121:23, 141:24, 142:23
**objections** [2] - 3:6, 4:15
**obligation** [1] - 89:22
**obligations** [1] - 90:10
**obtain** [3] - 13:18, 63:8, 63:20
**occasions** [1] - 93:9
**occur** [3] - 78:10, 96:19, 113:17
**occurred** [2] - 102:7, 109:11
**October** [4] - 88:13, 88:23, 113:11, 149:11
**OF** [3] - 1:2, 148:3, 148:5
**offended** [1] - 140:18
**offense** [4] - 35:4, 68:22, 75:22
**offensive** [8] - 55:7, 75:11, 75:18, 76:12, 79:4, 79:10, 80:7, 80:10
**offer** [2] - 59:17, 92:9
**office** [49] - 32:25, 33:5, 33:6, 34:4, 34:21, 35:18, 35:22, 51:6, 59:20, 66:7, 66:8, 67:15, 67:24, 68:4, 68:7, 68:15, 70:20, 70:21, 73:2, 73:9, 74:2, 74:8, 76:17, 79:20, 80:20, 86:25, 90:9, 93:13, 94:10, 94:23, 99:19, 101:15, 109:7, 109:20, 110:23, 111:2, 111:8, 113:18, 113:23, 115:21, 116:3, 118:11, 118:17, 120:6, 120:10, 123:9, 125:20, 132:12, 134:11
**officer** [1] - 3:11
**official** [2] - 32:12, 32:15
**officially** [1] - 17:12
**often** [1] - 68:12
**on-site** [1] - 118:11
**on-the-ground** [2] - 59:25,

60:5

**once** [3] - 65:3, 123:25, 128:9

**one** [30] - 7:17, 15:11, 29:8, 30:15, 30:16, 38:19, 39:11, 57:25, 60:23, 61:17, 66:6, 66:25, 67:17, 83:25, 86:4, 88:5, 95:16, 95:21, 95:25, 128:3, 129:19, 132:19, 132:23, 133:15, 134:9, 134:25, 135:6, 136:6, 144:20

**one's** [2] - 41:15, 95:22

**one-page** [1] - 88:5

**openly** [1] - 120:11

**operating** [1] - 24:12

**operations** [1] - 90:24

**opinion** [28] - 44:21, 44:22, 44:24, 45:19, 45:20, 45:21, 75:10, 75:16, 76:6, 76:8, 76:11, 78:25, 79:9, 80:6, 80:9, 92:9, 102:25, 103:22, 103:24, 105:13, 106:12, 108:9, 112:15, 112:16, 120:20, 121:9, 128:15, 142:24

**opinions** [1] - 112:11

**opportunity** [3] - 8:2, 94:16, 104:8

**order** [1] - 63:20

**organization** [1] - 134:10

**original** [1] - 83:25

**originally** [1] - 128:22

**ourselves** [1] - 90:4

**out-of-pocket** [1] - 144:15

**outcome** [1] - 148:18

**Outlook** [2] - 86:19, 86:23

**outside** [5] - 12:4, 13:6, 48:23, 69:20, 104:19

**oversee** [3] - 18:14, 30:4, 35:21

**overseeing** [2] - 35:18, 90:23

**owed** [2] - 10:10, 52:3

**owing** [1] - 19:14

**own** [13] - 12:4, 57:17, 75:16, 90:10, 90:11, 93:14, 103:23, 106:12, 108:8, 111:19, 112:14, 112:15

**owned** [3] - 20:24, 24:7, 27:8

**owner** [3] - 18:9, 21:4, 21:10

**ownership** [3] - 18:13, 22:20, 24:2

## P

**p.m** [1] - 145:16

**Pace** [1] - 29:18

**PAGE** [2] - 149:5, 149:8

**page** [9] - 83:20, 83:21, 84:15, 88:5, 127:11, 128:18, 131:14, 133:22, 134:19

**PAGE/LINE** [1] - 146:5

**paid** [5] - 36:10, 66:2, 92:13, 103:5, 130:19

**pain** [2] - 44:5, 44:16

**painful** [1] - 45:13

**paper** [1] - 68:25

**paperwork** [4] - 23:10, 33:21, 97:12, 129:10

**parcel** [1] - 41:20

**parents** [2] - 31:22

**parking** [2] - 140:15, 140:20

**part** [6] - 18:21, 41:20, 67:20, 126:16, 131:2, 135:25

**participating** [1] - 4:3

**participation** [1] - 141:21

**particular** [4] - 35:11, 35:16, 67:13, 132:9

**parties** [4] - 3:6, 4:13, 69:21, 148:16

**partly** [1] - 130:23

**partners** [1] - 21:6

**passed** [2] - 21:7, 137:19

**passing** [1] - 135:19

**past** [1] - 74:2

**pat** [2] - 17:8, 71:15

**paycheck** [4] - 42:23, 43:11, 103:13, 107:25

**payers** [1] - 23:8

**paying** [1] - 134:11

**payment** [1] - 33:15

**payroll** [2] - 119:5, 119:10

**penalty** [1] - 4:12

**pending** [1] - 7:10

**people** [24] - 16:9, 31:12, 33:8, 36:10, 45:8, 45:9, 49:10, 60:3, 74:8, 75:3, 79:3, 79:7, 86:24, 92:14, 94:5, 110:25, 111:7, 111:8, 113:3, 120:7, 121:5, 125:20, 138:23

**people's** [1] - 36:12

**per** [2] - 29:23, 67:8

**perceived** [1] - 75:20

**percent** [2] - 59:7

**percentage** [2] - 22:21, 58:18

**perfect** [2] - 95:23, 138:16

**perfectly** [1] - 9:8

**perform** [1] - 77:19

**performance** [1] - 25:24

**period** [6] - 38:24, 68:3, 76:25, 95:8, 113:6, 121:8

**perjury** [1] - 4:12

**permitted** [1] - 64:17

**Perry** [2] - 70:15, 71:6

**person** [9] - 4:9, 33:14, 44:15, 67:18, 72:9, 76:13, 109:2, 109:3, 132:14

**person's** [1] - 7:18

**personal** [23] - 45:5, 45:21, 45:24, 63:12, 64:2, 73:12, 73:14, 75:16, 76:5, 76:8, 76:11, 80:9, 80:23, 98:7, 102:25, 103:21, 103:22, 106:12, 108:8, 120:10, 121:7, 123:2, 128:14

**personally** [4] - 43:17, 107:4, 121:25, 125:21

**personnel** [10] - 36:2, 97:2, 97:5, 97:9, 98:4, 98:10, 107:13, 107:17, 108:4, 115:10

**persons** [1] - 1:9

**perspective** [1] - 118:19

**pertinent** [1] - 34:7

**pet** [1] - 69:18

**phrase** [2] - 70:19, 78:19

**phrased** [1] - 76:10

**phraseology** [1] - 118:5

**physical** [2] - 49:23, 50:2

**physically** [1] - 4:5

**pick** [2] - 73:19, 74:5

**picked** [3] - 8:6, 93:9, 95:15

**picking** [2] - 67:15, 140:8

**picture** [2] - 51:11, 51:15

**pitched** [1] - 66:18

**place** [2] - 94:12, 128:8

**places** [1] - 97:7

**Plaintiff** [5] - 1:5, 1:17, 4:21, 6:2, 27:25

**plaintiff** [2] - 2:5, 83:4

**PLAINTIFF'S** [1] - 149:8

**Plaintiff's** [10] - 83:10, 84:8, 87:16, 87:17, 88:3, 126:22, 127:2, 131:14, 133:21, 134:20

**plaintiffs** [1] - 83:7

**plan** [2] - 58:8, 108:4

**planned** [2] - 107:13, 107:18

**planning** [1] - 99:20

**players** [1] - 51:16

**plenty** [1] - 66:13

**pocket** [1] - 144:15

**point** [5] - 10:11, 86:12, 93:4, 139:22, 144:20

**points** [2] - 90:6, 134:9

**police** [1] - 51:24

**policies** [5] - 45:25, 46:4, 46:9, 47:19, 48:2

**policy** [3] - 100:17, 100:20, 101:3

**politicians** [1] - 61:16

**Pomerantz** [1] - 118:23

**poor** [3] - 112:3, 112:4, 112:12

**poorly** [1] - 142:21

**popular** [1] - 71:2

**populate** [1] - 86:23

**populated** [1] - 86:16

**portal** [1] - 40:14

**position** [5] - 37:23, 77:20, 90:6, 104:8, 104:13

**possibilities** [1] - 63:16

**possible** [3] - 24:11, 113:22, 113:25

**poverty** [1] - 92:2

**practical** [1] - 44:11

**practically** [1] - 24:14

**practice** [5] - 48:19, 64:9, 101:3, 108:3, 142:12

**precise** [7] - 20:2, 59:17, 60:25, 73:6, 77:23, 90:17, 123:22

**precisely** [9] - 20:3, 20:23, 50:7, 67:8, 77:8, 88:25, 95:10, 113:8, 113:13

**predicated** [2] - 41:15, 92:18

**preface** [2] - 27:14, 78:8

**prejudiced** [3] - 52:23, 53:5, 53:25

**prejudicial** [1] - 108:7

**prep** [1] - 12:20

**preparation** [1] - 12:6

**prepare** [3] - 10:17, 12:10, 23:9

**prepared** [1] - 125:21

**presence** [2] - 6:11, 12:5

**PRESENT** [1] - 2:21

**present** [6] - 4:5, 4:25, 19:5, 94:16, 113:14, 135:19

**presented** [1] - 10:24

**President** [10] - 17:6, 17:10, 17:13, 17:17, 28:24, 89:21, 90:5, 90:14, 90:18, 115:3

**presumption** [3] - 22:17, 22:18, 22:19

**pretty** [5] - 17:21, 30:23, 31:14, 82:10, 125:15

**previous** [1] - 16:21

**previously** [2] - 16:19, 16:20

**price** [3] - 62:21, 63:2, 63:21

**primarily** [2] - 33:9, 58:11

**primary** [1] - 33:9

**principle** [1] - 103:4

**print** [1] - 135:13

**printed** [4] - 132:20, 133:3, 133:11, 134:5

**private** [1] - 142:12

**privilege** [1] - 7:11

**problem** [3] - 83:9, 144:19

**problems** [2] - 138:17, 138:18

**proceedings** [2] - 81:11, 145:9

**produced** [2] - 88:11, 91:8

**production** [5] - 53:21, 83:14, 83:16, 88:4, 127:3
**professional** [1] - 75:12
**proffered** [1] - 59:9
**profit** [1] - 27:15
**profitable** [1] - 63:8
**profits** [1] - 22:12
**programs** [1] - 62:17
**progressive** [3] - 100:21, 100:22, 101:2
**prohibit** [1] - 42:12
**prohibiting** [7] - 41:9, 46:2, 46:10, 46:16, 46:20, 47:3, 48:3
**promoted** [1] - 36:14
**propensity** [1] - 93:6
**proper** [6] - 11:13, 50:15, 77:15, 100:5, 103:16, 118:5
**properly** [1] - 32:20
**properties** [5] - 23:9, 56:21, 57:13, 57:20, 90:24
**property** [6] - 23:11, 28:2, 32:23, 50:16, 58:19, 117:5
**protect** [2] - 41:25, 42:21
**protection** [1] - 43:15
**protections** [1] - 43:6
**prove** [3] - 63:19, 130:16, 143:23
**provide** [5] - 44:21, 45:19, 48:15, 64:22, 119:23
**providing** [1] - 48:11
**Public** [2] - 1:19, 148:8
**Puerto** [2] - 38:7, 114:18
**pull** [1] - 35:13
**punitive** [4] - 143:15, 143:18, 143:22, 143:24
**purely** [4] - 18:25, 69:7, 108:10, 108:19
**purpose** [2] - 38:4, 137:4
**purposes** [3] - 54:24, 108:22, 121:10
**pursuant** [2] - 1:17, 50:15
**purview** [1] - 90:25
**put** [13] - 33:10, 45:7, 79:23, 82:22, 92:25, 104:8, 104:12, 127:24, 128:8, 129:25, 135:24, 136:24, 140:4
**putting** [1] - 69:23

## Q

**quantify** [1] - 60:24
**quarterly** [1] - 23:13
**quarters** [1] - 139:12
**Queens** [4] - 29:16, 56:15, 58:5, 58:7
**questions** [7] - 6:10, 7:19, 20:10, 27:13, 111:23, 114:11, 145:11

**quick** [4] - 6:15, 20:9, 81:3, 145:3
**quicker** [1] - 82:18
**quite** [2] - 19:25, 93:6
**quote** [3] - 78:13, 91:23, 92:3

## R

**race** [19] - 38:3, 38:6, 39:14, 41:16, 44:13, 45:11, 54:23, 73:4, 73:8, 93:14, 93:22, 95:17, 114:17, 115:7, 116:5, 116:25, 117:24, 118:18, 119:20
**racial** [4] - 41:3, 54:14, 123:25, 130:14
**racially** [1] - 142:4
**raise** [3] - 42:22, 62:21, 94:4
**raised** [4] - 16:8, 92:6, 94:9, 144:7
**Ramona** [9] - 77:2, 77:5, 77:12, 93:17, 93:25, 94:3, 94:6, 94:9, 95:6
**randomly** [1] - 133:10
**range** [2] - 37:6, 59:14
**Raphael** [67] - 6:6, 14:4, 14:7, 14:8, 14:9, 14:14, 17:9, 17:16, 18:9, 18:10, 19:8, 19:23, 20:5, 21:2, 21:3, 21:11, 21:20, 21:24, 22:9, 24:15, 25:11, 25:21, 27:18, 28:10, 28:13, 28:18, 28:23, 31:21, 35:17, 38:2, 38:12, 39:2, 46:14, 49:21, 51:8, 52:6, 52:22, 53:9, 53:15, 53:24, 54:13, 54:17, 55:2, 55:9, 55:13, 62:13, 64:9, 64:22, 65:10, 65:23, 72:23, 74:4, 74:11, 74:14, 78:12, 89:4, 89:13, 91:17, 109:17, 114:2, 115:18, 119:7, 136:3, 138:9, 141:4, 142:10, 142:19
**RAPHAEL** [1] - 1:7
**Raphael's** [8] - 34:15, 55:7, 62:5, 65:19, 73:12, 89:24, 119:4, 119:8
**ratcheting** [1] - 101:10
**reach** [1] - 132:6
**react** [1] - 142:21
**reaction** [2] - 70:12, 140:21
**read** [20] - 7:6, 13:10, 13:22, 13:24, 15:23, 83:22, 86:6, 88:10, 89:10, 91:10, 91:15, 91:22, 92:4, 103:17, 103:19, 127:3, 131:20, 131:22, 134:4, 143:12
**readily** [1] - 92:12
**reading** [3] - 85:2, 89:6, 91:13

**real** [9] - 9:14, 9:21, 9:24, 30:11, 30:19, 30:25, 31:3, 31:5, 31:25
**realize** [1] - 68:22
**really** [33] - 19:25, 21:18, 29:22, 39:16, 40:20, 44:19, 50:7, 57:12, 59:2, 62:22, 69:4, 70:5, 70:13, 86:18, 89:16, 90:6, 96:21, 104:19, 104:20, 107:21, 108:25, 114:4, 115:11, 118:14, 132:6, 134:9, 136:14, 137:12, 137:16, 137:17, 138:22, 139:20, 140:11
**reason** [15] - 8:9, 8:12, 17:7, 42:17, 66:16, 73:25, 123:11, 123:17, 123:19, 124:24, 124:25, 135:11, 135:16, 135:17, 136:15
**reasonable** [1] - 137:10
**reasons** [1] - 57:18
**reassigned** [1] - 24:2
**receive** [7] - 13:13, 65:2, 65:7, 65:10, 65:12, 88:20, 141:4
**received** [9] - 13:21, 14:18, 38:25, 39:5, 65:16, 87:11, 89:9, 109:6, 130:16
**recently** [4] - 78:5, 122:24, 123:4, 144:12
**recess** [2] - 81:11, 145:9
**recognize** [1] - 14:12
**recollection** [20] - 9:16, 10:9, 21:5, 28:3, 28:7, 35:9, 38:13, 48:13, 49:8, 60:22, 70:3, 81:25, 85:19, 87:10, 91:12, 93:10, 93:12, 98:14, 115:15, 140:12
**record** [9] - 4:19, 5:16, 6:17, 74:19, 75:3, 97:17, 129:24, 137:7, 148:13
**refer** [5] - 15:13, 55:3, 74:11, 78:21, 80:7
**reference** [5] - 70:14, 71:2, 71:12, 82:24, 93:22
**referencing** [1] - 79:13
**referred** [5] - 62:14, 64:4, 75:6, 76:12, 80:19
**referring** [2] - 16:12, 66:12
**refinance** [1] - 50:16
**refuse** [1] - 55:5
**refusing** [1] - 55:10
**regard** [1] - 30:5
**reimbursed** [1] - 67:11
**rejected** [1] - 45:13
**related** [1] - 148:16
**relation** [1] - 93:16
**relationship** [4] - 19:22, 49:20, 68:9, 96:10
**relax** [1] - 112:25
**relevance** [1] - 52:17

**relevant** [1] - 139:20
**religion** [2] - 91:25, 93:3
**remarks** [1] - 7:18
**remember** [38] - 35:13, 50:7, 51:22, 51:25, 65:24, 71:12, 71:14, 71:16, 77:7, 77:9, 78:4, 88:22, 88:25, 95:8, 96:20, 97:22, 99:24, 100:9, 108:25, 109:4, 109:15, 109:21, 113:13, 113:21, 114:4, 114:5, 122:22, 124:11, 131:13, 132:23, 134:16, 134:17, 135:9, 135:10, 138:19, 140:16, 140:17, 140:23
**remind** [2] - 81:16, 90:3
**REMOTE** [1] - 2:2
**remotely** [3] - 1:18, 4:7, 9:2
**RENE** [1] - 117:4
**Rene** [3] - 54:17, 55:3, 117:4
**rent** [7] - 23:7, 35:15, 62:17, 63:3, 63:8, 63:20, 64:10
**rent-stabilization** [1] - 62:17
**rent-stabilized** [1] - 63:3
**rents** [2] - 33:10, 33:12
**repeat** [2] - 7:5, 117:17
**report** [4] - 25:5, 25:10, 25:20, 35:5
**reported** [1] - 1:18
**reporter** [6] - 7:6, 7:17, 8:6, 55:23, 84:2, 103:20
**Reporter** [3] - 1:19, 56:3, 148:8
**REPORTER** [2] - 4:2, 4:24
**reporter's** [1] - 81:4
**reporting** [2] - 4:6, 4:16
**repository** [1] - 85:15
**representation** [1] - 132:10
**represents** [1] - 6:2
**reprimand** [6] - 96:7, 102:3, 137:16, 139:25, 141:5, 141:6
**reprimanded** [1] - 36:16
**reprimands** [4] - 39:6, 100:18, 101:8, 102:12
**reputation** [2] - 61:10, 62:6
**request** [3] - 53:18, 53:21, 99:15
**REQUEST** [1] - 149:15
**requested** [1] - 103:19
**requesting** [1] - 99:19
**requests** [2] - 83:18, 84:2
**require** [1] - 74:4
**required** [8] - 23:10, 65:18, 65:20, 66:14, 66:23, 67:2, 77:20, 99:14
**requires** [1] - 6:19
**requisite** [1] - 23:10
**reserved** [1] - 3:7
**resign** [1] - 138:13

resource [6] - 98:5, 126:18, 127:25, 128:6, 130:25, 131:15

resources [2] - 127:4, 127:8

respect [9] - 10:24, 29:23, 32:22, 46:8, 91:2, 91:3, 93:22, 134:11, 142:3

respective [1] - 3:5

response [3] - 11:4, 83:18, 98:13

responses [2] - 8:5, 11:25

responsibilities [4] - 90:7, 90:11, 90:21, 91:19

responsibility [1] - 144:6

responsible [2] - 33:15, 67:15

result [1] - 48:19

resume [1] - 77:16

retaliated [1] - 43:10

retaliating [1] - 42:12

retaliation [7] - 15:20, 43:7, 47:2, 47:4, 105:9, 105:25, 106:7

retire [2] - 19:18, 26:3

retired [3] - 26:7, 26:16, 37:15

retrieve [2] - 10:9, 34:5

retrieved [1] - 133:6

returns [1] - 29:7

Revenue [1] - 33:22

revenue [1] - 22:12

review [5] - 9:6, 10:20, 10:22, 12:5, 84:13

reviewed [5] - 10:23, 11:5, 11:10, 11:11, 11:24

reviewing [1] - 88:9

rewarded [1] - 121:22

Rico [2] - 38:8, 114:18

ridiculous [2] - 124:3, 130:16

Road [2] - 26:25, 27:8

road [1] - 73:17

Rob [4] - 73:18, 74:3, 91:5, 141:6

Rob's [1] - 116:4

ROBERT [1] - 1:7

Robert [24] - 6:6, 18:9, 18:10, 20:25, 28:18, 31:9, 31:10, 34:15, 35:6, 35:7, 35:17, 36:24, 38:2, 38:11, 50:3, 89:4, 89:13, 89:18, 89:19, 108:19, 114:23, 119:4, 142:11, 142:25

Robert's [1] - 20:13

Rockville [2] - 26:25, 27:9

roll [1] - 35:15

roof [1] - 139:11

room [4] - 4:6, 8:16, 9:3, 142:9

rudely [1] - 138:21

rules [8] - 46:15, 46:19, 46:22, 47:3, 98:19, 98:24, 99:5, 99:11

run [1] - 30:3

# S

sad [1] - 135:21

safe [2] - 43:8, 49:10

sam.m@mcande.com [1] - 2:10

SAMUEL [1] - 2:9

saved [1] - 100:7

savings [1] - 120:16

saw [12] - 40:22, 46:12, 46:21, 60:19, 80:2, 85:5, 101:15, 101:20, 110:21, 111:20, 122:20, 135:3

scary [1] - 140:19

screaming [2] - 138:23, 141:7

screen [5] - 55:17, 82:13, 96:23, 126:4, 126:8

scroll [2] - 83:24, 84:14

se [2] - 29:23, 67:8

sealing [1] - 3:14

searched [1] - 135:7

second [4] - 82:19, 83:21, 109:3, 144:21

Section [4] - 58:12, 58:13, 58:19, 59:8

see [16] - 44:19, 60:8, 60:9, 64:6, 69:19, 82:21, 88:16, 88:18, 96:4, 116:3, 126:8, 126:12, 126:14, 126:20, 128:25, 143:14

seeing [4] - 60:3, 86:8, 91:12, 92:10

seeking [1] - 143:15

seem [4] - 69:3, 128:20, 134:8, 140:10

seemingly [1] - 84:23

self [3] - 90:4, 90:13, 137:21

self-appointed [2] - 90:4, 90:13

self-serving [1] - 137:21

send [3] - 48:3, 81:22, 99:18

sense [4] - 31:19, 59:4, 97:21, 128:15

sent [4] - 87:12, 125:20, 128:23, 129:12

separately [1] - 24:5

September [1] - 72:4

serious [3] - 15:25, 16:2, 16:5

seriously [2] - 106:9, 106:13

serve [1] - 60:22

server [1] - 133:6

serves [4] - 13:15, 37:11, 87:10, 93:10

Service [1] - 33:22

serving [1] - 137:21

sessions [1] - 12:21

set [1] - 148:11

several [1] - 30:14

severe [1] - 101:8

share [4] - 82:12, 112:21, 112:22, 126:3

shared [1] - 112:19

shareholder [1] - 24:19

sharing [1] - 96:23

shooting [2] - 59:15, 133:19

short [9] - 56:2, 66:15, 67:3, 76:25, 95:8, 95:11, 95:12, 140:9, 140:24

short-staffed [2] - 66:15, 67:3

Shorthand [2] - 1:19, 148:7

shorting [1] - 50:20

show [4] - 82:13, 82:18, 126:25, 127:7

showed [1] - 11:19

showing [7] - 22:12, 84:5, 87:15, 88:2, 124:3, 133:21, 134:19

shown [1] - 22:11

shows [1] - 62:7

shred [1] - 130:15

shrugs [1] - 8:7

shutting [1] - 142:13

sic] [1] - 34:23

side [3] - 39:17, 116:24, 144:15

sign [1] - 79:23

signed [3] - 3:10, 11:21, 51:16

significantly [1] - 62:23

silver [2] - 21:24, 22:6

similar [1] - 30:2

sit [1] - 95:24

site [2] - 118:11, 130:7

sitting [1] - 109:9

situation [8] - 104:5, 105:5, 106:4, 108:11, 110:17, 121:2, 128:14, 140:22

situations [1] - 19:13

six [1] - 71:14

skills [2] - 112:4, 112:13

skin [3] - 45:3, 91:25, 93:3

slumlord [4] - 61:13, 61:22, 62:6, 62:14

slumlords [1] - 61:17

slurs [2] - 54:14

small [7] - 10:14, 31:14, 58:21, 109:7, 110:23, 120:6, 120:10

snacks [1] - 67:15

sneak [1] - 137:5

software [2] - 33:11, 86:20

sole [1] - 21:10

solely [2] - 45:2, 130:22

someone [17] - 33:20, 44:11, 44:25, 64:6, 72:15, 74:19, 78:25, 79:6, 79:23, 96:5, 97:11, 117:7, 118:22, 125:8, 135:13, 137:15, 139:18

sometimes [4] - 79:11, 116:2, 138:19, 139:16

somewhat [1] - 142:14

somewhere [1] - 59:6

sorry [8] - 47:13, 87:24, 98:12, 107:22, 109:24, 115:12, 129:16, 129:17

sort [4] - 14:8, 76:3, 141:5, 142:5

sorts [1] - 48:24

sounding [1] - 144:10

sounds [4] - 34:9, 39:10, 81:8, 137:10

source [1] - 91:4

speaking [4] - 24:14, 107:5, 121:25, 139:18

special [1] - 68:8

specific [7] - 54:3, 54:5, 56:22, 56:23, 56:24, 57:3, 57:11

spelled [3] - 116:18, 117:4, 120:13

spend [1] - 74:20

spic [1] - 55:3

spit [1] - 51:7

spoken [2] - 92:5, 114:8

spoon [2] - 21:25, 22:6

sport [1] - 64:22

sports [2] - 51:11, 51:15

spread [2] - 57:20, 58:2

squeeze [1] - 134:10

ss [1] - 148:4

St [1] - 118:2

stabilization [1] - 62:17

stabilized [1] - 63:3

staffed [2] - 66:15, 67:3

stamped [1] - 127:6

stand [2] - 48:6, 81:5

stands [5] - 42:17, 43:12, 44:23, 84:9, 106:3

start [6] - 46:6, 49:13, 57:5, 101:6, 138:22

started [5] - 16:25, 20:11, 27:5, 31:8, 121:4

STATE [1] - 148:3

state [4] - 5:16, 41:8, 42:11, 61:25

State [2] - 1:20, 148:9

statement [3] - 54:4, 54:5, 61:3

Staten [2] - 57:18, 57:19

**States** [1] - 80:12
**STATES** [1] - 1:2
**stating** [2] - 4:18, 105:15
**STEIN** [80] - 2:18, 4:22, 11:9, 11:15, 11:18, 12:14, 16:10, 16:21, 22:2, 42:7, 42:24, 43:12, 43:24, 44:6, 44:17, 45:16, 47:20, 48:5, 50:21, 52:16, 52:24, 54:7, 55:22, 57:4, 58:23, 60:11, 60:20, 61:5, 61:24, 62:9, 63:10, 63:22, 68:5, 72:11, 75:14, 75:23, 76:7, 79:15, 80:21, 81:8, 82:24, 83:6, 83:9, 83:22, 84:11, 89:25, 94:25, 96:13, 97:19, 99:6, 100:13, 102:14, 102:23, 103:6, 105:2, 105:10, 105:17, 106:2, 106:10, 106:19, 106:25, 107:19, 108:6, 110:9, 111:3, 117:13, 117:16, 120:22, 121:14, 121:23, 128:11, 131:4, 131:18, 136:17, 137:8, 141:24, 142:16, 142:23, 145:13, 145:15
**Stein** [1] - 4:22
**stereotyped** [1] - 140:19
**sticking** [1] - 139:22
**still** [5] - 23:24, 37:15, 81:17, 118:6, 137:25
**STIPULATED** [3] - 3:4, 3:9, 3:13
**STIPULATIONS** [1] - 3:2
**stolen** [2] - 50:12, 50:13
**stop** [3] - 17:24, 19:11, 96:22
**store** [2] - 73:20, 144:22
**stories** [1] - 68:17
**story** [2] - 55:18, 55:21
**Street** [2] - 2:6, 2:16
**stress** [3] - 69:2, 69:24, 132:18
**stressed** [1] - 70:2
**stretch** [1] - 81:6
**struggling** [2] - 27:21, 28:21
**stuck** [1] - 14:10
**stuff** [2] - 51:21, 130:19
**subjected** [1] - 15:5
**submit** [4] - 40:16, 63:18, 97:14, 99:15
**subordinate** [1] - 104:10
**subordinates** [1] - 104:3
**Subscribed** [1] - 147:13
**substantiate** [1] - 129:11
**succeeded** [1] - 118:10
**sued** [2] - 123:25, 128:9
**suggest** [1] - 112:5
**suggestion** [1] - 140:18
**suing** [1] - 52:5

**super** [2] - 54:22, 117:6
**superintendents** [2] - 25:2, 25:4
**supers** [2] - 32:19, 39:12
**supervise** [4] - 24:22, 32:5, 32:9, 35:8
**supervised** [3] - 34:13, 34:17, 114:22
**supervisor** [6] - 18:7, 32:12, 37:25, 77:10, 99:16, 104:16
**supplemented** [1] - 83:19
**supposed** [1] - 128:6
**surprise** [1] - 80:3
**surprised** [1] - 80:5
**Susan** [1] - 118:22
**suspension** [1] - 101:9
**switch** [2] - 64:20, 114:9
**sworn** [4] - 3:10, 5:8, 147:13, 148:12
**system** [4] - 33:11, 100:11, 100:15, 125:15

## T

**tax** [2] - 33:17, 33:22
**team** [1] - 66:24
**tease** [1] - 74:8
**technically** [1] - 23:25
**telephone** [1] - 13:4
**temper** [2] - 142:19, 142:25
**temporarily** [1] - 55:9
**ten** [8] - 13:2, 26:11, 26:12, 26:15, 30:15, 32:2, 78:5, 94:19
**ten-minute** [1] - 94:19
**tenant** [4] - 40:8, 40:14, 60:14, 64:6
**tenants** [12] - 23:7, 40:11, 41:2, 41:24, 42:2, 58:13, 58:19, 59:7, 59:23, 60:9, 61:4, 64:13
**Teppel** [4] - 114:23, 115:9, 115:14, 133:25
**TEPPEL** [1] - 115:4
**Teppel's** [2] - 114:24, 115:6
**term** [6] - 69:18, 75:8, 77:15, 85:15, 93:20, 100:24
**terminated** [18] - 27:12, 36:20, 38:17, 72:5, 77:21, 78:3, 88:24, 89:2, 109:23, 110:2, 110:8, 110:18, 111:12, 111:18, 112:6, 113:10, 114:3, 114:7
**termination** [7] - 39:3, 101:10, 101:11, 108:14, 109:11, 115:14, 143:9
**terms** [3] - 27:15, 29:10, 118:11
**terrible** [1] - 121:6

**testified** [4] - 5:8, 9:9, 49:21, 102:15
**testify** [1] - 59:13
**testimony** [7] - 4:11, 9:4, 90:12, 123:19, 133:7, 144:5, 148:13
**text** [1] - 9:7
**THE** [9] - 4:2, 4:24, 12:16, 82:14, 83:24, 84:16, 126:5, 131:20, 145:14
**theater** [2] - 55:15, 55:20
**themselves** [1] - 99:4
**thinking** [2] - 93:11, 111:16
**thorough** [1] - 36:5
**threatened** [1] - 129:14
**three** [2] - 58:3, 139:6
**throats** [1] - 93:18
**throughout** [3] - 57:20, 99:22, 141:12
**throw** [3] - 51:10, 51:14, 51:19
**tickets** [5] - 64:23, 65:2, 65:10, 65:13, 65:16
**timeframe** [1] - 99:20
**title** [11] - 17:2, 17:5, 17:19, 90:19, 114:20, 114:25, 116:22, 118:13, 118:15, 119:16, 119:18
**titled** [1] - 101:22
**titles** [1] - 33:3
**TO** [2] - 128:13, 138:13
**today** [14] - 6:10, 6:11, 6:23, 8:10, 8:14, 11:10, 11:11, 12:6, 13:8, 83:2, 91:14, 135:12, 141:13, 145:12
**today's** [2] - 10:18, 12:10
**together** [4] - 26:5, 68:16, 135:25, 139:10
**Tom** [2] - 74:9, 74:12
**tone** [1] - 79:14
**tongue** [1] - 138:21
**took** [5] - 22:9, 66:25, 68:22, 94:18, 120:4
**top** [4] - 61:17, 131:24, 132:25, 149:9
**training** [13] - 29:20, 29:21, 30:3, 30:5, 47:6, 47:7, 47:9, 47:10, 47:11, 47:17, 48:11, 48:16, 137:12
**transaction** [3] - 9:14, 9:21, 50:10
**translate** [1] - 69:15
**transparent** [1] - 92:12
**treat** [3] - 78:14, 78:20, 79:3
**treated** [1] - 79:8
**treatment** [1] - 93:3
**trial** [2] - 3:8, 6:22
**tried** [1] - 144:12
**trips** [1] - 74:15
**true** [3] - 62:24, 63:17,

148:13
**truth** [4] - 6:19, 16:14, 85:21, 93:10
**truthful** [1] - 16:17
**truthfully** [1] - 16:6
**try** [2] - 24:10, 132:7
**trying** [5] - 40:21, 51:17, 60:18, 86:12, 134:10
**tussle** [1] - 141:2
**tussled** [1] - 51:19
**twisting** [1] - 70:17
**two** [5] - 29:19, 68:18, 83:20, 93:19, 95:7
**two-page** [1] - 83:20
**Tyler** [2] - 70:15, 71:6
**type** [10] - 9:20, 10:7, 18:14, 19:20, 31:23, 33:2, 42:21, 46:4, 53:13, 101:25
**typically** [1] - 113:18

## U

**U.S** [1] - 6:8
**ugly** [1] - 80:12
**unaware** [5] - 46:7, 62:13, 75:5, 100:15, 100:19
**uncle** [1] - 21:6
**Uncle** [2] - 74:9, 74:12
**under** [8] - 4:11, 9:9, 9:12, 25:14, 44:3, 81:17, 90:25, 139:11
**understand** [22] - 6:18, 6:21, 6:25, 7:3, 14:23, 15:4, 15:14, 15:15, 15:18, 15:22, 19:25, 23:15, 61:21, 62:19, 101:14, 107:21, 137:3, 137:22, 138:25, 139:19, 139:23, 143:21
**understood** [2] - 15:2, 15:8
**undertaken** [1] - 50:17
**unethical** [1] - 37:21
**United** [1] - 80:12
**UNITED** [1] - 1:2
**University** [1] - 29:18
**unlawful** [2] - 1:10, 43:9
**unless** [1] - 7:10
**up** [35] - 5:3, 8:7, 21:21, 32:21, 33:24, 42:13, 46:13, 46:25, 48:2, 49:6, 56:19, 57:16, 60:14, 63:15, 67:15, 70:17, 70:20, 70:22, 71:7, 71:10, 73:19, 74:5, 81:5, 89:22, 95:16, 101:8, 101:10, 113:24, 124:16, 129:20, 132:11, 134:12, 140:8, 145:4, 145:6
**upset** [3] - 51:4, 96:5, 96:11
**uses** [1] - 14:7

162

## V

**V-A-R-G-H-E-S-E** [1] - 116:18

**vacation** [3] - 99:12, 99:15, 99:21

**vaguely** [2] - 71:12, 140:23

**Varghese** [7] - 116:13, 116:14, 116:15, 119:12, 119:13, 137:24, 140:7

**vehicles** [2] - 18:25, 92:19

**venue** [1] - 10:14

**veracity** [1] - 53:20

**verbal** [6] - 46:5, 46:9, 46:15, 46:22, 101:6, 102:12

**verbally** [1] - 4:10

**verification** [2] - 5:4, 11:21

**Verified** [1] - 5:5

**via** [1] - 13:4

**Vice** [10] - 17:6, 17:10, 17:13, 17:17, 28:24, 89:21, 90:4, 90:13, 90:18, 115:3

**victim** [1] - 55:14

**Videoconference** [1] - 1:16

**view** [1] - 130:18

**vilified** [1] - 45:2

**Vincent** [1] - 118:3

**violation** [1] - 32:23

**virtue** [3] - 31:13, 77:18

**visible** [1] - 8:23

**voicemail** [1] - 34:6

**vouchers** [2] - 58:13, 58:19

## W

**waive** [1] - 4:14

**waived** [1] - 3:15

**walked** [1] - 113:22

**wall** [4] - 51:11, 51:15, 111:21, 111:25

**Wall** [1] - 2:6

**walls** [1] - 51:18

**Wanda** [75] - 6:3, 28:10, 28:14, 37:8, 38:15, 39:19, 49:13, 51:24, 53:4, 53:7, 53:23, 55:5, 65:15, 65:18, 67:20, 68:10, 69:2, 69:8, 70:6, 71:9, 71:18, 76:16, 78:13, 78:17, 79:23, 81:19, 81:22, 84:6, 85:24, 87:3, 88:13, 88:21, 89:20, 91:23, 92:24, 93:6, 93:23, 94:6, 94:13, 94:22, 95:14, 96:4, 98:9, 108:14, 110:7, 111:11, 112:19, 112:21, 114:3, 114:7, 115:13, 122:3, 124:5, 127:8, 127:25, 128:23, 129:13, 130:19, 131:10, 131:25, 132:10, 134:23, 135:14, 135:18, 137:16,

138:18, 138:21, 139:14, 139:17, 139:21, 140:17, 141:16, 142:9, 144:20, 149:12

**WANDA** [2] - 1:4, 2:22

**Wanda's** [14] - 70:16, 72:21, 96:11, 112:2, 125:4, 129:24, 133:8, 134:7, 134:13, 135:8, 136:4, 139:2, 140:21, 143:5

**wants** [3] - 11:9, 84:12, 105:15

**warned** [1] - 101:4

**warning** [2] - 101:7

**warnings** [1] - 39:2

**Washington** [53] - 6:3, 14:24, 15:19, 27:10, 27:24, 28:5, 37:9, 38:16, 39:19, 49:13, 53:4, 53:8, 53:24, 55:5, 55:10, 65:15, 65:18, 68:10, 69:19, 70:2, 70:7, 72:16, 72:17, 72:18, 73:11, 74:5, 74:9, 74:12, 75:6, 76:16, 84:6, 85:24, 87:3, 88:13, 88:21, 92:5, 96:12, 98:9, 110:2, 110:7, 112:6, 122:16, 128:23, 130:19, 131:11, 131:25, 134:23, 135:15, 142:9, 143:15, 143:23, 144:7, 149:12

**WASHINGTON** [2] - 1:4, 2:22

**Washington 's** [10] - 66:6, 67:20, 73:8, 79:24, 108:14, 115:14, 122:4, 126:17, 127:25, 141:16

**Water** [7] - 26:18, 26:21, 26:24, 34:8, 34:18, 78:10, 115:20

**ways** [1] - 113:2

**wcowles @mcande.com** [1] - 2:12

**weather** [1] - 66:17

**website** [2] - 40:12, 40:15

**wedding** [4] - 122:11, 122:13, 122:15, 127:16

**week** [2] - 13:5, 121:5

**weekend** [1] - 29:25

**weekly** [2] - 66:19, 67:6

**whatsoever** [7] - 8:15, 10:3, 19:6, 31:24, 139:21, 142:5, 144:8

**white** [3] - 60:9, 61:4, 115:8

**Whitnee** [3] - 122:7, 122:16, 127:16

**whole** [3] - 56:10, 60:14, 134:4

**wife** [2] - 19:15, 119:8

**wife's** [1] - 19:19

**will..** [1] - 132:4

**WILLIAM** [1] - 2:11

**William** [2] - 4:20, 5:23

**willing** [1] - 144:17

**WILSON** [1] - 2:14

**Winston** [5] - 117:7, 117:9, 117:11, 117:19, 117:22

**withdrawn** [2] - 19:21, 61:2

**WITNESS** [8] - 12:16, 82:14, 83:24, 84:16, 126:5, 131:20, 145:14, 149:5

**witness** [14] - 2:15, 4:10, 4:25, 5:7, 60:17, 76:4, 84:6, 87:15, 88:2, 134:19, 134:22, 143:9, 148:10, 148:14

**woman** [13] - 70:8, 71:20, 71:25, 72:4, 72:10, 75:12, 75:21, 76:17, 77:2, 80:20, 94:10, 94:23, 115:18

**Woman** [1] - 71:6

**women** [2] - 74:18, 76:20

**wondering** [1] - 49:23

**word** [5] - 11:13, 50:13, 79:20, 90:18, 142:15

**workers** [3] - 113:4, 139:3, 139:7

**workplace** [16] - 14:25, 30:3, 41:10, 41:25, 42:15, 43:7, 43:19, 46:3, 46:17, 47:8, 48:12, 81:20, 105:9, 105:13, 105:25, 144:12

**workplaces** [1] - 43:22

**works** [1] - 37:19

**worse** [1] - 27:19

**worth** [1] - 22:9

**wrapped** [1] - 145:4

**write** [3] - 40:15, 48:2, 74:20

**writes** [1] - 91:23

**writing** [3] - 53:18, 86:22, 140:5

**written** [12] - 39:6, 46:5, 46:6, 46:19, 47:3, 47:19, 98:19, 99:4, 99:11, 101:7, 102:2, 102:12

**wrote** [5] - 17:15, 123:7, 123:10, 123:21, 124:20

## Y

**year** [4] - 20:21, 37:10, 78:3, 129:17

**Year's** [1] - 74:6

**years** [22] - 10:9, 13:16, 30:15, 32:2, 36:25, 38:17, 49:24, 56:15, 70:25, 71:14, 78:5, 78:9, 79:21, 111:16, 113:9, 122:8, 125:16, 131:21, 132:6, 137:18, 142:6

**yelling** [1] - 141:7

**YORK** [3] - 1:2, 148:3, 148:5

**York** [14] - 1:20, 2:8, 2:17, 6:7, 26:19, 27:2, 27:9, 41:19, 45:8, 56:10, 56:19, 57:14, 61:18, 148:9

**Yorker** [1] - 61:21

**yourself** [7] - 6:6, 17:20, 90:13, 112:17, 129:8, 129:13, 129:20

Deane                                          147



LEE   DEANE

Subscribed and sworn to

before me this 25 day

of January            2022

_____

ADAM W. ROTHKRUG
Notary Public, State of New York
Reg. No. 02R06073742
Qualified in Nassau County
Commission Expires 4/29/22