UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

WANDA WASHINGTON,

                     Plaintiff,

     v.

GILMAN MANAGEMENT CORP., ROBERT
RAPHAEL, LEE DEANE, and JOHN and
JANE DOE (said names being fictitious, the
persons intended being those who aided and
abetted the unlawful conduct of the named
Defendants),

                     Defendants.

------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

20-CV-5432 (JS) (LGD)

**LEE G. DUNST**, Magistrate Judge:

Presently before the Court is Defendants' motion for summary judgment at Electronic

Case File Number ("ECF No.") 54, Plaintiff's letter motion to strike at ECF No. 58, and

Plaintiff's cross motion for partial summary judgment at ECF No. 58.  On April 27, 2023, these

motions were referred to the undersigned[1] for a Report and Recommendation by District Judge

Joanna Seybert.  Apr. 27, 2023 Order.  For the following reasons, the Court respectfully

recommends that Judge Seybert grant in part and deny in part Defendants' motion for summary

judgment, deny Plaintiff's partial motion for summary judgment, and deny Plaintiff's motion to

strike as moot.

---

[1] On June 14, 2022, this case was randomly reassigned to the undersigned.  June 14, 2022
Order.

## I.    BACKGROUND

Plaintiff Wanda Washington ("Plaintiff") commenced this action on November 9, 2020 against Gilman Management Corp. ("Gilman"), Robert Raphael ("Raphael"), and Lee Deane (collectively, "Defendants"), alleging that during her employment with Gilman of approximately eighteen years, she was discriminated against and was subjected to a hostile work environment because of her race and color, and that she was wrongfully terminated in 2018 in retaliation for her complaints about racial discrimination, in violation of 42 U.S.C. § 1981 ("Section 1981") and the New York State Human Rights Law ("NYSHRL").  ECF No. 1 ("Complaint"); ECF No. 60 ¶ 1.

The Complaint sets forth six separate causes of action against all Defendants:  (1) race discrimination under Section 1981; (2) retaliation under Section 1981; (3) race discrimination in violation of the NYSHRL; (4) retaliation in violation of the NYSHRL; (5) hostile work environment in violation of Section 1981; and (6) hostile work environment in violation of the NYSHRL. Defendants answered the Complaint on January 11, 2021 and subsequently filed an amended answer.  ECF Nos. 18 & 20.

### A.    Factual Background[2]

#### i.  Plaintiff, Defendants, and Relevant Non-Parties

Gilman is a New York-based property management and investment company with offices in Great Neck and elsewhere in New York State.  ECF No. 60 ¶ 2; ECF No. 20

---

[2] These background facts are primarily taken from Plaintiff's Complaint (ECF No. 1), Defendants' Amended Answer (ECF No. 20), and the parties' respective Local Civil Rule 56.1 Statements (ECF Nos. 60 & 63).  The Local Civil Rules require motions for summary judgment to attach "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civil Rule 56.1(a).  The Local Civil Rules also require the nonmovant, here the Plaintiff, to file a statement with "correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of the moving party . . . . "  Local Civil Rule 56.1(b).  All references herein to the Rule

¶ 11.  Gilman was founded as a real estate management company in 1945, and the founder, Alvin Gilman, was active in the company until he retired in 1993.  ECF No. 1 ¶¶ 12-13; ECF No. 20 ¶ 13.  According to the Complaint, Gilman manages over 3,500 residential units in over 100 buildings in the New York City tri-state area.  ECF No. 1 ¶ 14; ECF No. 20 ¶ 14.

Plaintiff Wanda Washington is a Black female who had been employed by Gilman as an administrative assistant from 2000 until her termination on October 3, 2018.[3]  ECF No. 60 ¶ 9.  For all relevant times, Plaintiff lived in Nassau County, New York.  ECF No. 1 ¶ 10.  Plaintiff worked at varying times as an administrative assistant, receptionist, and bookkeeper for Gilman.  ECF No. 60 ¶ 10.

When Plaintiff first started working at Gilman, she was married to James Frank Washington, but they are now divorced.  *Id.* ¶ 11.  James Frank Washington is a Black male and has worked as an independent contractor for Gilman for more than twenty years.  *Id.* ¶ 12.

Defendant Raphael has been an owner and the Chief Executive Officer of Gilman since 2007.  ECF No. 1 ¶ 15; ECF No. 20 ¶ 15; ECF No. 60 ¶ 3.  The parties dispute whether he is white or whether he also identifies as partially Hispanic.  ECF No. 60 ¶ 3. In 2018, Raphael supervised the Gilman property managers, but the parties dispute whether he supervised Defendant Lee Deane.  *Id.* ¶ 15.  Generally, Raphael was primarily

---

56.1 Statements incorporate both the statements and the opposing parties' response, as well as all citations referenced therein.

[3] Defendants allege that Plaintiff was previously terminated by Raphael at one point during this eighteen-year time period, but she later apologized to Raphael and was rehired.  ECF No. 60 ¶ 9.

responsible for hiring, promoting, disciplining, and firing employees, and determining employee compensation and duties. *Id.* ¶ 19.

Brian Teppel ("Teppel") was employed by Gilman as a Vice President and also had investments in some of the properties managed by Gilman. *Id.* ¶¶ 5-6. Teppel was occasionally involved in hiring decisions and deciding salaries with Raphael. *Id.* ¶ 19. Teppel is a white male. *Id.* ¶ 6.

Defendant Lee Deane was employed by Gilman as a Vice President and/or property/building manager (the parties appear to dispute his exact title) and also invested in some of the properties managed by Gilman. ECF No. 60 ¶¶ 5-7, 13. The parties dispute whether Lee Deane was at "the same level" as Raphael and Teppel in Gilman. *Id.* ¶ 14. Lee Deane is a white male. *Id.* ¶ 13. Lee Deane was not involved in personnel decisions at Gilman and played no role in hiring, promoting, disciplining, firing employees, or determining their compensation or duties. *Id.* ¶ 18.

Donna D'Addario ("D'Addario") is a white female who was employed by Gilman since 1982 and works as the office manager. *Id.* ¶ 16. The parties appear to dispute whether she is still employed at Gilman and what her precise duties were at Gilman (namely, whether they included human resource duties). *Id.* D'Addario was not involved in personnel decisions at Gilman; namely, she had no involvement in hiring, promoting, disciplining, firing employees, or determining their compensation or duties. *Id.* ¶ 18.

Marilyn Kumar ("Kumar") has been an employee of Gilman since 2005. *Id.* ¶ 20. She is from Guyana and identifies as West Indian. *Id.* The parties dispute her exact role, but appear to agree she had some supervisory responsibility in the Gilman office. *Id.*

Donna Deane is Kumar's mother. *Id.* ¶ 22. Donna Deane worked for Gilman as an administrative employee beginning in 2008. *Id.* ¶ 23. Donna Deane is not related to Defendant Lee Deane. *Id.* ¶ 22.

Lisa Blumenthal ("Blumenthal") is a white female who worked at Gilman as an administrative assistant from December 11, 2000 to September 11, 2015. *Id.* ¶ 24.

Anna Varghese ("Varghese") worked for Gilman in an administrative capacity until July 2018. *Id.* ¶ 26. Anna Varghese's father, Isaac Varghese, worked on the "bookkeeping side" at Gilman and assisted D'Addario. *Id.* ¶ 27. Isaac Varghese is from India. *Id.*

Rene Feliciano ("Feliciano") and Nelson Colon ("Colon") are Hispanic males who, at all relevant times, were employed by Gilman as property managers. *Id.* ¶ 28.

Finally, Maria D'Alessandro ("D'Alessandro"), a white female, was the office manager when Plaintiff first started to work at Gilman at its Rockville Centre office. *Id.* ¶ 29.

### ii. Plaintiff's Primary Allegations Against Raphael and Lee Deane

As set forth in the Complaint, Plaintiff alleges numerous instances of racial discrimination, as well as the existence of a hostile work environment, during her time at Gilman.

Plaintiff makes multiple allegations against Lee Deane. According to the Complaint, Lee Deane referred to Plaintiff as an "angry black woman" on multiple occasions from 2007 until she was fired in 2018. *Id.* ¶ 31. Lee Deane allegedly started using this phrase after a verbal altercation in the office in which Blumenthal allegedly told Plaintiff that it would be easier for Blumenthal's daughter (who is white) to receive

welfare if she was Black.  *Id.*  Plaintiff purportedly complained about Blumenthal's comments, after which Lee Deane started calling her an "angry black woman."  *Id.* Plaintiff maintains she did not complain about Lee Deane's use of the phrase "angry black woman," apparently because she believed "it wouldn't have mattered."  *Id.* ¶ 33. While denying the use of the phrase "angry black woman," (*id.* ¶ 35) Lee Deane described an argument between Plaintiff and another Black female employee at Gilman as a fight between "two caged dogs" during his deposition.  ECF No. 63 ¶ 137.

Plaintiff further alleges that in or around 2010, Lee Deane made a so-called "stress meter" out of paper, attached it to the side of Plaintiff's cubicle, and would move the dial to indicate what he believed her stress level was at any given time.  ECF No. 60 ¶ 36.  Plaintiff found this stress meter to be racist, as no one else in the office got one, and she felt that as a Black woman, she was perceived to be the "lowest on the totem pole." *Id.* ¶ 37.  Lee Deane admitted that he put the stress meter at Plaintiff's desk but claimed that it was a joke.  *Id.* ¶ 39.

As to Raphael, Plaintiff alleges that he made a racially derogatory comment regarding Feliciano, a Hispanic employee.  *Id.* ¶ 71.  The parties dispute whether Plaintiff complained to Raphael about the comment.  *Id.* ¶ 72.  Plaintiff does not appear to offer evidence that any other Gilman employee heard Raphael call anyone a racially derogatory term or use racial slurs or offensive racial language.  *Id.* ¶ 74.  Plaintiff also claimed that Lee Deane told her that Raphael was racist (ECF No. 63 ¶ 127), but Lee Deane apparently denied saying this to her.  ECF No. 54-1 ¶ 86.  As a result of this incident, Plaintiff purportedly refused to attend the next work luncheon based on Raphael's alleged comment, which resulted in Raphael firing her.  ECF No. 60 ¶ 72. However, Raphael gave Plaintiff her job back after she apologized.  *Id.*

Plaintiff also testified that Raphael continually refused to pay two Black contractors or vendors, requiring them to show up at Gilman demanding payment. ECF No. 63 ¶ 134. Raphael denied this specific allegation and testified that everyone shows up to the office to get paid. *Id*.

Plaintiff further claims that Raphael and D'Addario required Blumenthal to monitor and document how long Plaintiff spent going to the bathroom at work, although Blumenthal testified she was not asked to do so. ECF No. 63 ¶ 128.

Plaintiff additionally testified that on multiple occasions Raphael exposed Plaintiff to pornography that he would leave on his computer monitor, although Raphael denied these allegations. *Id.* ¶ 130.

### iii. Plaintiff's Allegations Regarding Salary and Health Insurance

Plaintiff makes a series of allegations regarding racial discrimination in the handling of compensation and insurance benefits at Gilman.

As to salaries, the parties dispute whether Blumenthal, who was a white administrative assistant, made more money than Plaintiff. ECF No. 60 ¶¶ 78-79. However, in 2014, Blumenthal's annual salary of $42,000 was greater than Plaintiff's salary of $33,980. *Id.* ¶ 79. Further, the parties agree that Plaintiff repeatedly raised concerns about her salary at Gilman over the years. *Id.* ¶ 81.

The parties next dispute whether all employees similarly situated to Plaintiff were offered the same health insurance benefits and had the same amount of deductions taken for health premiums for the same coverage. *Id.* ¶ 82. The parties appear to agree that Gilman paid Plaintiff's full health insurance for a period of time, but Raphael later stopped such payments. *Id.* The parties appear to agree that certain other employees continued to have their health insurance paid for by Gilman. *Id.* It appears that certain

employees paid more for health insurance than Plaintiff, whereas some employees on single plans paid the same amount as Plaintiff. *Id.* ¶¶ 82-85.

### iv.   Plaintiff's Residence on Property Managed by Gilman and Loans From Gilman

The parties explain that Plaintiff lived for approximately seven years in an apartment in Hewlett managed by Gilman, and that it was very common for employees to live in Gilman apartments. *Id.* ¶ 54. Employees living in Gilman apartments, including Plaintiff, would often pay reduced rent. *Id.* ¶ 57. Plaintiff alleges that in or around August 2018, Raphael ordered her to move out of her Gilman apartment and to find a new place, while "white superintendents and property managers" continued to live in Gilman apartments at reduced rates. *Id.* ¶ 59. The parties dispute whether Plaintiff was similarly situated to the other Gilman employees and the "white superintendents and property managers" who continued to remain in their Gilman apartments. *Id.* ¶¶ 59-63. The parties further dispute whether Plaintiff was already planning to move out of the Gilman apartment around this time. *Id.* ¶¶ 64-65.

According to the parties, Gilman also would provide any employee, including Plaintiff, with an interest-free loan (so long as they asked Raphael and had a valid reason), regardless of their race, work performance, or conduct. *Id.* ¶ 66. In January 2018, Plaintiff received a $20,000 loan from Gilman, of which Plaintiff paid back only $1,900, and Plaintiff argues that Raphael used Plaintiff's retirement fund to pay back the remainder of loan. *Id.* ¶¶ 69-70.

### v.   Other Alleged Incidents

Plaintiff further alleges discrimination related to office perks and various office duties. She explained that women of color in the office were required to use their own

vehicles and gas for company work, whereas white employees in management positions were not required to use their own resources for company business and were able to use leased cars and credit cards. *Id.* ¶ 40. She further alleges that she frequently went to the post office and bank for company business and was not reimbursed for her gas, car maintenance, or parking costs. *Id.* ¶ 41. The parties dispute whether all the administrative assistants (including Plaintiff) were responsible for duties such as answering the phones, and going to the post office and bank, or whether the white administrative assistant did not have to do these tasks. *Id.* ¶¶ 42-44. The parties dispute whether Plaintiff was entitled to such reimbursements. *Id.* ¶¶ 45-46. Plaintiff also makes allegations regarding other tasks she performed, including picking up office birthday cakes, and the parties dispute whether this was mandatory or whether Plaintiff volunteered to do so. *Id.* ¶¶ 47-49.

Plaintiff also alleges that she did not benefit from other company perks, which other employees received. *Id.* ¶¶ 50-53. For example, she alleges that Teppel, Lee Deane, D'Addario, Feliciano, and Colon were provided with leased vehicles, company credit cards, and professional sports tickets. *Id.* ¶ 50. She also alleges that Lee Deane and Teppel were not required to clock in or out. *Id.* ¶ 51. She further states Gilman never had any Black executives or investors in the company. *Id.* ¶ 51. Plaintiff further alleges that Raphael never gave her the company's professional sports tickets. *Id.* ¶ 52.

Plaintiff alleges that on one occasion when she worked as a receptionist at Gilman, someone hung a sign on her desk that read, "Please don't feed the animal." *Id.* ¶ 75. She does not know who hung the sign. *Id.*

Finally, Plaintiff also alleges that a Gilman employee was accused of losing or stealing money from a trip to the bank, and the employee claimed that she saw a Black man in "a hoodie and [] felt threatened," which purportedly resulted in the employee losing track of the money.  ECF No. 63 ¶ 131.  Plaintiff was offended by this incident, as she believed the story was fabricated and was damaging to Black people.  *Id.* ¶ 132.

### vi.  Plaintiff's Complaints in August, September, and October 2018

Plaintiff alleges that on or around August 21, 2018, she complained about Raphael's purported discrimination in an email to D'Addario.  ECF No. 60 ¶¶ 88-90. The email states:

> Yesterday RR [Raphael] just asked me when am I moving?
> Said he's doing bad at Windsor. Needs my apt. back.
> BT [Teppel] pays $100.00 for his duplex in Soho.
> I just use my gas and my car to put his $100,000.00 check in LRN.
> He can't afford to pay for "THE GIRLS" health insurance.
> The rich, white, Jewish people health insurance is paid in full.
> And he had the freaking nerve to ask me could I stay with someone else until my place is ready.
> A few weeks ago I told him I hired a contractor that took my money and walked off the job.
> I asked him if he could help me get my measly $5,000.00 out of American Fund. He told me that's not how it works. He couldn't help.
> My hope for RR is that a judge makes him live at Halsey Street for a year with my take home pay and no credit cards.
> He's so prejudice. I'm black, I'm a woman and my life is worth a crap in his eye site [sic].

*Id.* ¶ 90; ECF No. 59-18.  D'Addario does not recall raising Plaintiff's concerns to Raphael.  ECF No. 60 ¶ 91.

Plaintiff alleges that on or around August 23, 2018, she emailed the same complaint to Lee Deane.  *Id.* ¶ 92.  Lee Deane does not recall ever seeing the email.  *Id.* ¶ 96.  Lee Deane further claims that he did not have access to the email address where Plaintiff sent her complaint (leedeane@me.com).  ECF No. 63 ¶ 139.

On September 11, 2018, Plaintiff sent an email directly to Raphael to complain about how she was unhappy with her health insurance premiums, the situation of her and other female employees, and various other issues.  *Id.* ¶ 140; ECF No. 59-19.  The email states as follows:

> Hi Robert,
> I need your help.
> You asked me when am I moving?
> You ask me, if I could stay with someone until I move.
> You said you're doing bad at Windsor. You need my apt. back.
> Even if I move in with someone else, who's paying the storage and moving bill for my belongings?
> I asked if you could get the $5,000.00 out of American Fund, I told you the contractor, I hired took my money and walked off the job.
> I know, I'm not family but, Michele was pregnant with Haley when I came to Gilman Management.
> I have been here a long time. The buildings stopped at (32) Gilman Management Corp.
> You paid Frank's, Whitnee's and my health insurance in full. Gilman's business has increased and our staff has decrease. We don't have a receptionist to answer the phones and we are constantly interrupted with calls. You have to find where you left off with your paper work over and over again.
> This is very counterproductive, we are wasting valuable time.
> See the attached it's a shame and it's just wrong!!!
> Out of my check, I'm paying $628.10 for my rent.
> You really have no idea was doing bad is.
> $343.59 bi-weekly for medical.
> I sincerely hope something gives to make a better life for the ladies in this office. Our lives matter.
> I am struggling to survive.
> Thank you and have a good holiday,
> Wanda

ECF No. 59-19.

On or around September 29, 2018, Plaintiff again "voiced frustrations" to Raphael in an email "discussing her pay rate, insurance premiums and how women in the office had to pay a higher share of the premiums, and about having to use her personal car and

gas for company business." ECF No. 60 ¶ 98. The email contains the subject line

"$541.28" and states:

> That's how much money you expect me to survive off of weekly in the
> year 2018.
> The rich people in this office get their health insurance paid
> in full. The poor women in this office are paying ¾ of the health
> insurance premium.
> We have a $40.00 co-pay for office visits, $70.00 for a specialist and $3,000.00
> deductible if we go into the hospital. We pay for our medicine also.
> We don't have pensions and or 401K.
> It wouldn't hurt you financially to be fair to us.
> The ladies in this office deserves [sic] a cost of living raise.
> Don't you care about office moral? Happy employees are more productive.
> Stress kills and it affects everyone differently. Worrying causes stress.
> . . .
> Today I'm at the office delivering Manny's birthday cake (the bakery is closed on
> Sunday & Monday) and picking up Nelson's rent bills that he ask me to bring
> home for him.
> I go to the post office, the bank, the bakery and I deliver your mother's
> paycheck for years.
> Anything I'm asked to do. I use my car and my gas for Gilman's errands.
> A gas allowance would be appreciated. $541.28 doesn't go very far.
> Please allow me to sign the money in the American fund over to you in
> exchange for a check I can cash now.
> I'm trying to move. It's very expensive. I'm asking for your help……not to be
> ignored.

*Id.* ¶ 99; ECF No. 59-19. Plaintiff argues that the "women" referred to in this email are

all "non-white." ECF No. 60 ¶ 98. Raphael testified that he could not recall if he ever

read this email. *Id.* ¶ 99.

On or around October 2, 2018, Plaintiff once again complained about racial

discrimination in an email to Lee Deane. *Id.* ¶ 100. This email contained the subject

"The Haves and the Have Nots," and states, "Please stop ignoring me. You guys buy and

sell, refinance, flip houses, Cam and distributions quarterly[.] What do we have? Nobody

gives us a dollar. Is it because our skin color and religion make us meaningless?" *Id.* ¶

101; ECF No. 59-30. Lee Deane does not recall receiving or reading this email. ECF
No. 60 ¶ 102.

Raphael testified that neither Lee Deane nor D'Addario ever told Raphael that
Plaintiff's aforementioned emails that contained complaints about discrimination. *Id.* ¶
103.

### vii.   Raphael's Termination of Plaintiff's Employment on October 3, 2018

The parties agree that Plaintiff and Raphael met alone in his office on October 3,
2018, and that Raphael fired Plaintiff during that meeting. *Id.* ¶ 108. Plaintiff testified
that this was because she raised the issue of her treatment based on her race. *Id.* ¶ 107.
In contrast, Raphael contends that he fired Plaintiff because she allegedly was trying to
blackmail Gilman with false allegations of racial discrimination. *Id.* ¶ 108.

Plaintiff initiated the meeting because she wanted Raphael to pay her health
insurance and asked for a cost of living raise because she was struggling financially,
while Gilman's portfolio had doubled or tripled. *Id.* ¶ 105. Plaintiff states that she first
asked Donna Deane (another woman of color) to accompany her to the meeting with
Raphael, but she declined. *Id.* ¶ 106; ECF No. 61 at 8. Plaintiff alleges that "during a
conversation about her negative work conditions and increased insurance premiums,"
Raphael told Plaintiff to quit if she had a problem with her work conditions. ECF No. 60
¶ 104. According to Plaintiff, Raphael first said, "'Well, if you don't like it, you can just
quit' and I [then] said, 'you know, if I wasn't black and I wasn't a woman, you wouldn't
be treating me like this,' and he said 'you know what, get the f**k out of here, you're
f**ken fired.'" *Id.* ¶ 107.

Raphael tells a very different version of what occurred in the meeting with Plaintiff in his office. He testified that Plaintiff first requested another loan from Gilman. *Id.* Raphael claims after Plaintiff stated that Raphael would not be "treating her negatively" "if she was not black and female," that he then terminated her employment because he was being "blackmailed with a discrimination lawsuit if he did not accede to Plaintiff's demands." *Id* ¶ 108. Regarding the meeting, Raphael testified as follows:

> Q. And what was the reason you terminated Ms. Washington?
> A. I felt I was being – if I – I felt, if I didn't give her more money, I was going to be blackmailed into a discrimination lawsuit. What happened was she'd come to me, you know, in the office and basic – came saying she needs more money. I'm not talking about in terms of salary; she needs another loan, which I refused to give because I had just given her 20,000 dollars. And when I said, Wanda, I can't give you any more. She goes, well, I'm having problems moving into my apartment, money was stolen from me by my contractor, I need the money. You know, and then, at that point, I said I can't give it. And she said to me, you know, because you're discriminating against me. And at that point, I said – I saw where I was heading. And I felt I was being blackmailed into giving money that I didn't have to give. And that's why she was fired. For that reason, that reason solely, you know.

*Id.* ¶ 107.

Raphael says he doesn't know if he told Lee Deane, Donna D'Addario, or Marilyn Kumar why he terminated Plaintiff and doesn't recall if he documented it. *Id.* ¶ 108.

Various witnesses have mixed recollections about what happened after Plaintiff's termination. *Id.* ¶ 107. However, on October 24, 2018, D'Addario emailed Kumar that "Wanda needs a termination letter from us. What am I going to say she was terminated for? I need to write something in the letter. I can't say because she asked for a raise . . ." *Id.* ¶ 108; ECF No. 59-25. Kumar responded, "LOL..... she was rude (as per Robert [Raphael]). Anyway you got to ask ROBERT." ECF No. 60 ¶ 108; ECF No. 59-25.

14

Furthermore, Blumenthal testified that Raphael had a temper and she believed that he would be angry if confronted with allegations of discrimination.  ECF No. 60 ¶¶ 124-26.

It was solely Raphael's decision to terminate Plaintiff.  ECF No. 60 ¶ 110.  Lee Deane was not involved in Plaintiff's termination.  *Id.* ¶ 111.

### viii.  Previous Gilman Terminations and Allegations of Discrimination

Plaintiff alleges that at least four other Gilman employees were fired over time, including two Black employees and Manuel Lopez ("Lopez") (who is Hispanic).  *Id.* ¶¶ 112-13.  Raphael made the decision to fire Lopez.  *Id.* ¶ 114.  However, the parties dispute why Lopez was fired.  *Id.* ¶ 113.  Defendants claim it was because he engaged in harassment and extortion.  *Id.*  Notably, email communications relating to Lopez's firing note that nothing should be put into writing to avoid potential litigation.  *Id.* ¶ 113.

Defendants claim that no other employee ever complained to Defendants about race discrimination, or retaliation, or filed an external complaint or lawsuit against Defendants alleging racial discrimination.  *Id.* ¶ 115.  However, Raphael testified that an employee filed a race complaint against Gilman with the EEOC and Gilman settled the claim.  *Id.*; ECF No. 59-7 at 130:22-132:24.

### B.    The Instant Motions

Presently before the Court is Defendants' Motion for Summary Judgment (ECF No. 54), with supporting documentation including the Declaration of Attorney Larry Lum (the "Lum Declaration") (ECF No. 54-1), Defendants' Memorandum of Law (ECF No. 54-3), and various supporting documents (including ECF No. 55).  Plaintiff filed a motion to strike the Lum Declaration at ECF No. 57, which Defendants responded to at ECF No. 62.  Plaintiff also filed a cross motion for partial summary judgment and

opposition to Defendants' motion for summary judgment (ECF No. 58) with supporting

documents (ECF Nos. 59 & 61).  Defendants responded to Plaintiff's motion for

summary judgment at ECF No. 64, and Plaintiff replied at ECF No. 65.

The aforementioned briefing and supporting materials submitted by the parties is

substantial.  The parties have submitted approximately 80 pages of briefs.  Additionally,

the parties have submitted approximately 38 pages of declarations, as well as

approximately 3,365 pages of supporting exhibits.[4]

### i. Defendants' Motion for Summary Judgment

Defendants argue that Plaintiff cannot establish a Section 1981 or NYSHRL

discrimination claim, as she cannot show an inference of discriminatory intent based upon her

race.  ECF No. 54 at 5.  Defendants claim that "Plaintiff was hired, supervised, and terminated

within the same protected category;" Gilman is diverse; and the only other person terminated by

Gilman was a person outside of Plaintiff's protected class.  *Id* at 6.  Defendants dispute

Plaintiff's claim that "she was paid less than similarly situated non-black employees; she had to

pay more in health insurance premiums than non-black employees;" and the claims concerning

various perks and office responsibilities.  *Id.* at 7.  Defendants further argue that Gilman's health

---

[4] The Court notes that these bloated filings violate the letter and spirit of Local Rule 7.1(a)(3), which mandates that parties should only submit supporting exhibits "*necessary* for the decision of the motion" (emphasis added). Such a violation has been found to warrant dismissal of a motion without prejudice. *See, e.g., Field v. Bayerische Motoren Werke Aktiengesellschaft*, 594 F. Supp. 3d 530 (E.D.N.Y. 2022) (rejecting court filings due to the parties' failure to comply with (among other things) "the Local Rules of this District"); *Shaoxing Daqin Imp. & Exp. Co. v. Notations, Inc.*, No. 19-CV-2732, 2019 WL 4198767, at *2 (S.D.N.Y. July 30, 2019) (holding it was "blatantly improper" for the parties to have "attached voluminous exhibits" to their motion to dismiss briefs); *CareMatrix Corp. v. Kaplan*, No. 05-CV-3173, 2012 WL 13102106, at *2 (E.D.N.Y. July 3, 2012) (rejecting declaration that was not "limited to 'factual information and portions of the record necessary for decision of the motion'" (quoting Local Rule 7.1(a)(3)); *see also Veliz v. Crown Lift Trucks*, 714 F. Supp. 49, 58 (E.D.N.Y. 1989) (noting that "the practice of throwing in the kitchen sink at times may be so abusive as to merit Rule 11 condemnation") (citation omitted).

insurance deductions from paychecks increased for all employees as health insurance premiums rose over time.  *Id.*  Defendants further contend that Plaintiff failed to point to any similarly situated employees to support her claims of discrimination.  *Id.* at 8-9.

Defendants next argue that Plaintiff cannot establish a Section 1981 or NYSHRL retaliation claim, as she cannot establish that she engaged in a protected activity.  *Id.* at 12-13. Defendants argue that her complaints were for a loan and for Gilman to pay her full health insurance premiums, and Defendants disagree with the argument that she was engaged in a protected activity.  *Id.* at 13-15.

Defendants separately claim that Plaintiff cannot establish a discrimination or retaliation claim against Lee Deane, as he did not have supervisory authority over Plaintiff, was not involved in the personnel decisions, and did not directly participate in the alleged discrimination or retaliation.  *Id.* at 15-16.

Defendants further contend that they had a legitimate, non-discriminatory, and non-retaliatory reason for terminating Plaintiff – to wit, her alleged attempt to extort money from Gilman under the threat of a false discrimination charge.  *Id.* at 17.

Finally, Defendants argue that Plaintiff cannot establish a hostile work environment claim under Section 1981 or NYSHRL, as there is no evidence Plaintiff subjectively perceived the allegedly offensive conduct to be so offensive, abusive, or harassing as to create a hostile work environment, Plaintiff did not make any complaints, and no rational jury could reasonably find that the conduct was sufficiently pervasive as to alter the conditions of her employment.  *Id.* at 18-22.  Defendants also argue that Plaintiff cannot establish Gilman or Raphael's liability for any such conduct by Gilman employees.  *Id.* at 22-23.

### ii.  Plaintiff's Response to Defendants' Motion for Summary Judgment and Plaintiff's Cross Motion for Partial Summary Judgment

In response to Defendants' motion, Plaintiff first argues that her evidence allows the Court to enter judgment in her favor for her claim of retaliatory termination, as she was fired by Raphael immediately after she engaged in protected activity of complaining about discrimination based on her race.  ECF No. 61 at 2-4.  She further argues that Defendants' claim that Raphael fired her due to his fears of blackmail is too speculative to be credited.  *Id.* at 4.  In the alternative, she argues that if the Court does not grant her motion for summary judgment as to retaliation, the Court should deny Defendants' motion for summary judgment on this issue.  *Id.* at 6.  She explains that her protected activity was in good faith and that Defendants fail to offer a non-retaliatory reason for her termination.  *Id.* at 6-11.

Plaintiff also argues that the hostile work environment claims present a triable issue of fact against all Defendants and that the claims can be imputed to Defendants Gilman and Raphael.  *Id.* at 15-19.

Finally, Plaintiff argues that her race discrimination claims present a triable issue of fact under Section 1981 and NYSHRL.  *Id.* at 18-22.

### C.  Plaintiff's Motion to Strike and Defendants' Response

Plaintiff argues that the Lum Declaration should be struck, as it attempts to evade the Court's 25-page limit for a memorandum of law, improperly expands on the facts in the Rule 56.1 Statements, and provides a lengthy argumentative recounting of the facts.  ECF No. 57.  In response, Defendant argues primarily that the Lum Declaration is proper under Local Rule 7.1. ECF No. 62.

## II.    LEGAL STANDARD

### A.    Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court shall consider the parts of the materials in the record, including depositions, answers to interrogatories, and admissions, together with the affidavits or declarations. Fed. R. Civ. P. 56(c).

The movant bears the burden of demonstrating that "no genuine issue of material fact exists." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court must draw all reasonable inferences in the light most favorable to the opposing party. *Oakley v. Dolan,* No. 21-2939, 2023 WL 3263618, at *1 (2d Cir. May 5, 2023) (a court reviewing a motion for summary judgment should examine "the evidence in the light most favorable to, and drawing all reasonable inferences in favor of, the non-movant."). "If, as to the issue on which summary judgment is sought, there is *any* evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Id.* at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82–83 (2d Cir. 2004)).

However, we do not accept Plaintiff's facts to the extent that they are "'blatantly contradicted by the record.'" *Id.* at *1 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  Thus, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at *2 (citing *Scott*, 550 U.S. at 380).

Finally, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

**B.      42 U.S.C. § 1981**

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . . " 42 U.S.C. § 1981(a).  "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id*. § 1981(b).  Subsection (c) "explicitly applies Section 1981 to private discrimination." *Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296, 301 (2d Cir. 2006) (citing 42 U.S.C. § 1981(c)).  Further, "individuals may be held liable under § 1981." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000).  To hold individuals liable, a plaintiff must show "some affirmative link to causally connect the actor with the discriminatory action" and the alleged acts "must be predicated on the actor's personal involvement." *Id*. (internal quotations and citations omitted).

### C.    NYSHRL

New York State Executive Law § 296(1) (as part of the New York State Human Rights Law "NYSHRL") provides that "[i]t shall be an unlawful discriminatory practice . . . for an employer . . . because of an individual's . . . race . . . [or] color . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1).

New York State Executive Law § 296(7) prohibits retaliation in response to opposing discrimination: "[i]t shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."  N.Y. Exec. Law § 296(7).

## III.    DISCUSSION

As set forth herein, the undersigned recommends the following to Judge Seybert:

- Count 1 for racial discrimination pursuant to Section 1981: GRANT Defendant's motion for summary judgment;

- Count 2 for retaliation pursuant to Section 1981: DENY Defendants' motion for summary judgment as to Defendants Gilman and Raphael, but GRANT Defendants' motion for summary judgment as to Defendant Lee Deane;

- Count 3 for racial discrimination pursuant to the NYSHRL: GRANT Defendants' motion for summary judgment;

- Count 4 for retaliation pursuant to the NYSHRL: DENY Defendants' motion for summary judgment as to Defendants Gilman and Raphael, but GRANT Defendants' motion for summary judgment as to Defendant Lee Deane;

- Count 5 for a hostile work environment claim pursuant to Section 1981: DENY Defendants' motion for summary judgment;

- Count 6 for a hostile work environment claim pursuant to the NYSHRL: DENY Defendants' motion for summary judgment; and

- Deny as moot Plaintiff's motion to strike the Lum Declaration.

**A.    Disputed Facts**

Before analyzing the legal arguments at issue, the Court notes a significant number of material factual disputes.

### i.   Factual Dispute Regarding Plaintiff's Emails and Complaints from August to October 2018

First, the Court finds clearly disputed material facts regarding Plaintiff's late summer and early fall 2018 emails to Lee Deane and her complaints to Lee Deane, D'Addario, and Raphael. As noted previously, Plaintiff claims that on August 23, 2018 and October 2, 2018, she sent emails to Lee Deane complaining about racial discrimination at Gilman.  ECF No. 60 ¶¶ 92-26; 101-102.  However, Lee Deane denies receiving or reading these emails which were sent to an email address that includes his name.  *Id.*  Thus, the parties dispute the timeline, the substance, and whether Lee Deane received these 2018 emails.  *Id.* ¶¶ 138-142.

The parties also disagree about whether D'Addario would have raised Plaintiff's concerns with Raphael.  *Id.* ¶¶ 91-92.  Notably, Raphael contends that neither Lee Deane nor D'Addario ever told him that Plaintiff complained to them about discrimination.  *Id.* ¶ 103.  The Court also notes several disputes regarding whether Plaintiff properly raised her complaints and

whether a properly functioning system even existed for employees to express such concerns at Gilman. *See id.* ¶ 91.

### ii. Factual Dispute as to the Meaning of Plaintiff's Use of the Words "The Girls," "Women," and "Ladies"

A clear material fact dispute also exists as to Plaintiff's references to "the girls," "women," and "ladies" in her relevant emails. Plaintiff contends that these are references to "non-white" female employees, and Kumar testified that "girls" refers to the four building administrators (Plaintiff, Kumar, Varghese, and Donna Deane) in 2017, all of whom were people of color. *Id.* ¶¶ 20, 89, & 98.

### iii. Factual Dispute as to the October 3, 2018 Discussions Between Plaintiff and Raphael

Significant material disputes exist as to what occurred between Plaintiff and Raphael in his office on October 3, 2018.

Plaintiff and Raphael appear to dispute whether she complained about the cost of living and health insurance in this meeting (as Plaintiff argues) or whether she also requested another loan from Gilman (as Raphael argues). *Id.* ¶¶ 104 & 107. Notably, no other witness is aware of Raphael's apparent concerns that Plaintiff would blackmail him with allegedly false allegations of racial discrimination. *Id.* ¶¶ 108, 143-45. Furthermore, the post-firing internal emails at Gilman do not provide any explanation for Plaintiff's termination and do not mention the alleged blackmail attempt by Plaintiff. *Id.* ¶¶ 108, 149-52. The parties do agree, however, that it was Raphael's sole decision to terminate Plaintiff. *Id.* ¶ 110. The parties also appear to agree that no one else was in the meeting other than Plaintiff and Raphael. ECF No. 54-1 ¶ 121. While not present for the discussion between Plaintiff and Raphael, Kumar testified that she heard "from 'the girls' Veralize Mercado and Donna Deane (along with Manual Lopez)" that Plaintiff

accused Raphael of being racist, but Kumar later purported to recant this testimony.  ECF No. 60 ¶ 109.

### iv. Factual Dispute Regarding Lee Dean's Alleged "Angry Black Woman" Statements and His Admitted "Stress Meter"

The parties dispute Plaintiff's claims that Lee Deane repeatedly used the phrase "angry black woman" to describe Plaintiff, as well as various other race-based allegations.

Plaintiff alleges that Lee Deane used the term "angry black woman" numerous times over the years, but Lee Deane denies saying it.  ECF No. 60 ¶¶ 31, 33, & 35.  Plaintiff states that Lee Deane used the term "angry black woman" after Plaintiff complained about Blumenthal's comment about welfare, and Blumenthal and Kumar notably provide corroboration about Blumenthal's comment.  *Id.* ¶ 31.  Furthermore, Lee Deane confirmed Plaintiff's allegation that he placed the "stress meter" at Plaintiff's desk, but claimed it was a joke.  *Id.* ¶¶ 36-39; ECF No. 54-1 ¶¶ 40, 46-47; ECF No. 60 ¶ 32.

The Court also notes that Defendants' filings in connection with the pending motions use language and euphemisms about Plaintiff that is strongly similar to the "angry black woman" comment attributed to Lee Deane and further suggests to the Court that a clear factual dispute exists here.  For example, Defendants argue that "Plaintiff had a history of bullying and retaliatory argumentative behavior" (ECF No. 64 at 7), describes her "long-standing argumentative and belligerent approach" (*id.* at 7), and notes that "she speaks her mind no matter how it comes off and no matter to who she is speaking" (*id.* at 22).

Despite these factual disputes about his alleged use of the "angry black woman" phrase, Lee Deane described an argument between Plaintiff and another Black female as like a fight between "two caged dogs" during his deposition.  ECF No. 63 ¶ 137.

### v. Disputed Facts Regarding Gilman Hierarchy and Raphael's Supervisory Role

The Court finds conflicting evidence regarding the roles, titles, and reporting structure at Gilman.

Teppel and Lee Deane apparently were both Vice Presidents and on the "same level" in 2014 according to Raphael's testimony (ECF No. 60 ¶¶ 6-7, 14), but Raphael now contends that Lee Deane is not at the same level as Teppel. *Id.* ¶ 14; ECF No. 54-1 ¶ 30. Further, Raphael claims that Kumar and D'Addario supervised Plaintiff and administrators, but D'Addario and Lee Deane testified that there were no real supervisors other than Raphael. ECF No. 60 ¶ 21. Plaintiff also argues that Plaintiff, Teppel, Colon, and Feliciano are "similarly situated," because Raphael was the "only true supervisor" and there were no job titles at Gilman, but Defendants dispute this. *Id.* ¶¶ 15, 62-63. Notably, Lee Deane testified that Raphael gave assignments directly to administrative employees. *Id.* ¶ 62.

### vi. Disputed Facts Regarding Raphael's Derogatory Comment to Feliciano

The parties dispute whether Raphael previously made a racially derogatory comment to Feliciano (a Hispanic employee) and whether Plaintiff was fired for responding to it by not attending the next lunch meeting of Gilman employees. *Id.* ¶¶ 72-74; ECF No. 54-1 ¶¶ 83-84.

### vii. Disputed Facts Regarding the "Don't Feed the Animal" Sign

The parties appear to dispute the intent behind the "Don't Feed the Animal" sign that was hung on Plaintiff's desk. Plaintiff contends this event occurred and contributed to a hostile work environment, whereas Defendants claim it had nothing to do with race. *Compare* ECF No. 60 ¶ 75 *with* ECF No. 64 at 21.

### viii.   Disputed Facts Regarding Health Insurance Premiums

The parties raise clear factual disputes concerning whether Plaintiff paid more for an individual health insurance plan versus other Gilman employees.  ECF No. 60 ¶ 85.  While Raphael testified that Gilman may have paid for all of Teppel's health insurance, Plaintiff had to pay more for hers.  *Id.* ¶¶ 82 & 85.  Raphael's testimony appears to have shifted on this topic during the course of his deposition.  *Id.* ¶¶ 82 & 86.

### ix.   Dispute Regarding the Black Man in a Hoodie Allegation

Plaintiff states that she was offended by an unknown Gilman employee's fabricated story alleging theft of money by a Black man in a hoodie and that she reported the false story to Raphael.  *Id.* ¶ 132.  D'Addario confirmed hearing this story.  *Id.* ¶ 133.  In one of their submissions to the Court, Defendants dispute the significance of the hoodie story, and argue "[s]o what?"  ECF No. 64 at 21.  The Court finds a disputed material fact as to the significance of this story.

### B.   Analysis

### i.   Race Discrimination Claims Under Section 1981 and NYSHRL

The Court analyzes Plaintiff's Section 1981 and NYSHRL race discrimination claims under the three-step burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  "Under that familiar test, a plaintiff must first make out a *prima facie* case by showing that: (1) she is a member of a protected class; (2) she was qualified for and satisfactorily performing her job; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse action raise an inference of discrimination."  *Zheng-Smith v. Nassau Health Care Corp.*, 486 F. Supp. 3d 611, 621 (E.D.N.Y. 2020), *aff'd*, No. 20-3544-CV, 2021 WL 4097316 (2d Cir. Sept. 9, 2021) (citing *McDonnell Douglas*, 411 U.S. at 802).  "Once

a plaintiff makes a *prima facie* showing, 'discriminatory animus is presumed and the burden shifts to defendant to articulate a legitimate non-discriminatory reason for the employment decision. If defendant does so, the plaintiff must show that the articulated non-discriminatory reason for defendant's action is in fact a pretext for discrimination.'" *Id.* (citing *Jetter v. Knothe Corp.*, 324 F.3d 73, 75 (2d Cir. 2003)). Then, "[t]o successfully rebut a defendant's non-discriminatory rationale, 'the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination.'" *Id.* (citing *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

Applying this standard to both Plaintiff's Section 1981 and NYSHRL discrimination claims, the Court finds that Plaintiff has not established a *prima facie* case for discrimination, as she fails to identify a clear adverse employment action or an inference of racial discrimination. First, the court agrees with Defendants that Plaintiff has not identified similarly situated employees for comparison as related to her health insurance premiums claim. Teppel, D'Addario, and Blumenthal are not similarly situated employees, as they held different positions at Gilman or were not on comparable health insurance plans in comparison to Plaintiff. *See* ECF No. 60 ¶¶ 82-87. With respect to claims for company perks, reimbursements, rental apartments, or work duties, the Court does not find any credible evidence on the record for which a reasonable jury could find any discriminatory intent or motive. In considering Plaintiff's numerous other allegations, the Court does not find these to rise to adverse employment actions that were done as a result of her race. *See Abalola v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 1:20-CV-6199-GHW, 2022 WL 973861, at *9 (S.D.N.Y. Mar. 30, 2022) (granting Defendant's

motion for summary judgment on Section 1981 discrimination claims where the facts were not sufficient to find an adverse employment action based on a discriminatory intent).

Defendants also cite Plaintiff's 2018 termination as a separate discriminatory act. However, the Court does not find evidence from the record to suggest Plaintiff was terminated *because* of her race or a clear racially discriminatory intent. Although a jury could find her termination was because of her *complaints* of race discrimination *(see infra* Section III.B.ii.*)*, a reasonable jury could not find that her termination was *motivated* by racial discrimination. *See Claud v. Brown Harris Stevens Residential Sales, LLC*, No. 18-CV-1390 (DRH) (AKT), 2020 WL 3791851, at *8 (E.D.N.Y. July 7, 2020) (granting summary judgment on discrimination claims, but denying summary judgment on retaliation claims where an employee raised claims of race discrimination resulting in termination); *Gomez v. Metro. Dist.*, 10 F. Supp. 3d 224, 241 (D. Conn. 2014) (finding sufficient evidence to suggest Plaintiff was terminated for engaging in a protected activity, but finding insufficient evidence to find the termination was motivated by racial discrimination).

Therefore, the Court recommends that Plaintiff's claims for race discrimination pursuant to Section 1981 and NYSHRL be dismissed as to all Defendants (Gilman, Raphael, and Lee Deane).

### ii.  Retaliation Claims Under Section 1981 and NYSHRL

"'In order to defeat a motion for summary judgment addressed to a claim of retaliation . . . plaintiff must first present sufficient evidence to make out a *prima facie* case, that is, evidence sufficient to permit a rational trier of fact to find (1) that she engaged in protected participation . . . , (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the

adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.'"

*Zheng-Smith*, 486 F. Supp. 3d at 625 (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir.

2001)); *see Lopez v. White Plains Hosp.*, No. 22-817, 2022 WL 19835765, at *1 (2d Cir. May

16, 2022).  Additionally, "[t]he court employs the same analysis for claims under NYSHRL." *Id.*

(citing *Ideyi v. State Univ. of New York Downstate Med. Ctr.*, 09-cv-1490 (ENV), 2010 WL

3938411, at *6 (E.D.N.Y. Sept. 30, 2010)).

The Court finds a clear dispute of fact exists as to the retaliation claim and, as a result,

Defendants' motion should be denied as to Defendants Gilman and Raphael, but granted as to

Defendant Lee Deane.  Although numerous disputes exist as to exactly what occurred at the

October 3, 2018 meeting attended by only Plaintiff and Raphael, Plaintiff has provided more

than sufficient facts to plausibly allege that she was fired moments after complaining about

discrimination against her as a Black woman.  ECF No. 60 ¶ 107.  Furthermore, the Court finds

sufficient evidence that Plaintiff acted in good faith, given her numerous purported emails

complaining about potentially unequal treatment in the months leading up to the October 3, 2018

meeting in Raphael's office.  *Id.* ¶¶ 88-101.  At the same time, summary judgment in Plaintiff's

favor would be inappropriate, as Defendants allege a plausible non-retaliatory motive –

specifically, Raphael's purported concern about alleged blackmail.

With respect to Defendant Lee Deane, the Court does not find that he had any sufficient

level of involvement or supervisory authority over Plaintiff to support a claim for retaliation

associated with her firing in Raphael's office.  *See Whidbee v. Garzarelli Food Specialties, Inc.*,

223 F.3d 62, 75 (2d Cir. 2000) (in order to hold individuals liable, a plaintiff must show "some

affirmative link to causally connect the actor with the discriminatory action" and "must be

predicated on the actor's personal involvement"). It is undisputed that Lee Deane was not present in Raphael's office when Raphael terminated Plaintiff's employment at Gilman.

As a result, the Court recommends Judge Seybert deny the cross motions as to Plaintiff's retaliation claims as to Defendants Gilman and Raphael and allow these claims to proceed. However, the Court recommends that Judge Seybert grant Defendants' motion as to Defendant Lee Deane as to retaliation and dismiss these counts against him.

### iii. Hostile Work Environment Claims Pursuant to Section 1981 and NYSHRL

Plaintiff asserts hostile work environment claims pursuant to Section 1981 and the NYSHRL. "As with discrimination, analyses of hostile work environment claims under federal and New York law are coextensive." *Zheng-Smith*, 486 F. Supp. 3d at 623 (citing *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 670 (S.D.N.Y. 2012)). In considering such claims, "courts use a totality of the circumstances approach for determining whether a plaintiff's work environment is sufficiently hostile to support a hostile work environment claim." *Love v. City of New York Dept. of Consumer Affairs*, 390 F. Supp. 2d 362, 371 (S.D.N.Y. 2005). Such claims must first show that "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and second that 'a specific basis exists for imputing the conduct that created the hostile work environment to the employer.'" *Id.* (citing *Howley v. Town of Stratford*, 217 F.3d 141, 153-54 (2d Cir. 2000)). "In evaluating whether a workplace is hostile, courts consider several factors including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, as opposed to merely an offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Id.* (citing *Terry*, 336 F.3d at 148).

In evaluating Defendant's summary judgment motion, the Court notes Plaintiff's numerous relevant allegations, including, but not limited to, (1) Lee Deane repeatedly calling Plaintiff an "angry black woman," (2) Lee Deane creating a "stress meter" for only Plaintiff, (3) Raphael's use of a racially derogatory term and firing of Plaintiff because she did not want to attend company lunches due to his conduct, (4) an employee's story about being scared by a Black man in a hoodie, and (5) placement of the "don't feed the animal sign" at Plaintiff's desk. *See* ECF No. 60 at 14-20. As noted, there are numerous factual disputes with respect to these allegations (many of which Defendants deny), but these allegations are sufficient to potentially result in a jury finding of a hostile work environment. *See Crawford v. ExlService.com, LLC*, No. 16 CIV. 9137 (LAP), 2019 WL 5887214, at *2 (S.D.N.Y. Nov. 12, 2019) (denying defendants' summary judgment motion, where Plaintiff cited "a few sex-related comments by managers, the company's skewed diversity ratio, [Plaintiff] and another employee's impressions that the company favored Indian men over non-Indian women, and a laundry list of instances in which [Plaintiff] claims she was treated worse than her male Indian counterparts"); *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 397 (S.D.N.Y. 2019) (denying defendant's summary judgment motion where Plaintiff referenced "Defendant['s] derogatory comments toward Plaintiff and other Hispanic women, admonishments of Plaintiff speaking Spanish and practice of assigning multiple one-on-one patients at the same time").

Additionally, these claims could potentially be imputed on Gilman and Raphael, as a jury could find that Gilman failed to provide a reasonable avenue for complaints or that Raphael was aware of these complaints. *See Murray v. N.Y. Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) (stating that an employer may be liable for harassment by subordinates if "the employer has either provided no reasonable avenue for complaint or knew of the harassment but

did nothing about it"); *Watkins v. New York City Transit Auth.*, No. 16 CIV. 4161 (ER), 2020 WL 1888839, at *8 (S.D.N.Y. Apr. 16, 2020), *aff'd*, No. 19-286-CV, 2021 WL 2099229 (2d Cir. May 25, 2021) (finding that an employer could be vicariously liable for harassment of an employee when " the employer 'provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'"). Here, there are clear factual disputes as to whether Raphael was on notice of Plaintiff's complaint or whether Gilman provided an adequate avenue for employees to raise such complaints.

As a result, the Court recommends that Judge Seybert deny Defendants' motion for summary judgment as to the hostile work environment claims under Section 1981 and the NYSHRL.

### iv. Motion to Strike

The Court recommends denying as moot Plaintiff's motion to strike the Lum Declaration, as the Court has not considered the facts or allegations therein when granting Defendants' motions for summary judgment on Counts 1, 3, and 4 as to Defendant Lee Deane. Additionally, "the court is preferable to decide cases on the merits, rather than on possible procedural errors. It exercises its discretion to consider the records as evidence." *Lopez v. Hollisco Owners' Corp.*, 147 F. Supp. 3d 71, 79 (E.D.N.Y. 2015), *aff'd*, 669 F. App'x 590 (2d Cir. 2016).

## IV. CONCLUSION

For the above reasons, the Court recommends that Judge Seybert grant in part and deny in part Defendants' motion for summary judgment, deny Plaintiff's partial motion for summary judgment, and deny the motion to strike as moot.

## V. OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2), the parties shall have fourteen (14)

days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a) & (d) (addressing computation of days).  Any requests for an extension of time for filing objections must be directed to Judge Seybert.  FAILURE TO FILE TIMELY OBJECTIONS SHALL CONSTITUTE A WAIVER OF THOSE OBJECTIONS BOTH IN THE DISTRICT COURT AND ON LATER APPEAL TO THE UNITED STATES COURT OF APPEALS.  *See Thomas v. Arn*, 474 U.S. 140, 154-55 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *F.D.I.C. v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995).


Dated: Central Islip, New York
      July 27, 2023

**SO ORDERED**:

/s/ Lee G. Dunst
LEE G. DUNST
United States Magistrate Judge

33